UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**FILED**

2001 NOV -1  P 4 06

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

IN RE: DISPOSABLE CONTACT
LENS ANTITRUST LITIGATION

MDL Docket
No. 1030

---

### FINAL O R D E R AND JUDGMENT APPROVING SETTLEMENT WITH, AND DISMISSING ACTIONS AGAINST, JOHNSON & JOHNSON VISON CARE, INC., BAUSCH & LOMB, INC., AMERICAN OPTOMETRIC ASSOCIATION, AND AMERICAN OPTOMETRIC ASSOCIATION DEFENDANTS

On September 5, 1996, the Court, after briefing and argument, certified a consumer class in the Class Action consisting of: "All purchasers of Vistakon, Bausch & Lomb, and CIBA replacement contact lenses from eye care practitioners during the period 1988 to the present, excluding consumers in Florida represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-Civ-J-20" (the "Litigation Class"), and determined that the class plaintiffs were adequate representatives of the Class and had claims which were typical of those of its members;

By Order dated July 28, 1997 the Court modified the Litigation Class to exclude residents of Georgia and Tennessee;

By Order dated September 20, 2000, and February 28, 2001, the Court preliminarily and finally approved a Settlement Class which included Georgia and Tennessee residents in connection with a prior partial settlement between the plaintiffs and CIBA Vision Corporation.

By Order dated May 22, 2001, the Court approved a notice of proposed settlement with all remaining defendants and a plan for the dissemination of that notice and such dissemination

-1-

1320

was completed on July 22, 2001 which involved Defendant Johnson & Johnson Vision Products,

Inc., now known as Johnson & Johnson Vision Care, Inc. ("Johnson & Johnson" or "Vistakon"),

defendant American Optometric Association ("AOA"), defendant Bausch & Lomb Incorporated

("Bausch & Lomb"), and the individual defendants: L. Edward Elliot, John A. Gazaway, Richard

Hopping, Earle Hunter, Timothy Kime, Paul Klein, James C. Leadingham, Melvin Remba, Lee

Rigel, Ronald Snyder, Jack Solomon, William David Sullins, Jr., and Stanley Yamane

("Individual Defendants"); the plaintiffs, both individually and in their capacities as class

representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-

20C, 94-635-CIV-J-20 and 94-780-CIV-J-20 (collectively, the "Class Action"); the plaintiff, both

individually and in her capacity as a putative class representative ("Downey/Washington") and

her counsel, in Civil Action No. 94-1215-CV-J-20 (the "Downey/Washington Action") pending

in MDL 1030; the plaintiff, both individually and in his capacity as a putative class

representative ("Morris") and his counsel, in Civil Action No. 94-1214-CV-J-20 (the "Morris

Action") pending in MDL 1030; the plaintiff-states of Alabama, Alaska, Arizona, Arkansas,

California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland,

Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota,

Ohio, Oregon, Texas, Utah, West Virginia, and Wisconsin, and the Commonwealths of

Massachusetts, Pennsylvania, and Virginia (collectively, the "States"), in their capacities as

sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and on

behalf of the States' economies and general welfare in Civil Action No. 97-299-CIV-J-20A, 97-

698-CIV-J-21C, 97-861-CIV-J-20A, 97-928-CIV-J-20A, 98-93-CIV-J-21A, 98-511-CIV-J-21B,

98-515-CIV-J-21C, 98-536-CIV-J-20A, and 98-638-CIV-J-21A (the "States Action"); and the

State of Florida ("Florida"), as sovereign, as *parens patriae* on behalf of natural persons for whom Florida may act, and on behalf of Florida's economy and general welfare in Civil Action No. 94-619-CIV-J-20 (the "Florida Action").  To resolve these cases the parties entered into four separate Settlement Agreements: 1) filed April 23, 2001 with Johnson & Johnson , 2) February 16, 2001 with Bausch & Lomb, 3) May 22, 2001 with both the AOA, and the Individual Defendants (the "Settlement Agreements"); The Settlement Agreement as to Johnson & Johnson is attached as Exhibit A.  The Settlement Agreement as to Bausch & Lomb is attached as Exhibit B.  The Settlement Agreement as to the AOA is attached as Exhibit C.  The Settlement Agreement as to the Individual Defendants is attached as Exhibit D.  These settlement agreements are incorporated herein and made a part of this Order and judgment.

The class plaintiffs, the States, Florida, Morris, Downey/Washington, the Individual Defendants, Bauch & Lomb, the AOA, and Johnson & Johnson have moved for final approval of the Settlement Agreements (Doc. No. 1275, filed August 24, 2001; Doc. No. 1278, filed August 24, 2001; and Doc. No. 1282, filed August 24, 2001) and, on that basis, dismissal of the claims against the AOA, the Individual Defendants, Bausch & Lomb, and Johnson & Johnson in the Class Action, Morris Action, Downey/Washington Action, Florida Action, and the States Action.

A hearing was held on September 7, 2001, to determine the fairness, reasonableness and adequacy of these Settlement Agreements;

**IT IS HEREBY ORDERED AND ADJUDGED**:

1.      For purposes of this Final Order and Judgment, the following terms have the following meanings:

(a)      The term "alternative channel of distribution" means any mail order

-3-

company, pharmacy, buying club, department store, mass merchandise outlet or other appropriate distribution alternative which does not require that an eye care practitioner (as defined herein), either available on, or side-by-side to, its premises, examine the purchaser's eyes in connection with the sale of contact lenses.

(b)     The term "Settlement Class" means all purchasers of Vistakon, Bausch & Lomb and CIBA Vision replacement contact lenses from eye care practitioners during the period 1988 to the present excluding consumers in Florida represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-Civ-J-20.

(c)     The term "Settlement Class member" means a member of the Settlement Class.

(d)     The term "contact lens" means a medical device made of plastic that is placed on the eye.

(e)     The term "eye care practitioner" means an optometrist, ophthalmologist, or optician, including, but not limited to, any such person employed by or associated with a retail optical store (as defined herein).

(f)     The term "Florida resident" means any natural person who was a resident of the State of Florida at the time he or she, or someone on his or her behalf, purchased Johnson & Johnson, CIBA Vision, and/or Bausch & Lomb contact lenses.

(g)     The term "purchasers of Vistakon, Bausch & Lomb and CIBA Vision replacement contact lenses from eye care practitioners" means any natural person who bought, or on whose behalf someone bought, Johnson & Johnson, CIBA Vision, and/or Bausch & Lomb replacement contact lenses (as defined herein) from an eye care practitioner (as defined herein).

(h)     The term "replacement contact lenses" means contact lenses that are sold or dispensed to replace the initial contact lenses.

(i)     The term "retail optical store" means a store or a chain of stores that sells contact lenses to consumers and employs or has associated an eye care practitioner either available on, or side-by-side to, its premises to examine the purchaser's eyes in connection with the sale of contact lenses, including all stores or chains of stores to which  Johnson & Johnson, CIBA Vision, and/or Bausch & Lomb or their authorized distributors sold contact lenses.

(j)     The term "State resident" means any natural person who was a resident of any State at the time he or she, or someone on his or her behalf, purchased Johnson & Johnson, Bausch & Lomb, and/or CIBA Vision contact lenses.

2.     The Court has personal jurisdiction over the parties and has subject matter jurisdiction over the Class Action pursuant to 28 U.S.C. §§1331 and 1337 and over the Florida and States Action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and over the Morris Action and Downey/Washington Action pursuant to 28 U.S.C. §1331.

3.     The Court finds that the plan for dissemination of notice, preliminarily approved and completed pursuant to an Order dated May 22, 2001, satisfies the requirements of Fed. R. Civ. P. 23(e), 15 U.S.C. §15c(c) and the Due Process Clause of the United States Constitution.

4.     Pursuant to Fed. R. Civ. P. 23(e) and 15 U.S.C. §15c(c), the Court finds that the Settlement Agreements are fair, reasonable and adequate, and in the best interests of Settlement Class members, State residents and Florida residents.  The Court carefully considered all of the objections filed in this case, including the objections made by those who sought to intervene, and whose intervention was denied in previous Orders (Doc. No. 1316, filed October 17, 2001, and

Doc. No. 1318, filed October 30, 2001).  The objections are overruled because the Court finds

the Settlement Agreements to be fair and reasonable without allowing for excessive attorney fees

and under the circumstances provides reasonable and fair relief for the reasons states below to

current users of contact lenses and to those who no longer wear contact lenses.

Accordingly, the Settlement Agreements are finally approved.  In considering whether

the settlement is fair, reasonable, and adequate, the Court specifically considered seven factors

and found that all seven of the factors were satisfied.

a.      Absence of Collusion - There is no evidence before the Court that

would suggest the proposed settlements are the result of any collusion among the parties or their

counsel.  In fact, the record is to the contrary.  Throughout the litigation, counsel on both sides

aggressively and zealously pursued the interests of their respective clients.  Each settlement was

negotiated over an extended period of time during which experienced counsel adamantly

advanced their respective positions.  All settlement negotiations involved good-faith bargaining

conducted at arms' length.  Moreover, the Court supervised the settlement reached between

plaintiffs and J&J during the middle of the trial.  Under these circumstances there can be no

doubt that the settlements were achieved without collusion.

b.      The Likelihood of Success at Trial and the Range of Potential

Recovery - Neither plaintiffs nor defendants were guaranteed success at trial.  Both sides had an

enormous burden of explaining a complex antitrust lawsuit, and the plaintiffs had the burden of

establishing a conspiracy or conspiracies and an adverse market impact as a result of the

conspiracies.  After five weeks of trial, the Court is convinced from what is saw and heard up to

that point that the jury could have reasonably found for either side.  Plaintiffs' recovery is clearly

much more certain in light of the settlement.  The cash and benefits packages portion of the settlements before the Court are valued at $85,565,888.00.  When added to the CIBA settlement, the total recovery for plaintiffs equals $90,565,888.00 plus interest that has been earned on the deposited cash portions of the proposed settlements (which equals approximately $92 million). In addition, the injunctive relief requiring a change in distribution policies is at least, if not more, valuable than the cash and coupon components of the settlement for the plaintiffs.  These provisions alter the distribution policies of the manufacturers.  Although difficult to quantify, plaintiffs anticipate that these changes will result in very considerable savings for class members in the future.  Plaintiffs' damages expert testified that damages for the relevant period are $355.85 million.  The settlement provides an immediate and certain recovery of approximately twenty five percent of estimated damages and eliminates the risk of no recovery.  After weighing the likelihood of success at trial and on subsequent appeals against the substantial and immediate gains available from the settlements, the balance weighs heavily in favor of approval of the settlements.

        c.     <u>The Complexity, Expense, and Duration of the Litigation</u> - Given the size of the national plaintiff class of twenty three million, the number of plaintiff states, and the inherent complicated nature of the subject matter of the litigation, it is clear that this litigation is very intricate, expensive, and likely to last for an extended period of time.  Plaintiffs include a nationwide class of consumers as well as the attorneys general of thirty two states.  Not only is the relationship between the parties complex, but proving the existence and amount of damages as a result of defendants' alleged antitrust violations involve complicated theories and statistical models proffered by experts.  To add to the complexity of the case, there were federal as well as

-7-

numerous state law claims involved.  The Court sua sponte raised the issue of severing the state and federal law claims because they would be too complicated for the jury to understand.  The parties agreed that the jury would only decide the federal claims and the Court would decide the state claims.  They also agreed that if the jury found no liability on the federal claims, then the Plaintiffs agreed to drop the state law claims.  Given the complexity involved in trying numerous state and federal claims, settlement is preferable.

Both sides have also expended a great deal of time and expense in prosecuting and defending this action.  To date, the plaintiffs have spent nearly $8 million in expenses on this case (not including attorneys' fees).  It is unlikely that those expenses would stop or even decrease as the litigation progressed.  It is more likely the expenses would continue to grow, and for these reasons, settlement is preferable.

          d.     <u>The Terms of the Settlements are Fair, Reasonable, and Adequate</u> - The settlements before the Court contain benefits packages as well as cash components and injunctive relief.  These terms of the settlement are fair and reasonable for the following reasons: 1) there is a very high likelihood the coupons will be redeemed because they are for items which contact lens wearers use and must replace on a regular basis; 2) there are generous time limits placed on the use of the coupons; and 3) the benefits packages compare favorably to other promotional coupons, especially those that require a sizable expenditure in order to use them.

The injunctive relief provisions are also fair and reasonable.  Three major manufacturers of contact lenses have agreed to sell and distribute to alternative channels of distribution which means that replacement contact lenses will be available to consumers through alternative, and potentially less expesive, channels.  Although it is difficult to place a dollar value on these

savings, consumers, in most cases, will realize substantial savings as a result of the injunctive relief.

e.   The Procedures Used to Notify Class Members and to Allow them to Present their Views - The dissemination of notice in this case was designed to reach the national class as well as consumers in the plaintiff states. Notices were published in 671 newspapers, including the weekend edition of *USA Today*. The expansive publication program reached a readership in excess of 143 million people. In addition, individual notices were mailed to over 160,000 class members, two settlement internet web-sites have been established, and toll free telephone numbers are availabe to request a copy of the notice.

The long-form notice sets forth the terms of each of the proposed settlements, a description of the claims asserted, the date and time of the fairness hearing, that the attorneys will seek fees and expenses from the cash portion of the settlement, and consumers' rights with respect to the proposed settlements. The short-form notices briefly describe the proposed settlements, the date and time of the fairness hearing, and consumers' rights.

f.   The Judgment of Experienced Counsel Favors Approval of the Settlements - Counsel for all parties endorse the settlement before the Court. The views of the attorneys, while not conclusive, are entitled to significant weight. Counsels' view of the settlement in this case supports the Court's conclusion that the settlement is fair and reasonable.

g.   The Stage of Proceedings at the Time of Settlement - The parties reached settlements at various stages of the case. The settlement with B&L and the Individual Defendants were reached just prior to the start of trial. The settlement with the AOA was reached during the second week of trial. J&J did not settle until after plaintiffs rested and J&J's

motions for directed verdict were denied.  This demonstrates that the parties had ample basis to determine the strengths and weaknesses of their cases prior to settlement.

      5.     In accordance with the terms of the Settlement Agreements (and with the exception of those persons who have opted out of the plaintiff class):

        (a)     All claims asserted against the AOA, the Individual Defendants, Bausch & Lomb, and Johnson & Johnson in this Class Action, Florida Action, Morris Action, Downey/Washington Action, and the States Action are dismissed with prejudice.

        (b)     The Class plaintiffs and all Settlement Class members (both individually in their capacities as class representatives), State residents, Florida residents, Downey/Washington, Morris, and all their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity; the States, in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and on behalf of their economies and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity; and Florida, in its capacity as a sovereign, as *parens patriae* on behalf of natural persons for whom it may act, and on behalf of its economy and general welfare, and anyone acting on their behalf, including in a representative or derivative capacity, release and forever discharge Johnson & Johnson, Bausch & Lomb, the AOA, and the Individual Defendants, their present and former parents, subsidiaries, divisions, affiliates, stockholders, benefit plans, officers, directors, employees, agents, and any of their legal representatives, and the predecessors, heirs, executives, administrators, successors and assigns of each of the foregoing (the "Released Parties") from all manner of claims, liabilities, demands, actions, suits and causes of action, for damages, restitution, disgorgement, unjust enrichment,

civil penalties, statutory penalties, injunctive and/or declaratory relief, whether class, individual, representative, or otherwise in nature, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that accrued prior to the date of this Order and that the Class plaintiffs, Settlement Class members, State residents, Florida residents, Downey/Washington, Morris, and the States and Florida ever had, now have or hereafter can, shall or may have, which have been asserted or could have been asserted in the Class Action, States Action, Florida Action, Downey/Washington Action, or Morris Action, including, but not limited to, claims under the Sherman Antitrust Act, 15 U.S.C. §§1 *et seq.* Alabama Restraint of Trade or Production Act, §§8-10-1 *et seq.*, *Code of Alabama* (1975), Alaska Monopolies and Restraint of trade Act, as 45.50.562 Arizona's Uniform State Antitrust Act, A.R.S. §§44-1402 *et seq.*, Ark. Code Ann. §§4-75-201 *et seq.*, California Business and Professions Code §§16700 *et seq.* (including Business and Professions Code §16720), California Business and Professions Code §17200 (including Business and Professions Code §§17203, 17204, 17206.1), Section 35-26 and 35-28 of the Connecticut General Statutes, Sections 35-32, 35-34, 35-35 and 35-38 of the Connecticut General Statutes, the Delaware Antitrust Act, 6 *Del C.* Chapter 21, Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§ 501.201 *et seq.* (including §501.204), Florida Antitrust Act, Florida Statutes §§542.15 *et seq.* (including §542.18), the Idaho Antitrust Law, Idaho Code §§48-101 *et seq.*, Idaho Code §48-603(18) of the Idaho Consumer Protection Act, the Illinois Antitrust Act, 740 I.L..C S. 10/1 *et seq.*, Iowa Competition Law, Iowa Code §§553.1 *et seq.* (including §§553.4, 553.5), Kansas Restraint of Trade Act, KSA 50-101, *et seq.*, Kansas Consumer Protection Act, K.S.A. §§50-623 *et seq.*, Louisiana Rev. Stat. title 51, part IV, §§1401, *et seq.*, Maine Antitrust Statutes, 10 M.R.S.A.

Case 3:94-md-01030-HES   Document 1320   Filed 11/01/01   Page 12 of 147 PageID 10904

§§101, *et seq.*, Maine Unfair Trade Practices Act, 5 M.R.S.A. §§205-A *et seq.* (including §207), Maryland Antitrust Act, Maryland Comm. Law Code Ann. 11-201 *et seq.*, Mass. Gen. Laws Ann. ch. 93 §§1-14A, and ch. 93A, §§2, 4, section 2 of the Michigan Antitrust Reform At, MCL 445.772; MSA 28.70(2), the Minnesota Antitrust Law of 1971, Minn. Stat. §§325D.49-325D.66, the Missouri Antitrust Law, §§416.011 *et seq.*, the Missouri Merchandising Practices Act, §§407.010 *et seq.*, Nevada Unfair Trade Practices Act, NRS CH. 598A.010 *et seq.*, New Jersey Antitrust Act, N.J.S.A. 56:9-3 New York  General Business Law §§340-347, North Carolina Antitrust Act, N.C. Gen. Stat. 75-1, *et seq.* (including §§75-1.1, 75.2), North Dakota's Uniform State Antitrust Act, N.D. Cent. Code §§51-08.1-01 *et seq.* (1995 Supp.), the Ohio Valentine Act, Ohio Rev. Code §§59.1-9.1 *et seq.*, Oregon Antitrust Law, ORS 646.705 *et seq.*, Texas Free Enterprise and Antitrust Act of 1983 Tex. Bus. Com. Code §§15.01, *et seq.*, Utah Antitrust Act Utah Code Ann. §§76-10-911, *et seq.*, the Virginia Antitrust Act, Va. Code §59.1-9.1 *et seq.*, Revised Code of Washington §§19.86 *et seq.* (including §§19.86.030, 19.86.020), the West Virginia Antitrust Act, W. Va. Code §§47-18-1 *et seq.*, the West Virginia Consumer Credit and Protection Act, W. Va. Code §§46A-1-101 *et seq.*, the Wisconsin Trust and Monopolies Law, §§133.03(1), 133.04, 133.16, 133.17 and 133.18, Stats., or any state antitrust, unfair competition, unfair or deceptive trade practices, consumer protection, or similar  law, arising out of or relating to Johnson & Johnson's or Bausch & Lomb's policies, practices, courses of dealing and/or decisions not to sell their contact lenses directly to alternative channels of distribution and/or restrain their authorized distributors from doing so and/or arising out of or relating to allegations that Johnson & Johnson or Bausch & Lomb took any action to limit consumers' ready access to the prescription, work order, or other information a consumer would need to purchase contact

-12-

lenses from alternative channels of distribution (collectively, the "Released Claims").

(c)     The Class Plaintiffs, all Settlement Class members, Morris, Downey/Washington, State residents and Florida residents, their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity, and the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, are hereby permanently enjoined from asserting, instituting or prosecuting, either directly or indirectly, in any suit, action, proceeding or dispute, any Released Claim, in whole or in part, against any Released Party in any state or federal court or other forum.

(d)     With respect to the California state claim, the class plaintiffs, all Settlement Class members, Morris, Downey/Washington, State residents and Florida residents, their successors, heirs and assigns, and the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, are hereby deemed to have waived and released any and all provisions, rights and benefits conferred by §1542 of the California Civil Code, which reads:

> Section 1542. ***General Release; extent.*** A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

and also are deemed to have waived and released any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to §1542 of the California Civil Code. The Class plaintiffs, Morris, Downey/Washington, all Settlement Class members, State residents and

-13-

Florida residents, their successors, heirs and assigns, and the States and Florida and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, may hereafter discover facts other than or different from those which he, she or it knows or believes to be true with respect to the Released Claims, but class plaintiffs, Morris, Downey/Washington, all Settlement Class members, State residents and Florida residents, their successors, heirs and assigns, and the States and Florida and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, are hereby deemed to have expressly waived and fully, finally and forever settled and released any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claim, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other or different facts.

(e)     In accordance with their jurisdiction, Attorneys General for the Plaintiff States agree to continue to administer or enforce their state laws regarding the sale, dispensing and/or furnishing of contact lenses, provided that nothing in this paragraph 5(f) is intended to create a private right of action.

(f)     Nothing in this Final Order and Judgment or the Settlement Agreements is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Johnson & Johnson, Bausch & Lomb, the AOA, or the Individual Defendatns. Nor is it to be construed as the truth of any of the claims or allegations in the Class Action, Florida Action, the States Action, the Morris Action, the Downey/Washington Action, or in any other action in MDL 1030. Neither these Settlement Agreements nor any of their provisions may be offered or received in evidence in any action or proceeding, or otherwise used in any court or other tribunal, as an admission or concession of the merit or lack of merit of any claim against Johnson & Johnson, Bausch & Lomb, the AOA, or the Individual Defendants or of the liability or wrongdoing of any nature on the part of Johnson & Johnson, Bausch & Lomb, the AOA, or the Individual Defendants. The terms of this paragraph do not limit the right of any party to use the Settlement Agreements and this judgment in any proceeding to enforce the terms hereof.

-14-

6.     Without affecting the finality of this Final Order and Judgment, the Court retains exclusive jurisdiction for a period of five years from the date the Settlement Agreements becomes final: (a) over the Settlement Agreements, including their administration, consummation, and enforcement, and in order to determine issues relating to attorneys' fees, costs and expenses and to any distribution of the Settlement Fund to Settlement Class members, State residents or Florida residents; and (b) over Johnson & Johnson, Bausch & Lomb, the AOA, the Individual Defendants, the class plaintiffs, Settlement Class members, Morris, Downey/Washington, State residents, Florida residents, the States and Florida, for the purpose of enabling any of them to apply to the Court at any time for further orders and directions as may be necessary or appropriate for the construction and implementation of the terms of this Final Order and Judgment. The class plaintiffs, Morris, Downey/Washington, the States, Florida, and all Settlement Class members, State residents and Florida residents who did not file a notice with the clerk opting out of the settlement agreements are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding or dispute arising out of or relating to this Final Order and Judgment and/or the Settlement Agreements, including their applicability, and to have irrevocably waived and agreed not to assert by way of motion, defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

7.     The terms and conditions of ¶¶(c) and (d) of this Court's *In Camera* Order dated April 23, 2001 remain in full force and effect. No provision in the Settlement Agreements or in this Order shall be deemed to supersede that *In Camera* Order or to relieve the parties of their obligations under that order, which continues to be an essential condition of the Settlement.

8.     Plaintiffs' counsel attorneys' fees shall be awarded in the amount of $29,000,000.00, which represents approximately 31.5% of the total monetary recovery in this litigation. The Court further awards any unclaimed funds that may remain in the Settlement Fund to Plaintiff States in the following manner: If additional funds become available for distribution, including, for example, accrued interest or funds currently committed to the B&L-

-15-

CIBA dropout fund or for administrative costs, those funds shall revert to Plaintiff States to be used at their discretion for (1) a *cy pres* distribution to appropriate charities; (2) to fund antitrust or public protection enforcement purposes; or (3) as a contribution to the National Association of Attorneys General Milk Fund.  Distribution of any payment by Johnson & Johnson pursuant to § 5(e) of the settlement among Plaintiffs and Johnson & Johnson shall be subject to Court review and approval.

   9. The Court specifically considered the following factors in determining that the fees sought should be awarded in this case:

  a. Time and Labor Required.  The investigation and litigation of this case consumed over nine years and nearly 100,000 hours of attorney and paralegal time.

  b. The Novelty and Difficulty of the Questions Involved.  The case involved novel legal questions, including issues raised by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the effect of state regulatory regimes, the scope of permissible expert testimony, and other complex disputed factual and legal issues.  The case's complexity made it an extremely difficult case both to prove and to present to a jury.

  c. The Skill Requisite to Perform the Legal Service Properly.  The case required extensive legal expertise involving antitrust law and class action law.  Each issue was vigorously contested, and the case was tried for over five weeks.

  d. The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case.  The extensive labor required precluded both the private and public attorneys from working on other matters, including the ability of government counsel to engage in other enforcement matters.

  e. The Customary Fees.  This factor does not apply.

  f. Whether the Fee is Fixed or Contingent.  The fee here was contingent.  The Plaintiffs' attorneys risked nearly $8 million in expenses that were advanced in the prosecution of this case as well as the nearly 100,000 hours of time expended to resolve this case.

  g. Time Limitations Imposed by the Client or the Circumstances.  This factor does not

apply.

h. <u>The Amount Involved and the Results Obtained</u>. The damages claims presented were in excess of $350 million (excluding civil penalties and trebling). The amount recovered exceeds $92 million plus injunctive relief, which requires the major manufacturers of replacement contact lenses, according to the terms of the injunctions, to distribute replacement contact lenses through alternative channels of distribution.

i. <u>The Experience, Reputation, and Ability of the Attorneys</u>. Plaintiffs' counsel had extensive background in handling antitrust class actions and *parens patriae* prosecutions and demonstrated high legal abilities.

j. <u>The "Undesirability" of the Case</u>. The volume of documents, the vigorous defense and difficult legal and factual issues presented made this case undesirable from a plaintiff's perspective.

k. <u>The Nature and Length of the Professional Relationship with the Client</u>. This factor does not apply.

l. <u>Awards in similar cases</u>. The factors discussed justify an upward adjustment of the percentage award from this circuit's benchmark. *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991). In a similar case that went to trial as this case did, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999), the court determined that the benchmark was 30% and adjusted it upward to 33 1/3%. Here the Court settled on 31.5%.

10.     After attorney fees are paid out of the cash portion of the settlement, there is $9,854,000 plus interest remaining for unreimbursed expenses.

a.     The law firm of Milberg Weiss, counsel for plaintiffs, shall receive $739,665.25.

b.     The law firm of Hagens Berman LLP, counsel for plaintiffs, shall receive $386,452.11.

c.     The law firm of Wechsler Harwood Halebian & Feffer LLP, counsel for class plaintiffs, shall receive $97,764.17.

-17-

d.      The law firm of Douglas D. Chunn, P.A., counsel for class plaintiffs, shall receive $4,449.45.

e.      The law firm of Burt & Pucillo, LLP, counsel for plaintiffs, shall recieve $89,371.05.

f.      The law firm of Kohn, Swift & Graf, P.C., counsel for plaintiffs, shall receive $30,687.51.

g.      S. Perry Pendland, Esq., and associates, counsel for plaintiffs, shall receive $15,987.24.

h.      The law firm of Smith Hulsey & Busey, counsel for plaintiffs, shall receive $24,246.56.

i.      The Cuneo Law Group, P.C., counsel for plaintiffs, shall receive $56,208.33.

j.      The law firm of Wolf Haldenstein Adler Freeman & Herz LLP, counsel for plaintiffs, shall receive $49,361.02.

k.      The law firm of Thompson Muraro Razook & Hart, counsel for plaintiffs, shall receive $67,174.39.

l.      The plaintiff states shall receive $2,048,676.67 in expenses.

m.      The state of Florida shall receive $2,458,861.21 in expenses.

n.      The NAAG New York Milk Fund shall receive $129,487.71.

o.      The Plaintiffs' States Cost Share Fund shall receive $1,495,990.69 to be redistributed to the states accordingly to their agreement.

11.     The Court finds, pursuant to Fed. R. Civ. P. 54(b), that there is no just reason for delay, and directs the Clerk to enter this Final Order and Judgment as to Johnson & Johnson, Bausch & Lomb, the AOA, and the Individual Defendants.  All pending motions in this case are terminated.  The clerk shall close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this /st day of November, 2001.

HARVEY E. SCHLESINGER
United States District Judge

Copies to:
Counsel of Record
Garry Randolf
Law Clerk

-19-

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re DISPOSABLE CONTACT LENS ANTITRUST LITIGATION | ) MDL Docket No. 1030 ) |
| ———————————————— | ) SETTLEMENT AGREEMENT WITH ) JOHNSON & JOHNSON VISION CARE, |
| This Document Relates To: | ) INC. ) |
| ALL ACTIONS. | ) ) |
| ———————————————— | ) |



THIS SETTLEMENT AGREEMENT is entered into as of the 23rd day of April, 2001, between (1) defendant Johnson & Johnson Vision Products, Inc., now known as Johnson & Johnson Vision Care, Inc. ("Johnson & Johnson" or "Vistakon"); (2) the State of Florida ("Florida"), in its capacity as sovereign, as *parens patriae* on behalf of natural persons for whom Florida may act, and on behalf of Florida's economy and general welfare in Civil Action No. 94-619-CIV-J-20 (the "Florida Action") pending in *In re: Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL-1030"); (3) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs") and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20, and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in MDL 1030; (4) the plaintiff, both individually and in her capacity as a putative class representative ("Downey/Washington") and her counsel, in Civil Action No. 94-1215-CV-J-20 (the "Downey/Washington Action") pending in MDL 1030; (5) the plaintiff, both individually and in his capacity as a putative class representative ("Morris") and his counsel, in Civil Action No. 94-1214-CV-J-20 (the "Morris Action") pending in MDL 1030; and (6) the plaintiff-States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, the "States") in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and on behalf of the States' economies and general welfare in Civil Action Nos. 97-299-CIV-J-20A, 97-698-CIV-J-21C, 97-861-CIV-J-20A, 97-928-CIV-J-20A, 98-93-CIV-J21A, 98-511-CIV-J-21B, 98-515-CIV-J-21C, 98-536-CIV-J-20A, and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030;

WHEREAS, the Class Action alleges that Johnson & Johnson conspired with Bausch & Lomb Incorporated ("Bausch & Lomb"), and/or CIBA Vision Corporation ("CIBA Vision"), and/or the American Optometric Association ("AOA") and/or the Contact Lens and Anterior Segment Society ("CLASS"), and/or certain individuals not to sell replacement contact lenses (as defined herein) directly to alternative channels of distribution, and to restrain Johnson & Johnson's authorized distributors from reselling such lenses directly to such alternative channels of distribution, with the alleged effect of artificially raising or maintaining the retail prices for Johnson & Johnson, Bausch & Lomb and/or CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution;

WHEREAS, the Florida Action, the Morris Action, and the Downey/Washington Action allege that Johnson & Johnson conspired with Bausch & Lomb, and/or the AOA and/or CLASS, and/or certain individuals not to sell replacement contact lenses (as defined herein) directly to alternative channels of distribution, and to restrain Johnson & Johnson's authorized distributors from reselling such lenses directly to such alternative channels of distribution, with the alleged effect of artificially raising or maintaining the retail prices for Johnson & Johnson and Bausch & Lomb lenses sold to consumers through those companies' authorized channels of distribution and through alternative channels of distribution;

WHEREAS, the States Action (i) alleges that Johnson & Johnson conspired with CIBA Vision, Bausch & Lomb, AOA, CLASS, American Society of Contact Lens Specialists, Society of Eye Care Specialists, Eye Care Management Group, Vision Enhancement Council International, Society of Contact Lens Specialists, National Association of Contact Lens Specialists, the California Optometric Association, Optometric Society of the City of New York, the Wisconsin Optometric Association and/or certain individuals not to sell replacement contact lenses directly to alternative channels of distribution and to restrain Johnson & Johnson's authorized distributors from reselling such

- 2 -

lenses directly to such alternative channels of distribution; and/or to limit consumers' ready access to the prescription, work order, and/or other information a consumer would need to purchase contact lenses from alternative channels of distribution; and/or to form exclusive dealing arrangements between optometrists and contact lens manufacturers; and/or to tie the sale of contact lenses to the sale of vision services, all with the alleged effect of artificially raising or maintaining the retail prices for Johnson & Johnson, Bausch & Lomb and CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution and alternative channels of distribution and (ii) does not seek damages or other relief based on the purchase of contact lenses manufactured by persons or entities other than Johnson & Johnson, Bausch & Lomb, or CIBA Vision;

WHEREAS, Johnson & Johnson denies each and every allegation of unlawful conduct in the Class, States, Florida, Downey/Washington, and Morris Actions;

WHEREAS, on or about September 5, 1996, the Court in MDL 1030, after briefing and argument, certified a consumer class in the Class Action consisting of: "All purchasers of Vistakon, B&L and CIBA replacement contact lenses from eye care practitioners during the period 1988 to the present, excluding consumers in Florida represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-Civ-J-20" (the "Class"), and determined that the class plaintiffs were adequate representatives of the Class and had claims which were typical of those of its members;

WHEREAS, on July 28, 1997, the Court modified its class certification order to exclude consumers residing in Georgia or Tennessee;

WHEREAS, the Class, the States and Florida entered into a settlement agreement with CIBA Vision in May of 1997, which this Court has finally approved ("CIBA Vision Settlement");

- 3 -

WHEREAS, in connection with the CIBA Vision Settlement, the Court approved use of a "Settlement Class" which is defined the same as the Class is defined above, and which includes consumers in Georgia or Tennessee;

WHEREAS, in the States Action and the Florida Action, the States represent State residents (as defined herein) and Florida represents Florida residents (as defined herein) pursuant to 15 U.S.C. §15c;

WHEREAS, the class plaintiffs, the States and Florida and their respective counsel have concluded, after five weeks of trial, that it would be in the best interests of the Settlement Class and the residents of the States (as defined herein) and of Florida (as defined herein) to enter into this Settlement Agreement to avoid the risk and uncertainty of continued litigation, and to assure a benefit to the Settlement Class and residents of the States and of Florida;

WHEREAS, this Settlement Agreement is the result of arm's length negotiations, and the class plaintiffs, the States and Florida and their respective counsel consider this Settlement Agreement to be fair, reasonable, adequate and in the best interests of the Settlement Class and residents of the States and of Florida;

WHEREAS, Johnson & Johnson has concluded that, while denying all wrongdoing and liability, it is in its best interest to enter into this Settlement Agreement to eliminate the expense, inconvenience, burden and inherent risk and uncertainty of continued litigation;

WHEREAS, this Settlement Agreement shall not be deemed or construed as an admission or evidence of any violation of law or any liability or wrongdoing by Johnson & Johnson;

NOW, THEREFORE, it is agreed by the undersigned, on behalf of Johnson & Johnson, the class plaintiffs, the States, Florida, Downey/Washington, and Morris that, subject to the approval of the Court as provided herein, the Class, States, Florida, Downey/Washington, and Morris Actions and all claims of the class plaintiffs,

- 4 -

Downey/Washington, Morris, the States and of Florida, shall be settled, compromised and dismissed with prejudice as to Johnson & Johnson and, except as hereinafter provided, without costs or attorneys' fees, on the following terms and conditions:

1.  **Definitions.** For purposes of this Settlement Agreement only, the following terms have the following meanings:

(a)  The term "alternative channel of distribution" means any mail order company, pharmacy, buying club, department store, mass merchandise outlet or other appropriate distribution alternative that does not require that an eye care practitioner (as defined herein), be either available on or side-by-side to, its premises, and/or examine the purchaser's eyes in connection with the sale of contact lenses.

(b)  The term "Settlement Class" means all purchasers of Vistakon, Bausch & Lomb and CIBA Vision replacement contact lenses from eye care practitioners during the period 1988 to the present excluding consumers in Florida represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-Civ-J-20.

(c)  The term "Settlement Class member" means a member of the Settlement Class.

(d)  The term "contact lens" means a medical device made of plastic that is placed on the eye.

(e)  The term "eye care practitioner" means an optometrist, ophthalmologist, or optician, including, but not limited to, any such person employed by or associated with a retail optical store (as defined herein).

(f)  The term "Florida resident" means any natural person who was a resident of the State of Florida at the time he or she, or someone on his or her behalf, purchased Johnson & Johnson, CIBA Vision, and/or Bausch & Lomb contact lenses.

- 5 -

(g)     The term "purchasers of Vistakon, Bausch & Lomb and CIBA Vision replacement contact lenses from eye care practitioners" means any natural person who bought, or on whose behalf someone bought, Johnson & Johnson, CIBA Vision, and/or Bausch & Lomb replacement contact lenses (as defined herein) from an eye care practitioner (as defined herein).

(h)     The term "replacement contact lenses" means contact lenses that are sold or dispensed to replace the initial contact lenses.

(i)     The term "retail optical store" means a store or a chain of stores that sells contact lenses to consumers and employs or has associated an eye care practitioner either available on, or side-by-side to, its premises to examine the purchaser's eyes in connection with the sale of contact lenses, including all stores or chains of stores to which Johnson & Johnson, CIBA Vision, and/or Bausch & Lomb or their authorized distributors sold contact lenses.

(j)     The term "State resident" means any natural person who was a resident of any State at the time he or she, or someone on his or her behalf, purchased Johnson & Johnson, Bausch & Lomb, and/or CIBA Vision contact lenses.

2.     **Motions for Preliminary Approval**.  On May 22, 2001, at the time of the 3:00 p.m. hearing scheduled in this matter, the class plaintiffs, the States, Florida, Downey/Washington, Morris, and Johnson & Johnson, shall submit motions to the Court requesting preliminary approval of this Settlement Agreement and entry of an order in the form annexed hereto as Exhibit A.

3.     **Plan for Dissemination of Notice**.  Simultaneously with the parties' motions for preliminary approval, the class plaintiffs, the States and Florida shall submit to the Court a plan for dissemination of notice to Settlement Class members, State residents and Florida residents.  The costs of court-approved notice will be paid as described in paragraph 4(a) below.  The form of notice shall be, in relevant part, substantially the same as the form of

- 6 -

notice for the CIBA Vision Settlement. The plan for dissemination of notice shall provide for dissemination of notice at least as broadly as was provided for in the CIBA Vision Settlement. In addition, notice of the Johnson & Johnson Settlement shall be mailed personally to each person who requested notice of the CIBA Vision or Bausch & Lomb Settlements, or who made a claim or otherwise registered for the CIBA Vision or Bausch & Lomb Benefits Package.

4.    **The Settlement Fund**.

(a)    Subject to final approval of this Settlement Agreement under paragraph 12 hereof, in addition to provision of the Benefits Package Fund and Drop-Out Compensation Fund described in paragraphs 5 and 6 hereof and otherwise complying with this Settlement Agreement, Johnson & Johnson agrees to pay $25,000,000 in cash in full, complete and final settlement of the Class Action, the States Action, the Florida Action, the Morris Action, the Downey/Washington Action, all Released Claims (as defined in paragraph 13(a) hereof) and any obligations Johnson & Johnson might otherwise have to pay, including the cost of any notice to Class members, State residents or Florida residents, the payment of claims to Class members, State residents or Florida residents, and the costs of suit, including reasonable attorneys' fees, as approved by the Court pursuant to Fed. R. Civ. P. 23 and 15 U.S.C. §§15, 15c and 26, as follows: Johnson & Johnson deposited $25,000,000 on or before April 30, 2001 in immediately available funds into an escrow account to be maintained by San Diego National Bank (the "Account") which, together with the interest which thereafter accrues in the Account plus any funds deposited in the Account under the terms of paragraph 5(e) shall constitute the Johnson & Johnson Settlement Fund (the "Settlement Fund"). The Settlement Fund will be invested in a money market fund that invests solely in United States Treasury securities that are direct obligations of the United States of America or obligations the principal of, and the interest on which, are unconditionally guaranteed by the United States of America. The Settlement Fund shall be

- 7 -

administered pursuant to the Escrow Agreement annexed hereto as Exhibit B (the "Escrow Agreement"). Except for the payment of Court-approved notice and the fees and costs of administration incurred pursuant to the Escrow Agreement, the Settlement Fund will remain intact until final approval of this Settlement Agreement pursuant to paragraph 12 hereof. Notice cost will be paid ratably from the Bausch & Lomb, AOA and Johnson & Johnson Settlement Funds. The Settlement Fund shall be administered for the benefit of Settlement Class members, State residents and Florida residents as ordered by the Court.

(b)     If at the end of any claim submission period monies remain in the Settlement Fund, net of costs of administration and costs of suit, including reasonable attorneys' fees, as approved by the Court, the remaining amount shall be distributed in a manner, which may include a *cy pres* distribution, and on terms and conditions, determined by the Court in the exercise of its reasonable discretion; provided, however, that Johnson & Johnson shall be given written notice of any application requesting the Court's exercise of discretion pursuant to this subparagraph.

(c)     If, prior to the giving of Court-approved notice, (i) the Court declines to approve this Settlement Agreement preliminarily, (ii) the Court preliminarily approves the Settlement Agreement but withdraws such preliminary approval, or (iii) the Settlement Agreement is terminated pursuant to paragraph 10 hereof, then the Settlement Fund, including all income earned thereon, shall be returned to Johnson & Johnson within ten (10) business days of such event, less only (a) the fees and costs of administration incurred under the Escrow Agreement; (b) any accrued tax liability; and (c) the costs incurred in giving Court-approved notice.

(d)     It is intended that any Federal, State, Municipal, or local taxes due as a result of income earned by, or assets in, the Settlement Fund will be paid from the Settlement Fund. In the event that any Federal, State, Municipal, or local tax liability is finally assessed against and paid by Johnson & Johnson as a result of income earned by, or

- 8 -

assets in, the Settlement Fund, Johnson & Johnson shall be entitled to reimbursement of such payment, including without limitation, interest, penalties, taxes payable by reason of any such reimbursement, and Tax Expenses (as defined in paragraph 17 of the Escrow Agreement attached hereto as Exhibit B), from the Settlement Fund, or shall be indemnified for such payment by the Escrow Agent as set forth in paragraph 17 of the Escrow Agreement.  In all events, Johnson & Johnson shall have no liability or responsibility for taxes or Tax Expenses.  Johnson & Johnson will use all reasonable efforts to resist any such payment of tax liability.  Amounts Johnson & Johnson is required to incur in efforts to resists such payment shall be deemed "Tax Expenses" and shall be reimbursed from the Settlement Fund.

     5.     **The Benefits Package Fund**.

     (a)     Johnson & Johnson will provide to all eligible claimants, as provided in paragraph 5(c) below, a Benefits Package consisting of products and services related to contact lenses. Members of the Settlement Class and State and Florida residents may receive initial notice of the Benefits Package through the plan of dissemination of notice approved by the Court; provided, however, that Johnson & Johnson's obligation to provide the Benefits Package shall be contingent upon the Settlement becoming final pursuant to paragraph 12 hereof. The Benefits Package shall consist of: $50.00 off four or more multipacks, $25.00 off an eye care practitioner visit, plus one (1) additional coupon for $25.00 off a future purchase of four or more multipacks.

     (b)     The costs of administering the Benefits Package Fund shall be borne exclusively by Johnson & Johnson.

     (c)     Any purchaser of any replacement contact lenses manufactured by Johnson & Johnson, Bausch & Lomb, or CIBA Vision from January 1, 1988 through the date of claim will be eligible for a Benefits Package.

(d)     Claims may be made during the 12 months from the date of preliminary Court approval of the Settlement. In the event that the claims made during that period have not reached $30 million, Johnson & Johnson, in its sole discretion, may extend the claims period for an additional six months.

(e)     Johnson & Johnson guarantees that the value of the Benefits Package Fund to claimants will be $30 million. Johnson & Johnson will be credited $100.00 against the guarantee for each person who has registered a claim during the claim period and been sent a Johnson & Johnson Benefits Package. In the event that the value of all credits against the guarantee as calculated above does not reach $30 million, Johnson & Johnson will pay to the Johnson & Johnson Settlement Fund any difference between that value and $30 million within 30 days after the end of the claim period. Nothing in this paragraph shall permit any party to this agreement to describe this Benefits Package Fund as having a value of anything other than $30 million.

(f)     Johnson & Johnson will promote or advertise the availability of the Benefits Package, at its own expense, and in any manner it chooses, provided that the Benefits Package will be made available only to eligible and registered claimants. "Registered" for purposes of the Settlement Agreement and all notices and orders related thereto shall include claimants who register directly by calling the toll free number or through the website, and claimants who have requested a benefits package through Johnson & Johnson's website Acuvue.com or otherwise through a promotion or program sponsored by Johnson & Johnson, for whom Johnson & Johnson has provided names, contact information, and eligibility information to the claims administrator from time to time. No other party to this Settlement shall publicize or advertise the availability of the Benefits Package other than with respect to the initial press announcement and the Court-approved notice. This clause shall not impact the ability of class counsel, counsel for Florida and the

States or the claims administrator to communicate with prospective or actual class members concerning the settlements, including through the Court approved notice program.

6.     **The Drop-Out Compensation Fund.**  Upon presentation of a claim in appropriate form, and with the appropriate documentation of a valid prescription for Vistakon lenses or eye care practitioner verification thereof, Johnson & Johnson will provide $50.00 in Johnson & Johnson product coupons or $35.00 in cash to any person who formerly wore Johnson & Johnson brand contact lenses and who no longer wears contact lenses ("Drop-Outs").  To be eligible for the Johnson & Johnson product coupons or cash payment, claimants must demonstrate eligibility by completing a claim form which includes the claimant's name, address, telephone number, a statement that the claimant wore Johnson & Johnson contact lenses but no longer wears contact lenses, claimant's signature verifying the information above under penalty of perjury, and attaching the appropriate documentation as set forth above in the form of either (1) a copy of a valid written prescription for Johnson & Johnson-brand contact lenses dated on or after January 1, 1988; (2) a copy of a vendor or credit card receipt reflecting purchase of Johnson & Johnson-brand contact lenses on or after January 1, 1988; or (3) a signed statement from an eye care practitioner verifying that the consumer wore Johnson & Johnson-brand contact lenses on or after January 1, 1988. Johnson & Johnson's obligation under this paragraph shall in no event exceed a total of $5 million in value.

7.     **Injunctive Relief**

(a)     Johnson & Johnson will sell and distribute its replacement contact lenses to alternative channels of distribution (as defined in this Settlement Agreement) for a period of five (5) years from the date this Settlement Agreement becomes final under paragraph 12 hereof.

(b)     Subject to subparagraph (a) above, Johnson & Johnson will sell to alternative channels of distribution in a commercially reasonable and non-discriminatory

manner, provided that any such alternative channel of distribution, like any other authorized account, will sell contact lenses only to consumers based upon a valid prescription and in compliance with all federal and state laws and regulations regarding the sale or dispensing of contact lenses, and agrees not to substitute diagnostic lenses for a revenue-producing product.

8.    **Exclusive Remedies**.

(a)    Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided in the Court-approved notice shall look solely to the Benefits Package Fund, Drop-Out Compensation Fund and the Settlement Fund for settlement and satisfaction of all Released Claims, as defined in paragraph 13(a) hereof, as against Johnson & Johnson.

(b)    Except as provided in this Settlement Agreement, Johnson & Johnson shall not be liable for any costs, fees or expenses of the class plaintiffs, the States, Florida, Morris, or Downey/Washington or their counsel, experts, advisors, agents or representatives.

(c)    Because Johnson & Johnson's payment of the Settlement Fund, Benefits Package Fund and Drop-Out Compensation Fund will fully discharge any obligation it may otherwise have with respect to the payment of the costs, expenses and attorneys' fees in the Class, States, Florida, Morris, and Downey/Washington Actions, Johnson & Johnson agrees not to take any position or participate in the fee and expense approval process.

9.    **Non-Signatory States**

(a)    No later than fifteen (15) days after preliminary approval by the Court of this Settlement Agreement, the States and Florida will disclose the general terms and conditions of this Settlement Agreement to each state and commonwealth that is a non-signatory to this Settlement Agreement and the District of Columbia (collectively, the "Non-Signatory States") and shall provide a written invitation to each Non-Signatory State to become a signatory to this Settlement Agreement.  In the event any Non-Signatory State

- 12 -

informs a State or Florida that it intends to investigate, assert or pursue any claim against Johnson & Johnson arising out of or relating to Johnson & Johnson's policy, practice, course of dealing and/or decision not to sell its contact lenses directly to alternative channels of distribution and/or to restrain its authorized distributors from doing so, or on the basis of allegations that Johnson & Johnson took any action to limit consumers' ready access to the prescription, work order, and/or other information a consumer would need to purchase contact lenses from alternative channels of distribution, such State or Florida shall immediately notify Johnson & Johnson of such Non-Signatory State's intention.

(b)     Any Non-Signatory State may subsequently become a party to this Settlement Agreement by signing a copy of the Joinder in Settlement Agreement annexed hereto as Exhibit C no later than three (3) days before the actual publication of the Court-approved dissemination of notice, and then delivering such signed copy to Johnson & Johnson and each other party to this Settlement Agreement in Accordance with paragraph 20 hereof.

10.     **Termination**.  Notwithstanding any other provision hereof, Johnson & Johnson may terminate this Settlement Agreement if prior to the entry of the Final Order and Judgment pursuant to paragraph 12 hereof, any Non-Signatory State commences an action against Johnson & Johnson under federal or state law arising out of or relating to Johnson & Johnson's policy, practice, course of dealing and/or decision not to sell its contact lenses directly to alternative channels of distribution and/or to restrain its authorized distributors from doing so and/or on the basis of allegations that Johnson & Johnson took any action to limit consumers' ready access to the prescription, work order, and/or other information a consumer would need to purchase contact lenses from alternative channels of distribution. In the event Johnson & Johnson exercises its rights to terminate this Settlement Agreement under this paragraph, it shall notify the class plaintiffs, the States, Downey/Washington,

- 13 -

Morris, and Florida within ten (10) business days of receiving notice of the commencement of the Non-Signatory State's action.

     11.    **Entry of Final Order and Judgment**.  If the Court finally approves this Settlement Agreement under paragraph 12 hereof, the class plaintiffs, the States, Florida, Downey/Washington, Morris, and Johnson & Johnson shall jointly request entry of a Final Order and Judgment in the form annexed hereto as Exhibit D.

     12.    **Finality of Settlement**.  This Settlement Agreement shall become final upon the occurrence of all of the following events:

     (a)    It is approved in all respects by the Court as required by Fed. R. Civ. P. 23(e) and 15 U.S.C. §15c(c);

     (b)    Entry, as provided for in paragraph 11 hereof, is made of the Final Order and Judgment (Exhibit D hereto); and

     (c)    The time for appeal or to seek permission to appeal from the Court's approval of this Settlement Agreement as required by subparagraph (a) hereof and entry of a Final Order and Judgment as required by subparagraph (b) hereof has expired or, if appealed, approval of this Settlement Agreement and the Final Order and Judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.  The provisions of Fed. R. Civ. P. 60 shall not be taken into account in determining the times herein.

     13.    **Releases, Covenants Not to Sue, and Judgment Reduction**.

     (a)    Upon this Settlement Agreement becoming final pursuant to paragraph 12 hereof, the class plaintiffs (both individually and in their capacities as class representatives) and all Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided by the Court-approved notice, Downey/Washington, Morris, and all their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity; the States, in their

- 14 -

capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and on behalf of their economies and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity; and Florida, in its capacity as a sovereign, as *parens patriae* on behalf of natural persons for whom it may act, and on behalf of its economy and general welfare, and its assigns, and anyone acting on its behalf, including in a representative or derivative capacity, shall release and forever discharge Johnson & Johnson and its present and former parents, subsidiaries, divisions, affiliates, stockholders, benefit plans, officers, directors, employees, agents, and any of their legal representatives, and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing (the "Released Parties") from all manner of claims, liabilities, demands, actions, suits, and causes of action, for damages, restitution, disgorgement, unjust enrichment, civil penalties, statutory penalties, injunctive, and/or declaratory relief, whether class, individual, representative or otherwise in nature, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that accrued prior to the date of the Court's final approval of this Settlement Agreement as required by paragraph 12 hereof and that the class plaintiffs, Settlement Class members, Downey/Washington, Morris, State residents, Florida residents and the States and Florida ever had, now have or hereafter can, shall or may have, which have been asserted or could have been asserted in the Class Action, States Actions, Florida Action, Downey/Washington Action, or Morris Action, including, but not limited to, claims under the Sherman Antitrust Act, 15 U.S.C. §§1 *et seq.*, Alabama Restraint of Trade or Production Act, §§8-10-1 *et seq.*, Code of Alabama (1975), Alaska Monopolies and Restraint of Trade Act, AS §§45.50.562, Arizona's Uniform State Antitrust Act, A.R.S. §§44-1402 *et seq.*, Ark. Code Ann. §4-75-201 *et seq.*, California Business and Professions Code §§16700 *et seq.*, (including Business and Professions Code §16720), California Business and Professions Code §17200 (including Business and Professions Code §§17203, 17204, 17206.1), Sections

- 15 -

35-26 and 35-28 of the Connecticut General Statutes, Sections 35-32, 35-34, 35-35 and 35-38 of the Connecticut General Statutes, the Delaware Antitrust Act, 6 Del. C. Chapter 21, Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§501.201 *et seq.*, (including §501.204), Florida Antitrust Act, Florida Statutes §§542.15 *et seq.*, (including §542.18), the Idaho Antitrust Law, Idaho Code §§48-101 *et seq.*, Idaho Code §48-603(18) of the Idaho Consumer Protection Act, the Illinois Antitrust Act, 740 I.L.C.S. 10/1 *et seq.*, Iowa Competition Law, Iowa Code §§553.1 *et seq.* (including §§553.4, 553.5), Kansas Restraint of Trade Act, K.S.A. §§50-101. *et seq.*, Kansas Consumer Protection Act, K.S.A. §§50-623 *et seq.*, Louisiana Rev. Stat. title 51, part IV, §§1401, *et seq.*, Maine Antitrust Statutes, 10 M.R.S.A. §§1101, *et seq.*, Maine Unfair Trade Practices Act, 5 M.R.S.A., §§205-A, *et seq.* (including §207), Maryland Antitrust Act, Maryland Comm. Law Code Ann. 11-201, *et seq.*, Mass. Gen. Laws Ann. Ch. 93, §§1-14A, and Ch. 93A, §§2, 4, section 2 of the Michigan Antitrust Reform Act, MCL 445.772; MSA 28.70(2), the Minnesota Antitrust Law of 1971, Minn. Stat. §§325D.49-325D.66, the Missouri Antitrust Law, §§416.011 *et seq.*, the Missouri Merchandising Practices Act, §§407.010 *et seq.*, Nevada Unfair Trade Practices Act, N.R.S. CH. 598A.010 *et seq.*, New Jersey Antitrust Act, N.J.S.A. 56:9-3, New York General Business Law §§340-347, North Carolina Antitrust Act, N.C. Gen. Stat., 75-1 *et seq.* (including §§75-1.1, 75.2), North Dakota's Uniform State Antitrust Act, N.D. Cent. Code §§51-08.1-01 *et seq.* (1995 Supp.), the Ohio Valentine Act, Ohio Rev. Code §§1331.01 *et seq.*, Oregon Antitrust Law, ORS 646.705 *et seq.*, Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. Com. Code §§15.01, *et seq.* Utah Antitrust Act, Utah Code Ann.§§75-10-911, *et seq.* the Virginia Antitrust Act, Va. Code §§59.1-9.1 *et seq.*, Revised Code of Washington §§19.86 *et seq.* (including §§19.86.030, 19.86.020), the West Virginia Antitrust Act, W. Va. Code §§47-18-1 *et seq.*, the West Virginia Consumer Credit and Protection Act, W. Va. Code §§46A-1-101 *et seq.*, the Wisconsin Trust and Monopolies Law, §§133.03(1), 133.04, 133.16, 133.17 and 133.18, Stats., or any state antitrust, unfair

competition, unfair or deceptive trade practices, consumer protection, or similar law, arising out of or relating to Johnson & Johnson's policy, practice, course of dealing and/or decision not to sell its contact lenses directly to alternative channels of distribution and/or to restrain its authorized distributors from doing so and/or arising out of or relating to allegations that Johnson & Johnson took any action to limit consumers' ready access to the prescription, work order, or other information a consumer would need to purchase contact lenses from alternative channels of distribution (collectively, the "Released Claims").

(b)      The class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and on behalf of their economies and general welfare), Morris, Downey/Washington, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity: (i) shall not bring any proceeding to establish liability against any Released Party based, in whole or in part, upon any Released Claim; and (ii) upon this Settlement Agreement becoming final pursuant to paragraph 12 hereof, covenant and agree not to seek thereafter to establish liability against any Released Party based, in whole or in part, upon any Released Claim.

(c)      Nothing in this Settlement Agreement is intended to constitute, or shall be construed as, a release of or a covenant not to sue any party other than the Released Parties.

14.    **Waiver and Released Rights Under California Civil Code Section 1542.**

(a)      Upon this Settlement Agreement becoming final pursuant to paragraph 12 hereof, the class plaintiffs and all Settlement Class members, States residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities

- 17 -

as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare), Downey/Washington, Morris, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, expressly waive and release any and all provisions, rights and benefits conferred by §1542 of the California Civil Code, which provides:

> Section 1542. ***General Release; extent***. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

and also expressly waive and release any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to §1542 of the California Civil Code.

(b)  The class plaintiffs and all Settlement Class members, State residents and Florida residents, Downey/Washington, Morris, their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity, and the States and Florida and their assigns, may, after final approval of this Settlement Agreement pursuant to paragraph 10 hereof, discover facts other than or different from those which he, she or it knows or believes to be true with respect to Released Claims. Nevertheless, upon this Settlement Agreement becoming final under paragraph 12 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, and the States and Florida in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and on behalf of their economics and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, waive and fully, finally and forever settle and release, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other or different facts.

- 18 -

15.    **State Law Enforcement**

(a)    In accordance with their jurisdiction, Attorneys General for the States and Florida agree to continue to administer or enforce their state laws regarding the sale, dispensing and/or furnishing of contact lenses.

(b)    Nothing in this paragraph is intended to create a private right of action.

16.    **Termination by Reason of Court Action**.  In the event that this Settlement Agreement does not become final pursuant to paragraph 12 or is terminated pursuant to paragraph 10 hereof, it shall become null and void and have no force and effect, except as expressly provided otherwise herein.

17.    **Rescheduling of Events in Scheduling Order**.  In the event this Settlement Agreement does not become final pursuant to paragraph 12 or is terminated pursuant to paragraph 10 hereof, the class plaintiffs, the States, Florida and Johnson & Johnson shall use their best efforts to reschedule the trial, in a manner that will reasonably accommodate the litigation interests of the class plaintiffs, the States, Florida and Johnson & Johnson.

18.    **Inadmissibility of Settlement Agreement**.  This Settlement Agreement, including all exhibits, whether or not it becomes final pursuant to paragraph 12 hereof, and any and all negotiations, documents and discussions associated with it, shall not constitute or be construed as an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Johnson & Johnson or of the truth of any of the claims or allegations in the Class Action, the States Action, the Florida Action, the Downey/Washington Action, the Morris Action, or any other action in MDL 1030.  Neither this Settlement Agreement nor any of its provisions may be offered or received in evidence in any action or proceeding, or otherwise used in any court or other tribunal, as an admission or concession of the merit or lack of merit of any claim against Johnson & Johnson or of the liability or wrongdoing of any nature on the part of Johnson & Johnson.  The terms of this

paragraph do not limit the right of any party to use this Settlement Agreement in any proceeding to enforce the terms hereof.

19.    **Return of Johnson & Johnson Discovery Materials**.  The class plaintiffs, the States, Florida, Downey/Washington, Morris and their respective counsel agree that, except as otherwise required by law, all materials produced by, or information discovered of, or records of information discovered of, or produced by, Johnson & Johnson or any of its present or former directors, officers or employees pursuant to the Federal Rules of Civil Procedure or any state law or rule authorizing civil investigation demands, including all copies thereof (collectively, "Johnson & Johnson Materials"), in the possession or control of the class plaintiffs, the States, Florida, Downey/Washington, Morris, or their counsel, experts, consultants or agents shall, within sixty (60) days after the Judgment becomes final, be destroyed or, at the election of the respective plaintiffs, returned to Johnson & Johnson. Counsel for the class plaintiffs, Downey/Washington, and Morris, counsel for the States and counsel for Florida shall provide a written declaration to Johnson & Johnson certifying that all Johnson & Johnson Materials have been destroyed or returned to Johnson & Johnson, as the case may be.

20.    **Notices**.    All notices, demands, requests and other communications (collectively "Notices") given or served by any party in connection with this Settlement Agreement shall be in writing.  Notices shall be given by hand delivery, with receipt, or by nationally recognized overnight courier, with receipt, to each of the following:

Notices to Class Plaintiffs:

Dennis Stewart, Esq.
Joy Ann Bull, Esq.
Milberg Weiss Bershad
  Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, California 92101

George W. Sampson, Esq.
Hagens & Berman
1301 Fifth Avenue, Suite 2929
Seattle, Washington 98101

Stewart D. Wechsler
WECHSLER HARWOOD HALEBIAN
  &amp; FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022

Notices to the States and Florida provided to the persons set forth below on the signature pages of this Settlement Agreement at the addresses set forth on such pages.

Notices to Johnson & Johnson:

Kathryn A. Meisel
Assistant General Counsel
Johnson & Johnson
One Johnson & Johnson Plaza
New Brusnwick, NJ 08933

Margaret M. Zwisler
Robert F. Ruyak
Howrey Simon Arnold & White LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004

21.   **Binding Nature of Agreement**. This Settlement Agreement shall be binding upon, and inure to the benefit of, Johnson & Johnson's successors and assigns, and upon all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, Morris, Downey/Washington, their heirs and assigns, and upon the States and Florida and their assigns.

22.   **Complete Agreement**. This Settlement Agreement and its Exhibits contain the entire, complete, and integrated statement of each and every term and provision agreed to by and among the parties; it is not subject to any condition not provided for herein; and it supersedes all prior agreements between the parties with respect to its subject matter, including, but not limited to, the In Camera Memorandum of Understanding and Order dated as of April 23, 2001. This Settlement Agreement shall not be modified in any respect except by a writing executed by all of the parties.

23.   **Mutual Drafting of Agreement**. None of the parties to this Settlement Agreement shall be considered its drafter for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

- 21 -

24.    **Exclusive Jurisdiction**.  Upon this Settlement Agreement becoming final pursuant to paragraph 12 hereof, Johnson & Johnson, the class plaintiffs and all Settlement Class members, State residents, and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, Morris, Downey/Washington, the States and Florida agree irrevocably for a period of five years from the date the Settlement Agreement becomes final: (i) to submit to the exclusive jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement, including its applicability and enforcement; and (ii) not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, or that such Court is an improper venue or an inconvenient forum.

25.    **Counterparts**.  This Settlement Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

26.    **States Counsel**.  All States acknowledge that the Attorney General of Maryland acting through Assistant Attorney General John Tennis, or such other representative as the Maryland Attorney General may designate in writing, has full and complete authority to enter into the Escrow Agreement attached hereto as Exhibit B, and has full and complete authority to act as "States Counsel" under the Escrow Agreement on each State's behalf.

## ESCROW AGREEMENT

THIS AGREEMENT is made and entered into as of April 23, 2001, by and between (1) Johnson & Johnson Vision Care, Inc. ("Johnson & Johnson"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20 and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, the "States"), in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and on behalf of the States' economies and general welfare on Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A; 97-928-CIV-J-20A; 98-93-CIV-J-21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; (4) the State of Florida ("Florida"), in its capacity as sovereign as *parens patriae* on behalf of natural persons for whom Florida may act, and on behalf of Florida's economy and general welfare in Civil Action No. 94-619-Civ-J-20, pending in MDL-1030; (5) the plaintiff, both individually and in her capacity as a putative class representative ("Downey/Washington") and her counsel, in Civil Action No. 94-1215-CV-J-20 (the "Downey/Washington Action") pending in MDL 1030; (6) the plaintiff, both individually and in his capacity as a putative class representative ("Morris") and his counsel, in Civil Action No. 94-1214-CV-J-20 (the "Morris Action") pending in MDL 1030;(7) Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") (one of co-lead counsel for the class plaintiffs and the Class and for Morris and Downey/Washington and as Escrow Agent (as defined in paragraph 1 herein));

and (8) Howrey Simon Arnold & White LLP ("Howrey Simon") (lead counsel for Johnson & Johnson).

WHEREAS, as of April 23, 2001, Johnson & Johnson, the class plaintiffs, the States and Florida, Morris and Downey/Washington entered into a Settlement Agreement (the "Settlement Agreement");

WHEREAS, the class plaintiffs, the States, Florida, Morris and Downey/Washington, and Johnson & Johnson will seek a Final Order and Judgment (as hereinafter defined) from the Court approving the Settlement Agreement and the dismissal of the Class Action, Florida Action, Morris Action, Downey/Washington Action and the States Action against Johnson & Johnson;

WHEREAS, pursuant to that Settlement Agreement, Johnson & Johnson agreed to deposit the cash consideration for the settlement, *i.e.*, $25,000,000.00 into an escrow account to be maintained at San Diego National Bank ("The Account") on or before April 30, 2001;

WHEREAS, the class plaintiffs, the States, Florida, Morris, Downey/Washington, and Johnson & Johnson have entered into this Escrow Agreement to facilitate the consummation of the Settlement Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.      The class plaintiffs, the States, Florida, Morris and Downey/Washington, and Johnson & Johnson do hereby appoint, constitute and designate Milberg Weiss as their Escrow Agent for the purposes set forth herein, and Milberg Weiss accepts the agency created under this Escrow Agreement and agrees to perform the obligations imposed herein.

2.      As used herein, "Final Order and Judgment" means the Court giving final approval to the Settlement Agreement pursuant to paragraph 12 thereof;

3.      As used herein, "Florida Counsel" shall mean the Attorney General of Florida, acting through Patricia A. Conners, Chief, Antitrust Section, or such other representative as the Florida Attorney General may designate in writing.

4.      As used herein, "States Counsel" shall mean the Attorney General of Maryland acting through Assistant Attorney General John Tennis, or such other representative as the Maryland Attorney General may designate in writing.

5.      From the date of this Escrow Agreement until the Escrow Agent receives joint written instructions from Milberg Weiss, Howrey Simon, Florida counsel and the States Counsel that the Final Order and Judgment has been entered, "Counsel," as used hereinafter, shall mean Milberg Weiss, Howrey Simon, Florida Counsel and States Counsel.  When "Counsel" means Milberg Weiss, Howrey Simon, Florida counsel and States Counsel, instructions, confirmations and authorizations to or from the Escrow Agent must be received from Milberg Weiss, Howrey Simon, Florida counsel and States Counsel.

6.      On April 30, 2001, Johnson & Johnson deposited in the Account by wire transfer $25,000,000.00 (25 million dollars) in immediately available funds which, together with interest which thereafter accrues in the Account, and any further deposits which may be made into the account pursuant to ¶5(e) of the Settlement Agreement shall constitute the "Escrow Fund."

7.      The Escrow Agent shall invest the Escrow Fund in a money market fund which invests solely in United States Treasury securities which are direct obligations of the United States of America or obligations of the principal of and the interest on which are unconditionally guaranteed by the United States of America.  The Escrow Agent may sell or liquidate any of the investments at any time if the proceeds thereof are required for any release of funds permitted or required hereunder, and the Escrow Agent shall not be liable or responsible for any loss, charge, load, premium loss and/or penalty resulting from any such sale or liquidation.  If an investment must be liquidated, the proceeds of the liquidation will not be available for distribution until the Escrow Agent has received immediately available funds from the sale or liquidation of the investment.  Any losses or damages from such liquidation shall be deducted from the Escrow Fund.

8.      All income earned by the Escrow Fund shall be reinvested by the Escrow Agent in accordance with the above-referenced written instructions of Counsel and shall become a part of the Escrow Fund.

9.      Before the Settlement Agreement becomes final, the Escrow Agent is hereby authorized to transfer and distribute funds from the Escrow Fund by check, wire, electronic, or internal process, only in accordance with paragraph 10 hereof and upon such other prior written  authorization from Counsel (as defined in paragraph 5 hereof) as it may receive. Such authorization may be by facsimile transmission or other written communication. Except as provided in paragraph 8 hereof, the Escrow Agent shall disburse no other funds from the Escrow Fund before the Settlement Agreement is final pursuant to paragraph 12 of the Settlement Agreement without prior written authorization of Counsel.

10.     The Escrow Agent is hereby authorized to transfer and distribute funds from the Escrow Fund up to a total amount of $1,500,000, in accordance with ¶4(a) of the Settlement Agreement, for the costs associated with disseminating the Court-approved notice upon receipt of an Order preliminarily approving the Settlement Agreement and an Order approving the form of and plan for dissemination of notice.  Such funds will be used solely for providing the Court-approved notice.

11.     Subject to such other further orders and/or directions as may be made by the Court, after the Settlement Agreement is final, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of the Settlement Agreement or Orders of the Court.

12.     All funds deposited with or held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to an Order of the Court.

13.     In the event of disagreement between Counsel with respect to the distribution of funds from the Escrow Fund, the Escrow Agent shall hold the disputed funds until the disagreement is resolved.

- 4 -

14. Any Federal, State, Municipal or local taxes due as a result of income earned by, or assets in, the Escrow Fund are to be paid from the Escrow Fund by the Escrow Agent. The Escrow Agent shall make all estimated tax payments and make or file any returns or reports relative thereto, upon such confirmations by Counsel as it may request.

15. Johnson & Johnson, Florida Counsel, the States' Counsel and the Escrow Agent agree to treat the Escrow Fund as being at all times as one or more "qualified settlement funds" within the meaning of Treas. Reg. Section 1.468B-1. In addition, the Escrow Agent and, as required, Johnson & Johnson, Florida Counsel and States' Counsel, shall jointly and timely make such elections as necessary or advisable to carry out the provisions of this paragraph 15, including the "relation-back election" (as defined in Treas. Reg. Section 1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent to timely and properly prepare, and deliver the necessary documentation for signature by all necessary parties, and thereunder to cause the appropriate filing to occur.

16. For the purpose of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Escrow Fund (including, without limitation, the returns described in Treas. Reg. Section 1.468B-2(k)(l). Such returns (as well as the election described above) shall be consistent with this paragraph and in all events shall reflect that all taxes (including any interest or penalties) on the income earned by the Escrow Fund shall be paid out of the Escrow Fund.

17. (a) All (i) Federal, State, Municipal or local taxes (including any interest or penalties) due as a result of or arising with respect to the income earned by, or assets in, the Escrow Fund, including, but not limited to, any taxes or tax detriments that may be imposed upon Johnson & Johnson with respect to any income earned by, or assets in, the Escrow Fund ("Taxes") and (ii) expense and costs incurred in connection with the operation

- 5 -

and implementation of this paragraph (including, without limitation, expense of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing or failing to file the appropriate returns) ("Tax Expenses"), shall be paid out of the Escrow Fund by the Escrow Agent.

(b)     In the event any Federal, State, Municipal, or local tax liability is finally assessed against and paid by Johnson & Johnson as a result of income earned by, or assets in, the Escrow Fund, Johnson & Johnson shall be entitled to reimbursement of such payment, including, without limitation, interest, penalties, Tax Expenses, and taxes payable by reason of such reimbursement, from the Escrow Fund.  In that event, Johnson & Johnson shall present proof of payment to the Escrow Agent and, within five (5) business days of receipt, Johnson & Johnson shall be reimbursed for such payment from the Escrow Fund.  In the event of a disagreement between Johnson & Johnson and the Escrow Agent with respect to Johnson & Johnson's reimbursement for payment of Taxes or Tax Expenses pursuant to this paragraph 17, the Escrow Agent shall hold the disputed funds, and shall not pay them out of the Escrow Fund, until the disagreement is resolved.

(c)     In all events, Johnson & Johnson shall have no liability or responsibility for the Taxes or Tax Expenses.  The Escrow Agent shall indemnify and hold Johnson & Johnson harmless for Taxes or Tax Expenses (including, without limitation, taxes payable by reason of any such indemnification).  In the event that any income earned by the Escrow Fund is under applicable Federal, State, Municipal or local income tax laws includible in the taxable income of Johnson & Johnson, the amount of indemnification due hereunder shall be equal to the product of (i) the amount of such income inclusion (increased by any additional amounts includible in income as a result of this indemnification) and (ii) as to Johnson & Johnson, the maximum marginal corporate income or franchise tax rate (before credits) applicable on ordinary taxable income that is imposed under the tax laws of the applicable taxing jurisdiction before net operating loss carryovers for Johnson & Johnson for the taxable year in which indemnification hereunder becomes due and payable.  In the event that any other tax liability is finally assessed against and paid by Johnson & Johnson, and is

- 6 -

not reimbursed from the Escrow Fund but is indemnified by the Escrow Agent, the amount of indemnification due hereunder shall be a dollar-for-dollar reimbursement of all Taxes and Tax Expenses incurred by Johnson & Johnson in connection with the tax liability (including, without limitation, taxes payable by reason of any such indemnification).

(d)     Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of this Escrow Agreement and shall be timely paid by the Escrow Agent out of the Escrow Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to class members or, if necessary, from refund to Johnson & Johnson, any funds necessary to pay such amounts, including the establishment of adequate reserves for any such contingent Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. Section 1.468B-2(1)(2)).

(e)     The parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this paragraph 17.

18.     The Escrow Agent shall be entitled to rely upon the most recent instructions from Counsel as to the names of the persons authorized to instruct the Escrow Agent. Counsel shall provide a list of the signatures of such authorized persons to the Escrow Agent from time to time.

19.     The Escrow Agent shall be protected in acting upon written notice, request, waiver, consent, receipt or other paper document furnished to it by Counsel, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information contained therein, which they in good faith believe to be genuine and what it purports to be.

20.     Should the Escrow Agent receive or become aware of any demands or claims with respect to the Escrow Fund, other than those as contemplated by the Settlement Agreement, they shall have the right to apply to the District Court, on notice to the parties hereto, for appropriate instructions. Upon application to and order of the District Court, on

- 7 -

notice to the parties, the Escrow Agent shall be entitled to reimburse themselves from the Escrow Fund for all costs, damages, judgments and expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with or arising out of their action pursuant to this paragraph with respect to the Escrow Fund.

21.     This Escrow Agreement may not be assigned by the Escrow Agent without prior written approval of the parties hereto; provided, however, that upon thirty (30) days written notice by the Escrow Agent to the parties hereto, the Escrow Agent may resign as Escrow Agent hereunder.  Any assets held by such Escrow Agent under the terms of this agreement as of the effective date of the resignation shall be delivered to a successor escrow agent designated in writing by Counsel.  If no successor agent has been  appointed as of the effective date of the resignation, all obligations of such Escrow Agent hereunder shall nevertheless cease and terminate.  In the event the Escrow Agent resigns and a successor is not appointed as provided in this paragraph, the Escrow Agent's sole responsibility thereafter shall be to keep safely all Escrow Funds held by them and to deliver the same to a person designated by Counsel or in accordance with the direction of a final order or judgment of a court of competent jurisdiction.

22.     This Escrow Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the parties hereto.

23.     This Escrow Agreement will be governed by and construed in accordance with the laws of the State of New York.

24.     For purposes of notice, correspondence and mailing of checks, or wiring of funds, the parties' addresses shall be:

```
MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
DENNIS STEWART
JOY ANN BULL
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058
FAX:  619/231-7423
```

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL
Patricia A. Conners
Chief, Antitrust Section
STATE OF FLORIDA
PL-01 The Capitol
Tallahassee, FL 32399-1050
Telephone: 850/414-3600
FAX: 850/488-9134

J. JOSEPH CURRAN, JR.
ATTORNEY GENERAL
A.A.G. JOHN TENNIS
STATE OF MARYLAND
200 Saint Paul Place
Baltimore, MD 21202-2202
Telephone: 410/576-6474
FAX: 410/576-7830

HOWREY SIMON ARNOLD
 & WHITE LLP
MARGARET M. ZWISLER
ROBERT F. RUYAK
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202/783-0800
FAX: 202/383-6610

25.    All signatories to this Escrow Agreement warrant that they have full and complete authority to enter into and sign this Escrow Agreement on behalf of the entity or person they represent.

26.    This Escrow Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the class plaintiffs, Morris, Downey/Washington, the States, Florida, Johnson & Johnson and the Escrow Agent have caused this Escrow Agreement to be signed as of the 22d day of May , 2001.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re DISPOSABLE CONTACT LENS
ANTITRUST LITIGATION

This Document Relates To:

     ALL ACTIONS.

) MDL Docket No. 1030
)
) SETTLEMENT AGREEMENT
)
)
)
)
)
)

$Ex. B$

THIS SETTLEMENT AGREEMENT is entered into as of the _____ day of February, 2001, between (1) defendant Bausch & Lomb Incorporated ("Bausch & Lomb"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs") and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20 and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re: Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff-States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, with any state or commonwealth, including the District of Columbia, that joins this Settlement Agreement under paragraph 8(b) hereof, the "States") in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and as *parens patriae* on behalf of the States' economies and general welfare in Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A;97-928-CIV-J-20A; 98-93-CIV-J21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; and (4) the State of Florida ("Florida"), as *parens patriae* on behalf of natural persons for whom Florida may act, and as *parens patriae* on behalf of Florida's economy and general welfare in Case No. 94-619-CIV-J-20 (the "Florida Action") pending in MDL-1030;

WHEREAS, the Florida action and the Class Action allege that Bausch & Lomb conspired with Johnson & Johnson Vision Products, Inc. ("Vistakon"), and/or CIBA Vision Corporation ("CIBA Vision"), and/or the American Optometric Association ("AOA") and/or certain individual defendants not to sell replacement contact lenses (as defined herein) directly to alternative channels of distribution ( as defined herein), and to restrain Bausch &

- 1 -

Lomb's authorized distributors from reselling such lenses directly to such alternative channels of distribution, with the alleged effect of artificially raising or maintaining the retail prices for Bausch & Lomb, Vistakon and/or CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution;

WHEREAS, the States Action (i) alleges that Bausch & Lomb conspired with Vistakon, AOA, Contact Lens and Anterior Segment Society, Inc., American Society of Contact Lens Specialists, Society of Eye Care Specialists, Eye Care Management Group, Vision Enhancement Council International, Society of Contact Lens Specialists, National Association of Contact Lens Specialists, the California Optometric Association, Optometric Society of the City of New York, the Wisconsin Optometric Association and/or the twenty individuals in the complaint (collectively, with the individual defendants in the Class Action, the "Non-Settling Defendants") and with CIBA Vision not to sell replacement contact lenses directly to alternative channels of distribution and to restrain Bausch & Lomb's authorized distributors from reselling such lenses directly to such alternative channels of distribution, with the alleged effect of artificially raising or maintaining the retail prices for Bausch & Lomb, Vistakon and CIBA Vision replacement contact lenses sold to consumers through both those companies' authorized channels of distribution and alternative channels of distribution and (ii) does not seek damages or other relief based on the purchase of contact lenses manufactured by persons or entities other than Bausch & Lomb, Vistakon or CIBA Vision;

WHEREAS, Bausch & Lomb denies each and every allegation of unlawful conduct in the Class, States and Florida Actions;

WHEREAS, on or about September 5, 1996, the Court in MDL 1030, after briefing and argument, certified a consumer class in the Class Action consisting of: "All purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners during the period 1988 to the present, excluding consumers in Florida

represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-CIV-J-20" (the "Class"), and determined that the class plaintiffs were adequate representatives of the Class and had claims which were typical of those of its members;

WHEREAS, on July 28, 1997, the Court modified its class certification order to exclude consumers residing in Georgia or Tennessee;

WHEREAS, the Class, the States and Florida entered into a settlement agreement with CIBA Vision in May of 1997, which this Court has preliminarily approved ("CIBA Vision Settlement");

WHEREAS, in connection with the CIBA Vision Settlement, the Court approved use of a "Settlement Class" which is defined the same as the Class is defined above, and which includes consumers in Georgia or Tennessee;

WHEREAS, in the States Action and the Florida Action, the States and Florida represent State residents (as defined herein) pursuant to 15 U.S.C. §15c;

WHEREAS, the class plaintiffs, the States and Florida and their respective counsel have concluded, after extensive discovery and a thorough review of the facts and the relevant law, that it would be in the best interests of the Settlement Class and the residents of the States (as defined herein) and of Florida to enter into this Settlement Agreement in order to avoid the risk and uncertainty of continued litigation against Bausch & Lomb, and to assure a benefit to the Settlement Class and residents of the States and of Florida;

WHEREAS, this Settlement Agreement is the result of arm's length negotiations, and the class plaintiffs, the States and Florida and their respective counsel consider this Settlement Agreement to be fair, reasonable, adequate and in the best interests of the Settlement Class and residents of the States and of Florida;

WHEREAS, Bausch & Lomb has concluded that, despite its denials of wrongdoing and liability, it is in its best interest to enter into this Settlement Agreement to eliminate the expense, inconvenience, burden and inherent risk and uncertainty of continued litigation;

WHEREAS, this Settlement Agreement shall not be deemed or construed as an admission or evidence of any violation of law or any liability or wrongdoing by Bausch & Lomb;

NOW, THEREFORE, it is agreed by the undersigned, on behalf of Bausch & Lomb, the class plaintiffs, the States and Florida that, subject to the approval of the Court as provided herein, the Class, States and Florida Actions and all claims of the class plaintiffs, the States and of Florida, shall be settled, compromised and dismissed with prejudice as to Bausch & Lomb and, except as hereinafter provided, without costs or attorneys' fees, on the following terms and conditions:

1.     **Definitions**.  For purposes of this Settlement Agreement only, the following terms have the following meanings:

(a)     The term "alternative channel of distribution" means any mail order company, pharmacy, buying club, department store, mass merchandise outlet or other distribution alternative which does not require that an eye care practitioner (as defined herein), be either available on or side-by-side to, its premises, and/or examine the purchaser's eyes in connection with the sale of contact lenses.

(b)     The term "Settlement Class" means all purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practictioners during the period 1988 to the present excluding consumers in Florida represented by the Florida Attorney General in State of Florida v. Johnson & Johnson Vision Products, et al., Case No. 94-619-Civ-J-20.

(c)     The term "Settlement Class member" means a member of the Settlement Class.

- 4 -

(d)     The term "contact lens" means a medical device made of plastic that is placed on the eye.

(e)     The term "eye care practitioner" means an optometrist, ophthalmologist or optician, including, but not limited to, any such person employed by or associated with a retail optical store (as defined herein).

(f)     The term "Florida resident" means any natural person who was a resident of the State of Florida at the time he or she, or someone on his or her behalf, purchased CIBA Vision, Bausch & Lomb and/or Vistakon contact lenses.

(g)     The term "purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners" means any natural person who bought, or on whose behalf someone bought, CIBA Vision, Bausch & Lomb and/or Vistakon replacement contact lenses (as defined herein) from an eye care practitioner (as defined herein).

(h)     The term "replacement contact lenses" means contact lenses that are sold or dispensed to replace the initial contact lenses.

(i)     The term "retail optical store" means a store or a chain of stores that sells contact lenses to consumers and employs or has associated an eye care practitioner either available on, or side-by-side to, its premises to examine the purchaser's eyes in connection with the sale of contact lenses, including all stores or chains of stores to which CIBA Vision, Vistakon and/or Bausch & Lomb or their authorized distributors sold contact lenses.

(j)     The term "State resident" means any natural person who was a resident of any State at the time he or she, or someone on his or her behalf, purchased Bausch & Lomb, CIBA and/or Vistakon contact lenses.

2.     **Joint Motion for Preliminary Approval**.  Within five (5) business days of the execution of this Settlement Agreement, the class plaintiffs, Bausch & Lomb, the States

- 5 -

and Florida shall submit a joint motion to the Court requesting preliminary approval of this Settlement Agreement and entry of an order in the form annexed hereto as Exhibit A.

3.      **Plan for Dissemination of Notice**.  Simultaneously with the parties' joint motion for preliminary approval, the class plaintiffs, the States and Florida shall submit to the Court a plan for dissemination of notice to Settlement Class members, State residents and Florida residents.  The costs of court-approved notice will be paid out of the Bausch & Lomb Settlement Fund, as described in paragraph 4 below.  The form of notice shall be, in relevant part, substantially the same as the form of notice for the CIBA Vision Settlement.  The plan for dissemination of notice shall provide for dissemination of notice at least as broadly as was provided for in the CIBA Vision Settlement.  In addition, notice of the Bausch & Lomb Settlement shall be mailed personally to each person who requested notice of the CIBA Vision Settlement, or who made a claim or otherwise registered for the CIBA Vision Benefits Package.

4.      **The Settlement Fund**.

(a)      Subject to final approval of this Settlement Agreement under paragraph 11 hereof and Bausch & Lomb's right of termination under paragraph 9 hereof, in addition to provision of the Benefits Package described in paragraph 5 hereof, Bausch & Lomb agrees to pay $8,000,000 in cash in full, complete and final settlement of the Class Action, the States Action, the Florida Action, all Released Claims (as defined in paragraph 12(a) hereof) and any obligations Bausch & Lomb might otherwise have to pay, including the cost of any notice to Class members, State residents or Florida residents, the payment of claims to Class members, State residents or Florida residents, and the costs of suit, including reasonable attorneys' fees, as approved by the Court pursuant to Fed. R. Civ. P. 23 and 15 U.S.C. §§15, 15c and 26, as follows: upon execution of this Settlement Agreement, Bausch & Lomb shall deposit $8,000,000 in immediately available funds into an escrow account to be maintained by San Diego National Bank (the "Account") which, together with the interest

which thereafter accrues in the Account plus any funds deposited in the Account under the terms of paragraph 5(e) shall constitute the Bausch & Lomb Settlement Fund (the "Settlement Fund"). The Settlement Fund will be invested in a money market fund that invests solely in United States Treasury securities that are direct obligations of the United States of America or obligations the principal of, and the interest on which, are unconditionally guaranteed by the United States of America. The Settlement Fund shall be administered pursuant to the Escrow Agreement annexed hereto as Exhibit B (the "Escrow Agreement"). Except for the payment of Court-approved notice and the fees and costs of administration incurred pursuant to the Escrow Agreement, the Settlement Fund will remain intact until final approval of this Settlement Agreement pursuant to paragraph 11 hereof. The Settlement Fund shall be administered for the benefit of Settlement Class members, State residents and Florida residents as ordered by the Court.

(b)     If at the end of any claim submission period monies remain in the Settlement Fund, net of costs of administration and costs of suit, including reasonable attorneys' fees, as approved by the Court, the remaining amount shall be distributed in a manner, which may include a *cy pres* distribution, and on terms and conditions, determined by the Court in the exercise of its reasonable discretion; provided, however, that Bausch & Lomb shall be given written notice of any application requesting the Court's exercise of discretion pursuant to this subparagraph.

(c)     If, prior to the giving of Court-approved notice, (i) the Court declines to approve this Settlement Agreement preliminarily, (ii) the Court preliminarily approves the Settlement Agreement but withdraws such preliminary approval, or (iii) this Settlement Agreement is terminated under paragraph 9 hereof, then the Settlement Fund, including all income earned thereon, shall be returned to Bausch & Lomb within ten (10) business days of such event, less only (a) the fees and costs of administration incurred under the Escrow

Agreement; (b) any accrued tax liability; and (c) the costs incurred in giving Court-approved notice.

(d)      It is intended that any taxes due as a result of income earned by the Settlement Fund will be paid from the Settlement Fund.  In the event that federal or state income tax liability is finally assessed against and paid by Bausch & Lomb as a result of income earned by the Settlement Fund, Bausch & Lomb shall be entitled to reimbursement of such payment from the Settlement Fund.  Bausch & Lomb will use its best effort to resist any such payment.

5.      **The Benefits Package**.

(a)      Bausch & Lomb will provide to all eligible claimants, as provided in paragraph 5(c) below, a Benefits Package, which will include the following:

(i)      a single $50.00 rebate per claimant on the purchase of four (4) multipacks, and an additional $25.00 per claimant rebate on an additional purchase of four (4) multipacks, of any Bausch & Lomb® 2 week, SofLens66® Toric, PureVision™, SofLens® one day or Optima FW® contact lenses;

(ii)      a single $25.00 rebate per claimant on an eye examination, provided that the claimant also provides proof of purchase of Bausch & Lomb contact lenses (which may be purchased from an alternative channel of distribution and need not be purchased from the eye-care professional providing the examination);

(iii)      a single coupon for one free four-ounce bottle of Renu Multiplus® lens care solution;

(iv)      a single coupon for $5.00 off the purchase of a 12 oz. Renu Multiplus® lens care solution;

(v)      a free Bausch & Lomb® lens care kit sent in the Benefits Package (no coupon necessary);

(vi)    a coupon book for the purchase of various Bausch & Lomb® eye-care products;

(vii)    a free Renu® Rewetting drops sample and a coupon for $1.00 off purchase of additional rewetting drops; and

(viii)    a free ReNu Multiplus® Preservative Free drops sample.

The Benefits Package shall be offered through the plan for dissemination of notice approved by the Court; provided, however, that Bausch & Lomb's obligation to provide the Benefits Package shall be contingent upon this Settlement Agreement becoming final pursuant to paragraph 11 hereof.

(b)    The costs of administering the Benefits Package will be borne by Bausch & Lomb.

(c)    Any purchaser of any replacement contact lenses manufactured by Bausch & Lomb, Vistakon, or CIBA Vision from January 1, 1988, through the date of claim will be eligible for a Benefits Package.

(d)    Claims may be made until two years from the date of preliminary court approval of this Settlement Agreement.

(e)    Bausch & Lomb guarantees that the value of the Benefits Package to claimants will be at least equal to $9.5 million.  Bausch & Lomb will be credited in the amount of $120.81 against the guarantee for each person who has registered a claim during the claim period and been sent a Bausch & Lomb Benefits Package.  In the event that the value of all credits against the guarantee as calculated above is not equal to or greater than $9.5 million, Bausch & Lomb will pay to the Bausch & Lomb Settlement Fund any difference between that value and $9.5 million within 30 days after the end of the claim period.

(f) Bausch & Lomb will promote or advertise the availability of the Benefits Package, at its own expense, and in any manner it chooses, provided that the Benefits Package will be made available only to eligible and registered claimants.

6. **Injunctive Relief**.

(a) Bausch & Lomb agrees to sell and distribute its replacement contact lenses to alternative channels of distribution on the terms and conditions set forth in paragraph 7(f) of the Final Order and Judgment annexed hereto as Exhibit D for a period of five (5) years from the date this Settlement Agreement becomes final under paragraph 11 hereof.

(b) Bausch & Lomb will agree to sell its lenses directly to alternative channels of distribution on terms and conditions equally applicable to all accounts, which terms and conditions shall not discriminate against alternative channels of distribution.

7. **Exclusive Remedies**.

(a) Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided in the Court-approved notice shall look solely to the Benefits Package and the Settlement Fund for settlement and satisfaction of all Released Claims, as defined in paragraph 12(a) hereof, as against Bausch & Lomb.

(b) Except as provided in this Settlement Agreement, Bausch & Lomb shall not be liable for any costs, fees or expenses of the class plaintiffs, the States, Florida or their counsel, experts, advisors, agents or representatives.

(c) Since Bausch & Lomb's payment of the Settlement Fund will fully discharge any obligation it may otherwise have with respect to the payment of the costs, expenses and attorneys' fees in the Class, States and Florida Actions, Bausch & Lomb agrees not to take any position or participate in the fee and expense approval process.

8.     **Non-Signatory States**

(a)     The States and Florida represent and warrant that they have disclosed the general terms and conditions of this Settlement Agreement to each state and commonwealth that is a non-signatory to this Settlement Agreement and the District of Columbia (collectively, the "Non-Signatory States"); that no later than fifteen (15) days after preliminary approval by the Court of this Settlement Agreement, the States and Florida will provide a written invitation to each Non-Signatory State to become a signatory to this Settlement Agreement; and that, in the event any Non-Signatory State informs a State or Florida that it intends to investigate, assert or pursue any claim against Bausch & Lomb arising out of or relating to Bausch & Lomb's policy, practice, course of dealing and/or decision not to sell its contact lenses directly to alternative channels of distribution and/or to restrain its authorized distributors from doing so, such State or Florida shall immediately notify Bausch & Lomb of such Non-Signatory State's intention.

(b)     Any Non-Signatory State may subsequently become a party to this Settlement Agreement (to which Bausch & Lomb agrees to waive any objection) by signing a copy of the Joinder in Settlement Agreement annexed hereto as Exhibit C no later than three (3) days before the actual publication of the Court-approved dissemination of notice, and then delivering such signed copy to Bausch & Lomb and each other party to this Settlement Agreement in accordance with paragraph 18 hereof.

9.     **Termination**. Notwithstanding any other provision hereof, Bausch & Lomb may terminate this Settlement Agreement if prior to the entry of the Final Order and Judgment pursuant to paragraph 11(b) hereof, any Non-Signatory State commences an action against Bausch & Lomb under federal or state law arising out of or relating to Bausch & Lomb's policy, practice, course of dealing and/or decision not to sell its contact lenses directly to alternative channels of distribution and/or to restrain its authorized distributors from doing so. In the event Bausch & Lomb exercises its rights to terminate this Settlement

- 11 -

Agreement under this paragraph, it shall notify the class plaintiffs, the States and Florida within ten (10) business days of the commencement of the Non-Signatory State's action.

10.      **Entry of Final Order and Judgment**.  If the Court finally approves this Settlement Agreement under paragraph 11 hereof, the class plaintiffs, the States, Florida and Bausch & Lomb shall jointly request entry of a Final Order and Judgment in the form annexed hereto as Exhibit D.

11.      **Finality of Settlement**.  This Settlement Agreement shall become final upon the occurrence of all of the following events:

(a)      It is approved in all respects by the Court as required by Fed. R. Civ. P. 23(e) and 15 U.S.C. §15c(c);

(b)      Entry, as provided for in paragraph 10 hereof, is made of the Final Order and Judgment (Exhibit D hereto); and

(c)      The time for appeal or to seek permission to appeal from the Court's approval of this Settlement Agreement as required by subparagraph (a) hereof and entry of a Final Order and Judgment as required by subparagraph (b) hereof has expired or, if appealed, approval of this Settlement Agreement and the Final Order and Judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.  The provisions of Fed. R. Civ. P. 60 shall not be taken into account in determining the times herein.

12.      **Releases, Covenants Not to Sue and Judgment Reduction**.

(a)      Upon this Settlement Agreement becoming final pursuant to paragraph 11 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided by the Court-approved notice, their successors, heirs and assigns, the States, in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as

*parens patriae* on behalf of their economies and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, shall release and forever discharge Bausch & Lomb and its present and former parents, subsidiaries, divisions, affiliates, stockholders, benefit plans, officers, directors, employees, agents and any of their legal representatives, and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing (the "Released Parties"): (i) in the case of the class plaintiffs, Settlement Class members, State residents, the States, Florida residents and Florida from all manner of claims, liabilities, demands, actions, suits and causes of action, for damages, restitution, disgorgement, injunctive and/or declaratory relief, whether class, individual, representative or otherwise in nature, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that accrued prior to the date of the Court's final approval of this Settlement Agreement as required by paragraph 11 hereof and that the class plaintiffs, Settlement Class members, State residents, Florida residents and the States and Florida ever had, now have or hereafter can, shall or may have, which have been asserted or could have been asserted in the Class Action, States Actions or Florida Action, including, but not limited to, claims under the Sherman Antitrust Act, 15 U.S.C. §1 *et seq.*, Alabama Restraint of Trade or Production Act, §8-10-1 *et seq.*, Code of Alabama (1975), Alaska Monopolies and Restraint of Trade Act, AS §45.50.562 , Arizona's Uniform State Antitrust Act, A.R.S. §44-1402 *et seq.*, Ark. Code Ann. §4-75-201 *et seq.*, California Business and Professions Code Section 16700 *et seq.*, California Business and Professions Code Sections 17200 (including Business and Professions Code §17206.1), Sections 35-26 and 35-28 of the Connecticut General Statutes, Sections 35-32, 35-34, 35-35 and 35-38 of the Connecticut General Statutes, the Delaware Antitrust Act, 6 Del. C. Chapter 21, the Idaho Antitrust Law, Idaho Code §§48-101 *et seq.*, Idaho Code §48-603(18) of the Idaho Consumer Protection Act, the Illinois Antitrust Act, 740 I.L.C.S. 10/1 *et seq.*, Iowa Law, Iowa Code §§553.4, 553.5, Kansas Restraint of Trade

- 13 -

Act, K.S.A. §§50-101. *et seq*., Louisiana Rev. Stat. title 51, part IV, §1401, *et seq*., Maine

Antitrust Statutes, 10 M.R.S.A. §§1101, *et seq*., 5 M.R.S.A., §205-A Maryland Antitrust Act,

Maryland Comm. Law Code Ann. 11-201, *et seq*., Mass. Gen. Laws Ann. ch. 93, §§1-14A,

and Ch. 93A, §§2, 4, §2 of the Michigan Antitrust Reform Act, MCL 445.772; MSA

28.70(2), the Minnesota Antitrust Law of 1971, Minn. Stat. §§325D.49-325D.66, the

Missouri Antitrust Law, §§416.011 *et seq*., the Missouri Merchandising Practices Act,

§§407.010 *et seq*., Nevada Unfair Trade Practices Act, N.R.S. CH. 598A, New Jersey

Antitrust Act, N.J.S.A. 56:9-3, New York General Business Law §§340-347, North Carolina

Antitrust Act, N.C. Gen. Stat., 75-1 *et seq*. North Dakota's Uniform State Antitrust Act, N.D.

Cent. Code §§51-08.1-01 *et seq*. (1995 Supp.), the Ohio Valentine Act, Ohio Rev. Code

§§1331.01 *et seq*., Oregon Antitrust Law, ORS 646.705 *et seq*., Texas Free Enterprise and

Antitrust Act of 1983, Tex. Bus. Com. Code §§15.01, *et seq*. Utah Antitrust Act, Utah Code

Ann.§§75-10-911, *et seq*. the Virginia Antitrust Act, Va. Code §59.1-9.1 *et seq*., the West

Virginia Antitrust Act, W. Va. Code §47-18-1 *et seq*., the West Virginia Consumer Credit

and Protection Act, W. Va. Code §46A-1-101 *et seq*., the Wisconsin Trust and Monopolies

Law, §§133.03(1), 133.04, 133.16, 133.17 and 133.18, Stats., or any state antitrust law,

arising out of or relating to Bausch & Lomb's policy, practice, course of dealing and/or

decision not to sell its contact lenses directly to alternative channels of distribution and/or

to restrain its authorized distributors from doing so; and (ii) in the case of Florida residents,

from all manner of claims, liabilities, demands, actions, suits and causes of action, for

damages, restitution, disgorgement, injunctive and/or declaratory relief, whether class,

individual, representative or otherwise in nature, including costs, expenses, penalties and

attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that accrued

prior to the date of the Court's final approval of this Settlement Agreement as required by

paragraph 10 hereof and that such Florida residents ever had, now have or hereafter can, shall

or may have, including, but not limited to, claims under the Sherman Antitrust Act, 15

U.S.C. §1 *et seq.*, Florida Statutes §§501.201 *et seq.*, 542.15 *et seq.*, or any state antitrust law, arising out of or relating to Bausch & Lomb's policy, practice, course of dealing and/or decision not to sell its contact lenses directly to alternative channels of distribution and/or to restrain its authorized distributors from doing so;

       (b)     The class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity: (i) shall not bring any proceeding to establish liability against any Released Party based, in whole or in part, upon any Released Claim; and (ii) upon this Settlement Agreement becoming final pursuant to paragraph 11 hereof, covenant and agree not to seek thereafter to establish liability against any Released Party based, in whole or in part, upon any Released Claim.

       (c)     In the event a Non-Settling Defendant obtains judgment, in whole or in part, against Bausch & Lomb for contribution or indemnity based upon any claim a class plaintiff, a State, Florida or a Settlement Class member, State resident or Florida resident who has not timely exercised the right to opt out as provided in the Court-approved notice: (i) has asserted under state law against such Non-Settling Defendant in any action in MDL 1030; or (ii) has asserted or may assert under state law against such Non-Settling Defendant arising out of or relating to Bausch & Lomb's policy, practice, course of dealing and/or decision not to sell its contact lenses to alternative channels of distribution and/or to restrain its authorized distributors from so doing, (1) such class plaintiff or Settlement Class member, in the case of a judgment arising out of a class plaintiff or Settlement Class member's claim, (2) such State or State resident, in the case of a judgment arising our of a claim by a State or

State resident who is not a Class member, or (3) Florida or such Florida resident, in the case of a judgment arising out of a claim by Florida or a Florida resident, shall reduce any judgment or proportion thereof obtained against such Non-Settling Defendant by the proportionate amount of such judgment attributable to Bausch & Lomb.  In the event the judgment or proportion thereof is not so reduced, such class plaintiff, State, Florida or such Settlement Class member, State resident or Florida resident shall not attempt to collect from such Non-Settling Defendant such amount attributable to Bausch & Lomb.

(d)      Nothing in this Settlement Agreement is intended to constitute, or shall be construed as, a release of or a covenant not to sue any party other than the Released Parties, including, but not limited to, any Non-Settling Defendant for any claim or cause of action whatsoever, including, but not limited to, claims founded, in whole or in part, upon the conduct of the Released Parties.

13.    **Waiver and Released Rights Under California Civil Code Section 1542.**

(a)      Upon this Settlement Agreement becoming final pursuant to paragraph 11 hereof, the class plaintiffs and all Settlement Class members, States residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, expressly waive and release any and all provisions, rights and benefits conferred by §1542 of the California Civil Code, which provides:

Section 1542. ***Certain Claims Not Affected by General Release.***  A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

- 16 -

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to §1542 of the California Civil Code.

(b)     The class plaintiffs and all Settlement Class members, State residents and Florida residents, their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity, and the States and Florida and their assigns, may, after final approval of this Settlement Agreement pursuant to paragraph 11 hereof, discover facts other than or different from those which he, she or it knows or believes to be true with respect to Released Claims. Nevertheless, upon this Settlement Agreement becoming final under paragraph 11 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, and the States and Florida in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economics and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, waive and fully, finally and forever settle and release, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other or different facts.

14.     **Termination by Reason of Court Action.**  In the event that this Settlement Agreement does not become final pursuant to paragraph 11 hereof, it shall become null and void and have no force and effect, except as expressly provided otherwise herein.

15.     **Rescheduling of Events in Scheduling Order.**  In the event this Settlement Agreement is terminated pursuant to paragraph 9 or paragraph 14 hereof, the class plaintiffs, the States, Florida  and Bausch & Lomb shall use their best efforts to reschedule events in MDL 1030 that have been suspended as to Bausch & Lomb, in a manner that will reasonably accommodate the litigation interests of the class plaintiffs, the States and Bausch & Lomb.

In such event, Bausch & Lomb reserves the right to move for a separate trial of the Class Action, the States Action and/or Florida Action against it.

16. **Inadmissibility of Settlement Agreement**. This Settlement Agreement, including all exhibits, whether or not it becomes final pursuant to paragraph 11 hereof, and any and all negotiations, documents and discussions associated with it, shall not constitute or be construed as an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by Bausch & Lomb or of the truth of any of the claims or allegations in the Class Action, the States Action, the Florida Action or any other action in MDL 1030.

17. **Return of Bausch & Lomb Discovery Materials**. The class plaintiffs, the States, Florida and their respective counsel agree that, except as otherwise required by law, all materials produced by, or information discovered of, or records of information discovered of, or produced by, Bausch & Lomb or any of its present or former directors, officers or employees pursuant to the Federal Rules of Civil Procedure or any state law or rule authorizing civil investigation demands, including all copies thereof (collectively, "Bausch & Lomb Materials"), (a) in the possession or control of the class plaintiffs, the States, Florida or their counsel, experts, consultants or agents shall, within sixty (60) days after the final termination of the Class Action, the States Action and the Florida Action, be destroyed or, at the election of the respective plaintiffs, returned to Bausch & Lomb; and (b) in the possession or control of the States and Florida or their counsel, experts, consultants or agents shall be destroyed in the ordinary course of business or, at the election of the States and Florida, returned to Bausch & Lomb. Upon Bausch & Lomb's request, counsel for the class plaintiffs, counsel for the States and counsel for Florida shall provide a written declaration certifying that all Bausch & Lomb Materials have been destroyed or returned to Bausch & Lomb, as the case may be.

18. **Notices**. All notices, demands, requests and other communications (collectively "Notices") given or served by any party in connection with this Settlement

- 18 -

Agreement shall be in writing.  Notices shall be given by hand delivery, with receipt, or by

nationally recognized overnight courier, with receipt, to each of the following:

Notices to Class Plaintiffs:

Dennis Stewart, Esq.
Joy Ann Bull, Esq.
Milberg Weiss Bershad
  Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, California 92101

George W. Sampson, Esq.
Hagens & Berman
1301 Fifth Avenue, Suite 2929
Seattle, Washington 98101

Stuart D. Wechsler, Esq.
Wechsler Harwood Halebian
  & Feffer LLP
488 Madison Avenue, 8th Floor
New York, NY  10022

Notices to the States and Florida provided to the persons set forth below on the

signature pages of this Settlement Agreement at the addresses set forth on such pages.

Notices to Bausch & Lomb:

Robert B. Stiles, Esq.
Senior Vice President and
General Counsel
BAUSCH & LOMB, INC.
One Bausch & Lomb Place
Rochester, New York  14604

Thomas F. Cullen, Jr. Esq.
William V. O'Reilly, Esq.
JONES, DAY, REAVIS & POGUE
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113

19.    **Binding Nature of Agreement.**  This Settlement Agreement shall be binding

upon, and inure to the benefit of, Bausch & Lomb's successors and assigns.  Upon this

Settlement Agreement becoming final under paragraph 11 hereof, it shall be binding upon,

and inure to the benefit of, all Settlement Class members, State residents and Florida

residents who have not timely exercised the right to opt out as provided in the Court-

approved notice, their heirs and assigns, and upon the States and Florida and their assigns.

20.    **Complete Agreement.**  This Settlement Agreement contains an entire,

complete, and integrated statement of each and every term and provision agreed to by and

- 19 -

among the parties; it is not subject to any condition not provided for herein; and it supersedes all prior agreements between the parties with respect to its subject matter, including, but not limited to, the Bausch & Lomb Memorandum of Understanding dated as of January 26, 2001. This Settlement Agreement shall not be modified in any respect except by a writing executed by all of the parties.

21. **Mutual Drafting of Agreement.** None of the parties to this Settlement Agreement shall be considered its drafter for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

22. **Exclusive Jurisdiction.** Upon this Settlement Agreement becoming final pursuant to paragraph 11 hereof, Bausch & Lomb, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, the States and Florida agree irrevocably: (i) to submit to the exclusive jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement, including its applicability; and (ii) not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, or that such Court is an improper venue or an inconvenient forum.

23. **Counterparts.** This Settlement Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

# ESCROW AGREEMENT

THIS AGREEMENT is made and entered into as of February 16, 2001, by and between (1) Bausch & Lomb Incorporated ("Bausch & Lomb"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20 and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, the "States"), in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and as *parens patriae* on behalf of the States' economies and general welfare on Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A; 97-928-CIV-J-20A; 98-93-CIV-J-21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; (4) the State of Florida ("Florida"), in its capacity as sovereign as *parens patriae* on behalf of natural persons for whom Florida may act, and as *parens patriae* on behalf of Florida's economy and general welfare in civil Action No. 94-619-Civ-J-20, pending in MDL-1030; (5) Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") (one of co-lead counsel for the class plaintiffs and the Class and as Escrow Agent (as defined in paragraph 1 herein)); and (6) Jones, Day, Reavis & Pogue ("Jones Day") (lead counsel for Bausch & Lomb).

WHEREAS, as of February 16, 2001, Bausch & Lomb, the class plaintiffs, the States and Florida entered into a Settlement Agreement (the "Settlement Agreement");

WHEREAS, the class plaintiffs, the States, Florida and Bausch & Lomb will seek a Final Order and Judgment (as hereinafter defined) from the Court approving the Settlement

- 1 -

Agreement and the dismissal of the Class Action, Florida Action  and the States Action against Bausch & Lomb;

WHEREAS, pursuant to that Settlement Agreement, Bausch & Lomb agreed to deposit the cash consideration for the settlement, *i.e.*, $8,000,000.00 into an escrow account to be maintained at San Diego National Bank ("The Account") upon signature of the Settlement Agreement;

WHEREAS, the class plaintiffs, the States, Florida and Bausch & Lomb have entered into this Escrow Agreement to facilitate the consummation of the Settlement Agreement;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.     The class plaintiffs, the States, Florida and Bausch & Lomb do hereby appoint, constitute and designate Milberg Weiss as their Escrow Agent for the purposes set forth herein, and Milberg Weiss accepts the agency created under this Escrow Agreement and agrees to perform the obligations imposed herein.

2.     As used herein, "Final Order and Judgment" means the Court giving final approval to the Settlement Agreement pursuant to paragraph 11 thereof;

3.     As used herein, "Florida Counsel" shall mean the Attorney General of Florida, acting through Patricia A. Conners, Chief, Antitrust Section, or such other representative as the Florida Attorney General may designate in writing.

4.     As used herein, "States Counsel" shall mean the Attorney General of Maryland acting through Assistant Attorney General John Tennis, or such other representative as the Maryland Attorney General may designate in writing.

5.     From the date of this Escrow Agreement until the Escrow Agent receives joint written instructions from Milberg Weiss, Jones Day, Florida counsel and the States Counsel that the Final Order and Judgment has been entered, "Counsel," as used hereinafter, shall mean Milberg Weiss, Jones Day, Florida Counsel and States Counsel.  When "Counsel" means Milberg Weiss, Jones Day, Florida counsel and States Counsel, instructions,

- 2 -

confirmations and authorizations to or from the Escrow Agent must be received from Milberg Weiss, Jones Day, Florida counsel and States Counsel.

6. Upon execution of the Settlement Agreement, Bausch & Lomb will deposit in the Account by wire transfer $8,000,000.00 (8 million dollars) in immediately available funds which, together with interest which thereafter accrues in the Account, and any further deposits which may be made into the account pursuant to ¶5(e) of the Settlement Agreement shall constitute the "Escrow Fund."

7. The Escrow Agent shall invest the Escrow Fund in a money market fund which invests solely in United States Treasury securities which are direct obligations of the United States of America or obligations of the principal of and the interest on which are unconditionally guaranteed by the United States of America. The Escrow Agent may sell or liquidate any of the investments at any time if the proceeds thereof are required for any release of funds permitted or required hereunder, and the Escrow Agent shall not be liable or responsible for any loss, charge, load, premium loss and/or penalty resulting from any such sale or liquidation. If an investment must be liquidated, the proceeds of the liquidation will not be available for distribution until the Escrow Agent has received immediately available funds from the sale or liquidation of the investment. Any losses or damages from such liquidation shall be deducted from the Escrow Fund.

8. All income earned by the Escrow Fund shall be reinvested by the Escrow Agent in accordance with the above-referenced written instructions of Counsel and shall become a part of the Escrow Fund.

9. Before the Settlement Agreement becomes final, the Escrow Agent is hereby authorized to transfer and distribute funds from the Escrow Fund by check, wire, electronic, or internal process, in accordance with paragraph 9 hereof and upon such other prior written authorization from Counsel as it may receive. Such authorization may be by facsimile transmission or other written communication. Except as provided in paragraph 8 hereof, the Escrow Agent shall disburse no funds from the Escrow Fund before the Settlement

Agreement is final pursuant to paragraph 11 of the Settlement Agreement without prior written authorization of Counsel.

10.     The Escrow Agent is hereby authorized to transfer and distribute funds from the Escrow Fund up to a total amount of $1,500,000, for the costs associated with disseminating the Court-approved notice upon receipt of an Order preliminarily approving the Settlement Agreement and an Order approving the form of and plan for dissemination of notice.  Such funds will be used solely for providing the Court-approved notice.

11.     Subject to such other further orders and/or directions as may be made by the Court, after the Settlement Agreement is final, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of the Settlement Agreement or Orders of the Court.

12.     All funds deposited with or held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to an Order of the Court.

13.     In the event of disagreement between Counsel with respect to the distribution of funds from the Escrow Fund, the Escrow Agent shall hold the disputed funds until the disagreement is resolved.

14.     Any Federal, State, Municipal or local taxes due as a result of income earned by, or assets in, the Escrow Fund are to be paid from the Escrow Fund by the Escrow Agent. The Escrow Agent shall make all estimated tax payments and make or file any returns or reports relative thereto, upon such confirmations by Counsel as it may request.  In the event any tax liability is finally assessed against and paid by Bausch & Lomb as a result of income earned by, or assets in, the Escrow Fund, Bausch & Lomb shall be entitled to reimbursement of such payment from the Escrow Fund.  In that event, Bausch & Lomb shall present proof of payment to the Escrow Agent and, within five (5) business days of receipt, Bausch & Lomb shall be reimbursed for such payment from the Escrow Fund.

15.    Bausch & Lomb, Florida Counsel, the States' Counsel and the Escrow Agent agree to treat the Escrow Fund as being at all times as one or more "qualified settlement funds" within the meaning of Treas. Reg. Section 1.468B-1.  In addition, the Escrow Agent and, as required, Bausch & Lomb, Florida Counsel and States' Counsel, shall jointly and timely make such elections as necessary or advisable to carry out the provisions of this Section E.1., including the "relation-back election" (as defined in Treas. Reg. Section 1.468B-1) back to the earliest permitted date.  Such elections shall be made in compliance with the procedures and requirements contained in such regulations.  It shall be the responsibility of the Escrow Agent to timely and properly prepare, and deliver the necessary documentation for signature by all necessary parties, and thereunder to cause the appropriate filing to occur.

16.    For the purpose of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent. The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Escrow Fund (including without limitation the returns described in Treas. Reg. Section 1.468B-2(i)).  Such returns (as well as the election described above) shall be consistent with this paragraph and in all events shall reflect that all taxes (including any interest or penalties) on the income earned by the Escrow Fund shall be paid out of the Escrow Fund.

17.    All (a) taxes (including any interest or penalties) arising with respect to the income earned by the Escrow Fund, including any taxes or tax detriments that may be imposed upon Bausch & Lomb with respect to any income earned by the Escrow fund for any period during which the Escrow Fund does not qualify as a "qualified settlement fund" for Federal or state income tax purposes ("Taxes") and (b) expense and costs incurred in connection with the operation and implementation of this paragraph (including, without limitation, expense of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing or failing to file the appropriate returns) ("Tax Expenses"), shall be paid out of the Escrow Fund.  In all events, Bausch & Lomb shall have no liability or

- 5 -

responsibility for the Taxes or Tax Expenses.  The Escrow Agent shall indemnify and hold Bausch & Lomb harmless for Taxes or Tax Expenses (including, without limitation, taxes payable by reason by reason of any such indemnification).  In the event that any income earned by the Escrow Fund is under applicable Federal or state income tax laws includible in the taxable income of Bausch & Lomb, the amount of indemnification due hereunder shall be equal to the product of (i) the amount of such income inclusion (increased by any additional amounts includible in income as a result of this indemnification) and (ii) as to Bausch & Lomb, the maximum marginal corporate income or franchise tax rate (before credits) applicable on ordinary taxable income that is imposed under the tax laws of the applicable taxing jurisdiction before net operating loss carryovers for Bausch & Lomb for the taxable year in which indemnification hereunder becomes due and payable.  Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of this Escrow Agreement and shall be timely paid by the Escrow Agent out of the Escrow Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to class members or, if necessary, from refund to Bausch & Lomb, any funds necessary to pay such amounts, including the establishment of adequate reserves for any such contingent Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. Section 1.468B-2(1)(2)).  The parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this paragraph.

18.    The Escrow Agent shall be entitled to rely upon the most recent instructions from Counsel as to the names of the persons authorized to instruct the Escrow Agent. Counsel shall provide a list of the signatures of such authorized persons to the Escrow Agent from time to time.

19.    The Escrow Agent shall be protected in acting upon written notice, request, waiver, consent, receipt or other paper document furnished to it by Counsel, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth

and acceptability of any information contained therein, which they in good faith believe to be genuine and what it purports to be.

20.     Should the Escrow Agent receive or become aware of any demands or claims with respect to the Escrow Fund, other than those as contemplated by the Settlement Agreement, they shall have the right to apply to the District Court, on notice to the parties hereto, for appropriate instructions.  Upon application to and order of the District Court, on notice to the parties, the Escrow Agent shall be entitled to reimburse themselves from the Escrow Fund for all costs, damages, judgments and expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with or arising out of their action with respect to the Escrow Fund.

21.     This Escrow Agreement may not be assigned by the Escrow Agent without prior written approval of the parties hereto; provided, however, that upon thirty (30) days written notice by the Escrow Agent to the parties hereto, the Escrow Agent may resign as Escrow Agent hereunder.  Any assets held by such Escrow Agent under the terms of this agreement as of the effective date of the resignation shall be delivered to a successor escrow agent designated in writing by Counsel.  If no successor agent has been  appointed as of the effective date of the resignation, all obligations of such Escrow Agent hereunder shall nevertheless cease and terminate.  In the event the Escrow Agent resigns and a successor is not appointed as provided in this paragraph, the Escrow Agent's sole responsibility thereafter shall be to keep safely all Escrow Funds held by them and to deliver the same to a person designated by Counsel or in accordance with the direction of a final order or judgment of a court of competent jurisdiction.

22.     This Escrow Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the parties hereto.

23.     This Escrow Agreement will be governed by and construed in accordance with the laws of the State of New York.

24.     For purposes of notice, correspondence and mailing of checks, or wiring of funds, the parties' addresses shall be:

    MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
    DENNIS STEWART
    JOY ANN BULL
    600 West Broadway, Suite 1800
    San Diego, CA  92101
    Telephone:  619/231-1058
    FAX:  619/231-7423

    ROBERT A. BUTTERWORTH
    ATTORNEY GENERAL
    Patricia A. Conners
    Chief, Antitrust Section
    STATE OF FLORIDA
    PL-01 The Capitol
    Tallahassee, FL  32399-1050
    Telephone:  850/414-3600
    FAX:  850/488-9134

    JONES, DAY, REAVIS & POGUE
    WILLIAM V. O'REILLY
    51 Louisiana Avenue, N.W.
    Washington, D.C.  20001-2113
    Telephone:  202/879-3939
    FAX:  202/626-1700

    J. JOSEPH CURRAN, JR.
    ATTORNEY GENERAL
    A.A.G. JOHN TENNIS
    STATE OF MARYLAND
    200 Saint Paul Place
    Baltimore, MD 21202-2202
    Telephone:  410/576-6474
    FAX:  410/576-7830

25.     All signatories to this Escrow Agreement warrant that they have full and complete authority to enter into and sign this Escrow Agreement on behalf of the entity or person they represent.

26.     This Escrow Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re DISPOSABLE CONTACT LENS ANTITRUST LITIGATION | ) MDL Docket No. 1030 |
| | ) |
| | ) SETTLEMENT AGREEMENT |
| This Document Relates To: | ) |
| | ) |
| ALL ACTIONS. | ) |
| | ) |

*Ex. C*

THIS SETTLEMENT AGREEMENT is entered into as of the 22 nd day of May, 2001, between (1) defendant, the American Optometric Association ("AOA"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20, 94-1214-CIV-J-20, and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re: Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff-States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, with any state or commonwealth, including the District of Columbia, that joins this Settlement Agreement under paragraph 8(b) hereof, the "States") in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and as *parens patriae* on behalf of the States' economies and general welfare in Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A;97-928-CIV-J-20A; 98-93-CIV-J21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; and (4) the State of Florida ("Florida"), in its capacity as sovereign, as *parens patriae* on behalf of natural persons for whom Florida may act, and as *parens patriae* on behalf of Florida's economy and general welfare in Case No. 94-619-CIV-J-20 (the "Florida Action") pending in MDL-1030;

WHEREAS, the Florida action and the Class Action allege that the AOA conspired with Johnson & Johnson Vision Products, Inc. ("Vistakon"), and/or CIBA Vision Corporation ("CIBA Vision"), and/or Bausch & Lomb Incorporated ("Bausch & Lomb") (collectively, contact lens manufacturers) and/or certain individual defendants not to sell

- 1 -

replacement contact lenses (as defined herein) directly to alternative channels of distribution (as defined herein), and to restrain authorized distributors of the contact lens manufacturers from reselling such lenses directly to such alternative channels of distribution, with the alleged effect of artificially raising or maintaining the retail prices for Bausch & Lomb, Vistakon and/or CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution;

WHEREAS, the States Action (i) alleges that the AOA conspired with Vistakon, Bausch & Lomb, CIBA Vision, Contact Lens and Anterior Segment Society, Inc., American Society of Contact Lens Specialists, Society of Eye Care Specialists, Eye Care Management Group, Vision Enhancement Council International, Society of Contact Lens Specialists, National Association of Contact Lens Specialists, the California Optometric Association, Optometric Society of the City of New York, the Wisconsin Optometric Association and/or the eleven individuals in the complaint not to sell replacement contact lenses directly to alternative channels of distribution, to restrain authorized distributors of the contact lens manufacturers from reselling such lenses directly to such alternative channels of distribution, and to restrain consumer access to prescriptions or work orders needed to obtain contact lenses, with the alleged effect of artificially raising or maintaining the retail prices for Bausch & Lomb, Vistakon and CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution and alternative channels of distribution and (ii) does not seek damages or other relief based on the purchase of contact lenses manufactured by persons or entities other than Bausch & Lomb, Vistakon or CIBA Vision;

WHEREAS, the AOA denies each and every allegation of unlawful conduct in the Class, States and Florida Actions;

WHEREAS, on or about September 5, 1996, the Court in MDL 1030, after briefing and argument, certified a consumer class in the Class Action consisting of: "All purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care

practitioners during the period 1988 to the present, excluding consumers in Florida represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-CIV-J-20" (the "Class"), and determined that the class plaintiffs were adequate representatives of the Class and had claims which were typical of those of its members;

WHEREAS, on July 28, 1997, the Court modified its class certification order to exclude consumers residing in Georgia or Tennessee;

WHEREAS, the Class, the States and Florida entered into a settlement agreement with CIBA Vision in May of 1997, which this Court finally approved on February 28, 2001 ("CIBA Vision Settlement");

WHEREAS, the Class, the States and Florida entered into a settlement agreement with Bausch & Lomb on February 16, 2001, which this Court preliminarily approved on March 16, 2001 ("Bausch & Lomb Settlement");

WHEREAS, in connection with the CIBA Vision Settlement and the Bausch & Lomb Settlement, the Court approved use of a "Settlement Class" which is defined the same as the Class is defined above, and which includes consumers in Georgia or Tennessee;

WHEREAS, in the States Action and the Florida Action, the States and Florida represent State residents (as defined herein) pursuant to 15 U.S.C. §15c;

WHEREAS, the class plaintiffs, the States and Florida and their respective counsel have concluded, after extensive discovery, approximately two weeks of trial, and a thorough review of the facts and the relevant law, that it would be in the best interests of the Settlement Class and the residents of the States (as defined herein) and of Florida to enter into this Settlement Agreement in order to avoid the risk and uncertainty of continued litigation against the AOA, and to assure a benefit to the Settlement Class and residents of the States and of Florida;

WHEREAS, this Settlement Agreement is the result of arm's length negotiations, and the class plaintiffs, the States and Florida and their respective counsel consider this Settlement Agreement to be fair, reasonable, adequate and in the best interests of the Settlement Class and residents of the States and of Florida;

WHEREAS, the AOA has concluded that, despite its denials of wrongdoing and liability, it is in its best interest to enter into this Settlement Agreement to eliminate the expense, inconvenience, burden and inherent risk and uncertainty of continued litigation;

WHEREAS, this Settlement Agreement shall not be deemed or construed as an admission or evidence of any violation of law or any liability or wrongdoing by the AOA;

NOW, THEREFORE, it is agreed by the undersigned, on behalf of the AOA, the class plaintiffs, the States and Florida that, subject to the approval of the Court as provided herein, the Class, States and Florida Actions and all claims of the class plaintiffs, the States and of Florida, shall be settled, compromised and dismissed with prejudice as to the AOA and, except as hereinafter provided, without costs or attorneys' fees, on the following terms and conditions:

1.    **Definitions**.  For purposes of this Settlement Agreement only, the following terms have the following meanings:

(a)    The term "alternative channel of distribution" means any mail order company, pharmacy, buying club, department store, mass merchandise outlet or other distribution alternative which does not require that an eye care practitioner (as defined herein), be either available on or side-by-side to, its premises, and/or examine the purchaser's eyes in connection with the sale of contact lenses.

(b)    The term "Settlement Class" means all purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners during the period 1988 to the present excluding consumers in Florida represented by the Florida Attorney

General in State of Florida v. Johnson & Johnson Vision Products, et al., Case No. 94-619-Civ-J-20.

(c)     The term "Settlement Class member" means a member of the Settlement Class.

(d)     The term "contact lens" means a medical device made of plastic that is placed on the eye.

(e)     The term "eye care practitioner" means an optometrist, ophthalmologist or optician, including, but not limited to, any such person employed by or associated with a retail optical store (as defined herein).

(f)     The term "Florida resident" means any natural person who was a resident of the State of Florida at the time he or she, or someone on his or her behalf, purchased CIBA Vision, Bausch & Lomb and/or Vistakon contact lenses.

(g)     The term "purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners" means any natural person who bought, or on whose behalf someone bought, CIBA Vision, Bausch & Lomb and/or Vistakon replacement contact lenses (as defined herein) from an eye care practitioner (as defined herein).

(h)     The term "replacement contact lenses" means contact lenses that are sold or dispensed to replace the initial contact lenses.

(i)     The term "retail optical store" means a store or a chain of stores that sells contact lenses to consumers and employs or has associated an eye care practitioner either available on, or side-by-side to, its premises to examine the purchaser's eyes in connection with the sale of contact lenses, including all stores or chains of stores to which CIBA Vision, Vistakon and/or Bausch & Lomb or their authorized distributors sold contact lenses.

- 5 -

(j)      The term "State resident" means any natural person who was a resident of any State at the time he or she, or someone on his or her behalf, purchased Bausch & Lomb, CIBA and/or Vistakon contact lenses.

2.      **Motion for Preliminary Approval**. Within twenty (20) business days of the execution of this Settlement Agreement, the class plaintiffs, the States and Florida shall submit a motion to the Court requesting preliminary approval of this Settlement Agreement and entry of an order in the form annexed hereto as Exhibit A.

3.      **Plan for Dissemination of Notice**. Simultaneously with the parties' motion for preliminary approval, the class plaintiffs, the States and Florida shall submit to the Court a plan for dissemination of notice to Settlement Class members, State residents and Florida residents.  The form of notice for this settlement shall be, as far as is practicable, a part of and included in the form of notice for the Bausch & Lomb Settlement.  The plan for dissemination of notice for the Bausch & Lomb Settlement provides for dissemination of notice at least as broadly as was provided for in the CIBA Vision Settlement.  In addition, notice of the Bausch & Lomb Settlement (including notice of the AOA Settlement) is to be mailed personally to each person who requested notice of the CIBA Vision Settlement, or who made a claim or otherwise registered for the CIBA Vision Benefits Package.

4.      **The Settlement Fund**.

(a)      Subject to final approval of this Settlement Agreement under paragraph 10 hereof and the AOA's right of termination under paragraph 7 hereof, the AOA agrees to pay $750,000 in cash, no later than five (5) days from the date of this agreement, in full, complete and final settlement of the Class Action, the States Action, the Florida Action, all Released Claims (as defined in paragraph 11(a) hereof) and any obligations the AOA might otherwise have to pay, including the cost of any notice to Class members, State residents or Florida residents, the payment of claims to Class members, State residents or Florida residents, and the costs of suit, including reasonable attorneys' fees, as approved by

- 6 -

the Court pursuant to Fed. R. Civ. P. 23 and 15 U.S.C. §§15, 15c and 26, as follows: before execution of this Settlement Agreement, the AOA sent a check for $750,000 payable to the Milberg Weiss Bershad Hynes & Lerach LLP Trust Account. Upon execution of this Settlement Agreement, Milberg Weiss is authorized to deposit the $750,000 into an escrow account to be maintained by San Diego National Bank (the "Account") which, together with the interest which thereafter accrues in the Account shall constitute the AOA Settlement Fund (the "Settlement Fund"). The Settlement Fund will be invested in a money market fund that invests solely in United States Treasury securities that are direct obligations of the United States of America or obligations the principal of, and the interest on which, are unconditionally guaranteed by the United States of America. The Settlement Fund shall be administered pursuant to the Escrow Agreement annexed hereto as Exhibit B (the "Escrow Agreement"). Except for the payment of the fees and costs of administration incurred pursuant to the Escrow Agreement, the Settlement Fund will remain intact until final approval of this Settlement Agreement pursuant to paragraph 10 hereof. The Settlement Fund shall be administered for the benefit of Settlement Class members, State residents and Florida residents as ordered by the Court.

(b)     If at the end of any claim submission period monies remain in the Settlement Fund, net of costs of administration and costs of suit, including reasonable attorneys' fees, as approved by the Court, the remaining amount shall be distributed in a manner, which may include a *cy pres* distribution, and on terms and conditions, determined by the Court in the exercise of its reasonable discretion; provided, however, that the AOA shall be given written notice of any application requesting the Court's exercise of discretion pursuant to this subparagraph.

(c)     If, prior to the giving of Court-approved notice, (i) the Court declines to approve this Settlement Agreement preliminarily, (ii) the Court preliminarily approves the Settlement Agreement but withdraws such preliminary approval, or (iii) this Settlement

Agreement is terminated under paragraph 7 hereof, then the Settlement Fund, including all income earned thereon, shall be returned to the AOA within ten (10) business days of such event, less only (a) the fees and costs of administration incurred under the Escrow Agreement; and (b) any accrued tax liability.

(d)     It is intended that any taxes due as a result of income earned by the Settlement Fund will be paid from the Settlement Fund.  In the event that federal or state income tax liability is finally assessed against and paid by the AOA as a result of income earned by the Settlement Fund, the AOA shall be entitled to reimbursement of such payment from the Settlement Fund.  The AOA will use its best effort to resist any such payment.

5.     **Injunctive Relief**. The AOA hereby agrees to the following injunctive terms, which shall be in effect for a period of four years:

(a)     Consistent with state law, the AOA will not object to the release of contact lens prescriptions, except in the affirmative exercise of an optometrist's own medical judgment related to the specific, identified and documented health needs of a particular patient.  The AOA will not develop, disseminate, or urge the use of forms designed to limit either the availability or utility of prescriptions.  A form may contain reasonable expiration dates, limitations on refills and other provisions which are consistent with state law and good optometric practice;

(b)     The AOA will not ask or encourage any contact lens manufacturer to refuse to sell contact lenses to any channel of trade;

(c)     The AOA will not encourage nor support a refusal by optometrists (i) to do business with any contact lens manufacturer; or (ii) to write prescriptions for a particular contact lens manufacturer's contact lenses, based upon the manufacturer's contact lenses being sold by or to non-ECP retail outlets;

(d)     The AOA will make no agreement with any manufacturer to restrict the supply of contact lenses to any channels of trade;

- 8 -

(e)     The AOA will resist any invitation by any contact lens manufacturer to enlist the AOA's aid in enforcing any manufacturer's distribution policy refusing to sell contact lenses to any channel of trade;

(f)     The AOA will not endorse or pass on to others complaints about the sale of replacement disposable lenses to non-ECP retail outlets by any entity or about the sale of such lenses by a non-ECP retail outlet to any person or entity, other than about violations of federal or state laws;

(g)     The AOA, for a period of four years, shall continue to maintain and adhere to its written Antitrust Compliance Program;

(h)     The AOA shall not represent directly or indirectly that the incidence or likelihood of eye health problems arising from the use of replacement disposable contact lenses is affected by or causally related to the channel of trade from which the buyer obtains such lenses.  Specifically, AOA shall not represent directly or indirectly that increased eye health risk is inherent in the distribution of replacement disposable contact lenses by mail order, pharmacies, or drug stores.  This paragraph shall not prohibit the AOA from making such representations where such representations are supported by valid, clinical or scientific data;

(i)     Notwithstanding the foregoing, the AOA shall be permitted to (i) engage in collective actions protected under the *Noerr-Pennington* doctrine; (ii) present news, information or the views of its members to the public, manufacturers and others, and conduct surveys, collect data and disseminate such information, provided that such activities do not violate the proposed limitations on AOA conduct discussed above; and (iii) disseminate information about, or encourage compliance with, any federal or state laws and government regulations, including dispensing, antitrust, FTC and FDA laws; and

(j)     The AOA shall publish a letter from the president of the AOA setting forth the injunctive terms of this Settlement Agreement in the *AOA News* for four consecutive months, alternating between the "A" and "B" issues of the *AOA News*.

6.     **Exclusive Remedies**.

(a)     Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided in the Court-approved notice shall look solely to the Settlement Fund and injunctive relief for settlement and satisfaction of all Released Claims, as defined in paragraph 11(a) hereof, as against the AOA.

(b)     Except as provided in this Settlement Agreement, the AOA shall not be liable for any costs, fees or expenses of the class plaintiffs, the States, Florida or their counsel, experts, advisors, agents or representatives.

(c)     Since the AOA's payment of the Settlement Fund will fully discharge any obligation it may otherwise have with respect to the payment of the costs, expenses and attorneys' fees in the Class, States and Florida Actions, the AOA agrees not to take any position or participate in the fee and expense approval process.

7.     **Termination**.  Notwithstanding any other provision hereof, the AOA may terminate this Settlement Agreement if, prior to the entry of the Final Order and Judgment pursuant to paragraph 10(b) hereof, any Non-Signatory State commences an action against the AOA or advises the AOA, or any State pursuant to paragraph 8(a) hereof, that it intends to initiate an investigation under federal or state law arising out of or relating to the AOA's alleged policy, practice, course of dealing, agreement with contact lens manufacturers and/or pressure on contact lens manufacturers not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturers' authorized distributors from doing so and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses.  In the event the AOA exercises its rights to terminate this Settlement Agreement under this paragraph, it shall notify the class plaintiffs, the States and Florida

within ten (10) business days of the commencement of the Non-Signatory State's action or of being advised of the Non-Signatory State's intention to initiate an investigation.

8.    **Non-Signatory States**.

(a)    The States and Florida represent and warrant that they have disclosed the general terms and conditions of this Settlement Agreement to each state and commonwealth that is a non-signatory to this Settlement Agreement and the District of Columbia (collectively, the "Non-Signatory States"); that no later than fifteen (15) days after preliminary approval by the Court of this Settlement Agreement, the States and Florida will provide a written invitation to each Non-Signatory State to become a party to this Settlement Agreement; and that, in the event any Non-Signatory State informs a State or Florida that it intends to investigate, assert or pursue any claim against the AOA arising out of or relating to the AOA's alleged policy, practice, course of dealing, agreement with contact lens manufacturers and/or pressure on contact lens manufacturers not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturers' authorized distributors from doing so and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses, such State or Florida shall immediately notify the AOA of such Non-Signatory State's intention.

(b)    Any Non-Signatory State may subsequently become a party to this Settlement Agreement (to which the AOA agrees to waive any objection) by signing a copy of the Joinder in Settlement Agreement annexed hereto as Exhibit C no later than three (3) days before the actual publication of the Court-approved dissemination of notice, and then delivering such signed copy to the AOA and each other party to this Settlement Agreement in accordance with paragraph 17 hereof.

9.    **Entry of Final Order and Judgment**.  If the Court finally approves this Settlement Agreement under paragraph 10 hereof, the class plaintiffs, the States, Florida and

the AOA shall jointly request entry of a Final Order and Judgment in the form annexed hereto as Exhibit D.

10.     **Finality of Settlement**. This Settlement Agreement shall become final upon the occurrence of all of the following events:

(a)     It is approved in all respects by the Court as required by Fed. R. Civ. P. 23(e) and 15 U.S.C. §15c(c);

(b)     Entry, as provided for in paragraph 9 hereof, is made of the Final Order and Judgment (Exhibit D hereto); and

(c)     The time for appeal or to seek permission to appeal from the Court's approval of this Settlement Agreement as required by subparagraph (a) hereof and entry of a Final Order and Judgment as required by subparagraph (b) hereof has expired or, if appealed, approval of this Settlement Agreement and the Final Order and Judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.  The provisions of Fed. R. Civ. P. 60 shall not be taken into account in determining the times herein.

11.     **Releases, Covenants Not to Sue and Judgment Reduction**.

(a)     Upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided by the Court-approved notice, their successors, heirs and assigns, the States and Florida, in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, shall release and forever discharge the AOA and its present and former divisions, affiliates, committees, sections, centers, and benefit plans, and its officers, directors, trustees,

- 12 -

volunteers, employees and agents who are not defendants in this action, and any of their legal representatives, and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing (the "Released Parties") from all manner of claims, liabilities, demands, actions, suits and causes of action, for damages, restitution, disgorgement, injunctive and/or declaratory relief, whether class, individual, representative or otherwise in nature, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that accrued prior to the date of the Court's final approval of this Settlement Agreement as required by paragraph 10 hereof and that the class plaintiffs, Settlement Class members, State residents, Florida residents and the States and Florida ever had, now have or hereafter can, shall or may have, which have been asserted or could have been asserted in the Class Action, States Actions or Florida Action, including, but not limited to, claims under the Sherman Antitrust Act, 15 U.S.C. §1 *et seq.*, Alabama Restraint of Trade or Production Act, §8-10-1 *et seq.*, Code of Alabama (1975), Alaska Monopolies and Restraint of Trade Act, AS §45.50.562 *et seq.*, Arizona's Uniform State Antitrust Act, A.R.S. §44-1402 *et seq.*, Ark. Code Ann. §4-75-201 *et seq.*, California Business and Professions Code Sections 16700 *et seq.*, California Business and Professions Code Sections 17200 (including Business and Professions Code §17206.1), Sections 35-26 and 35-28 of the Connecticut General Statutes, Sections 35-32, 35-34, 35-35 and 35-38 of the Connecticut General Statutes, the Delaware Antitrust Act, 6 Del. C. Chapter 21, Florida Statutes §§501.201 *et seq.*, 542.15 *et seq.*, the Idaho Antitrust Law, Idaho Code §§48-101 *et seq.*, Idaho Code §48-603(18) of the Idaho Consumer Protection Act, the Illinois Antitrust Act, 740 I.L.C.S. 10/1 *et seq.*, Iowa Competition Law, Iowa Code §§553.1 *et seq. (2001)*, Kansas Restraint of Trade Act, K.S.A. §§50-101. *et seq.*, Louisiana Rev. Stat. title 51, part IV, §1401, *et seq.*, Maine mini-Sherman Act, 10 M.R.S.A. §§1101, *et seq.*, 5 M.R.S.A., §§205-A *et seq.*, Maryland Antitrust Act, Maryland Comm. Law Code Ann. 11-201, *et seq.*, Mass. Gen. Laws Ann. ch. 93, §§1-14A, and Ch. 93A, §§2, 4, §2 of the Michigan Antitrust

- 13 -

Reform Act, MCL 445.772; MSA 28.70(2), the Minnesota Antitrust Law of 1971, Minn. Stat. §§325D.49-325D.66, the Missouri Antitrust Law, §§416.011 *et seq.*, the Missouri Merchandising Practices Act, §§407.010 *et seq.*, Nevada Unfair Trade Practices Act, NRS 598A.010 *et seq.,* New Jersey Antitrust Act, N.J.S.A. 56:9-3, New York General Business Law §§340-347, North Carolina Antitrust Act, N.C. Gen. Stat., 75-1 *et seq.* North Dakota's Uniform State Antitrust Act, N.D. Cent. Code §§51-08.1-01 *et seq.*, Ohio Antitrust Law, the Ohio Valentine Act, Ohio Rev. Code §§1331.01 *et seq.*, Oregon Antitrust Law, ORS 646.705 *et seq.*, Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. Com. Code §§15.01, *et seq.*, Utah Antitrust Act, Utah Code Ann.§§76-10-911, *et seq.*, the Virginia Antitrust Act, Va. Code §59.1-9.1 *et seq.*, the West Virginia Antitrust Act, W. Va. Code §47-18-1 *et seq.*, the West Virginia Consumer Credit and Protection Act, W. Va. Code §46A-1-101 *et seq.*, the Wisconsin Trust and Monopolies Law, §§133.03(1), 133.04, 133.16, 133.17 and 133.18, Stats., or any state antitrust and/or consumer protection law, arising out of or relating to the AOA's alleged policy, practice, course of dealing, agreement with contact lens manufacturers, and/or pressure on contact lens manufacturers not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturers' authorized distributors from doing so, and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses ("Released Claims");

(b)   The class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity: (i) shall not bring any proceeding to establish liability against any Released Party based, in whole or in part, upon any Released Claim; and (ii) upon this Settlement

- 14 -

Agreement becoming final pursuant to paragraph 10 hereof, covenant and agree not to seek thereafter to establish liability against any Released Party based, in whole or in part, upon any Released Claim.

(c)     In the event Vistakon, as a non-settling defendant, obtains judgment, in whole or in part, against the AOA for contribution or indemnity based upon any claim a class plaintiff, a State, Florida or a Settlement Class member, State resident or Florida resident who has not timely exercised the right to opt out as provided in the Court-approved notice: (i) has asserted under state law against Vistakon in any action in MDL 1030; or (ii) has asserted or may assert under state law against Vistakon arising out of or relating to the AOA's alleged policy, practice, course of dealing, agreement with contact lens manufacturers, and/or pressure on contact lens manufacturers not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturers' authorized distributors from doing so, and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses, (1) such class plaintiff or Settlement Class member, in the case of a judgment arising out of a class plaintiff or Settlement Class member's claim, (2) such State or State resident, in the case of a judgment arising our of a claim by a State or State resident who is not a Class member, or (3) Florida or such Florida resident, in the case of a judgment arising out of a claim by Florida or a Florida resident, shall reduce any judgment or proportion thereof obtained against Vistakon by the proportionate amount of such judgment attributable to the AOA. In the event the judgment or proportion thereof is not so reduced, such class plaintiff, State, Florida or such Settlement Class member, State resident or Florida resident shall not attempt to collect from Vistakon such amount attributable to the AOA.

(d)     Nothing in this Settlement Agreement is intended to constitute, or shall be construed as, a release of or a covenant not to sue any party other than the Released Parties, including, but not limited to, Vistakon for any claim or cause of action whatsoever,

including, but not limited to, claims founded, in whole or in part, upon the conduct of the Released Parties.

12.      **Waiver and Released Rights Under California Civil Code Section 1542.**

(a)      Upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, the class plaintiffs and all Settlement Class members, States residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, expressly waive and release any and all provisions, rights and benefits conferred by §1542 of the California Civil Code, which provides:

> Section 1542. *Certain Claims Not Affected by General Release*. A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to §1542 of the California Civil Code.

(b)      The class plaintiffs and all Settlement Class members, State residents and Florida residents, their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity, and the States and Florida and their assigns, may, after final approval of this Settlement Agreement pursuant to paragraph 9 hereof, discover facts other than or different from those which he, she or it knows or believes to be true with respect to Released Claims. Nevertheless, upon this Settlement Agreement becoming final under paragraph 9 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, and the States and Florida in their capacities as sovereigns, as *parens patriae* on behalf of natural

- 16 -

persons for whom they may act, and as *parens patriae* on behalf of their economics and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, waive and fully, finally and forever settle and release, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other or different facts.

13.     **Termination by Reason of Court Action**.  In the event that this Settlement Agreement does not become final pursuant to paragraph 10 hereof, it shall become null and void and have no force and effect, except as expressly provided otherwise herein.

14.     **Rescheduling of Events in Scheduling Order**.  In the event this Settlement Agreement is terminated pursuant to paragraph 7 or paragraph 13 hereof, the class plaintiffs, the States, Florida  and the AOA shall use their best efforts to reschedule events in MDL 1030 that have been suspended as to the AOA, in a manner that will reasonably accommodate the litigation interests of the class plaintiffs, the States, Florida, and the AOA. In such event, the AOA reserves the right to move for a separate trial of the Class Action, the States Action and/or Florida Action against it.

15.     **Inadmissibility of Settlement Agreement**.  This Settlement Agreement, including all exhibits, whether or not it becomes final pursuant to paragraph 10 hereof, and any and all negotiations, documents and discussions associated with it, shall not constitute or be construed as an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the AOA or of the truth of any of the claims or allegations in the Class Action, the States Action, the Florida Action or any other action in MDL 1030.

16.     **Return of the AOA Discovery Materials**.  The class plaintiffs, the States, Florida and their respective counsel agree that, except as otherwise required by law, all materials produced by, or information discovered from, or records of information discovered from, or produced by, the AOA or any of its present or former directors, trustees volunteers,

- 17 -

officers or employees who are not defendants in this action, pursuant to the Federal Rules of Civil Procedure or any state law or rule authorizing civil investigation demands, including all copies thereof (collectively, "AOA Materials"), in the possession or control of the class plaintiffs, the States, Florida or their counsel, experts, consultants or agents shall, within sixty (60) days after the final termination of the Class Action, the States Action and the Florida Action, be destroyed or, at the election of the respective plaintiffs, returned to the AOA. Upon the AOA's request, counsel for the class plaintiffs, counsel for the States and counsel for Florida shall provide a written declaration certifying that all the AOA Materials have been destroyed or returned to the AOA, as the case may be.

17.   **Notices**.   All notices, demands, requests and other communications (collectively "Notices") given or served by any party in connection with this Settlement Agreement shall be in writing. Notices shall be given by hand delivery, with receipt, or by nationally recognized overnight courier, with receipt, to each of the following:

Notices to Class Plaintiffs:

Dennis Stewart, Esq.
Joy Ann Bull, Esq.
Milberg Weiss Bershad
 Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, California 92101

George W. Sampson, Esq.
Hagens & Berman
1301 Fifth Avenue, Suite 2929
Seattle, Washington 98101

Stuart D. Wechsler, Esq.
Wechsler Harwood Halebian
 & Feffer LLP
488 Madison Avenue, 8th Floor
New York, NY  10022

Notices to the States and Florida provided to the persons set forth below on the signature pages of this Settlement Agreement at the addresses set forth on such pages.

Notices to the AOA:

Edward C. LaRose
Trenam, Kemker, Scharf, Barkin, Frye,
O'Neill & Mullis, P.A.
Post Office Box 1102
Tampa Florida 33601-1102

D. Biard MacGuineas
Dykema Gossett
Franklin Square
Suite 300 West Tower
1300 "I" Street N.W.
Washington DC 20005-3306

18.     **Binding Nature of Agreement**. This Settlement Agreement shall be binding upon, and inure to the benefit of, the AOA's successors and assigns. Upon this Settlement Agreement becoming final under paragraph 10 hereof, it shall be binding upon, and inure to the benefit of, all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their heirs and assigns, and upon the States and Florida and their assigns.

19.     **Complete Agreement**. This Settlement Agreement contains an entire, complete, and integrated statement of each and every term and provision agreed to by and among the parties; it is not subject to any condition not provided for herein; and it supersedes all prior agreements between the parties with respect to its subject matter, including, but not limited to, the AOA Preliminary Settlement Agreement dated as of March 27, 2001. This Settlement Agreement shall not be modified in any respect except by a writing executed by all of the parties.

20.     **Mutual Drafting of Agreement**. None of the parties to this Settlement Agreement shall be considered its drafter for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

21.     **Exclusive Jurisdiction**. Upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, the AOA, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, the States and Florida agree irrevocably: (i) to submit to the exclusive jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, for any suit, action, proceeding or dispute arising

- 19 -

out of or relating to this Settlement Agreement, including its applicability; and (ii) not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, or that such Court is an improper venue or an inconvenient forum.

22.    **Counterparts.**  This Settlement Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

**Co-Lead Counsel for Class Plaintiffs:**

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
DENNIS STEWART
JOY ANN BULL

_____
DENNIS STEWART

600 West Broadway, Suite 1800
San Diego, California 92101
Telephone: 619/231-1058
619/231-7423 (fax)

HAGENS BERMAN LLP
GEORGE SAMPSON

_____
GEORGE SAMPSON

1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: 206/623-7292
206/623-0594 (fax)

WECHSLER HARWOOD HALEBIAN
  & FEFFER LLP
STUART D. WECHSLER

_____
STUART D. WECHSLER

488 Madison Avenue, 8th Floor
New York, NY  10022
Telephone: 212/935-7400
212/753-3630 (fax)

**Counsel for the State of Florida:**

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL
STATE OF FLORIDA

By: _____
        Name: RICHARD E. DORAN
        Title: Deputy Attorney General

PATRICIA A. CONNERS
Chief, Antitrust Section
OFFICE OF THE
ATTORNEY GENERAL
PL-01 The Capitol
Tallahassee, FL  32399-1050
Telephone: 850/414-3600

R. SCOTT PALMER

- 20 -

## ESCROW AGREEMENT

THIS AGREEMENT is made and entered into as of May 22, 2001, by and between (1) the American Optometric Association ("AOA"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20, 94-1214-CIV-J-20, and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, the "States"), in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and as *parens patriae* on behalf of the States' economies and general welfare on Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A; 97-928-CIV-J-20A; 98-93-CIV-J-21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; (4) the State of Florida ("Florida"), in its capacity as sovereign as *parens patriae* on behalf of natural persons for whom Florida may act, and as *parens patriae* on behalf of Florida's economy and general welfare in civil Action No. 94-619-Civ-J-20, pending in MDL-1030; (5) Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") (one of co-lead counsel for the class plaintiffs and the Class and as Escrow Agent (as defined in paragraph 1 herein)); and (6) Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, Professional Association ("AOA counsel") (lead counsel for the AOA).

WHEREAS, as of May 22, 2001, the AOA, the class plaintiffs, the States, and Florida entered into a Settlement Agreement (the "Settlement Agreement");

WHEREAS, the class plaintiffs, the States, Florida and the AOA will seek a Final Order and Judgment (as hereinafter defined) from the Court approving the Settlement Agreement and the dismissal of the Class Action, Florida Action and the States Action against the AOA;

WHEREAS, pursuant to that Settlement Agreement, the AOA agreed to deposit the cash consideration for the settlement, *i.e.*, $750,000, into an escrow account to be maintained at San Diego National Bank ("The Account") upon signature of the Settlement Agreement;

WHEREAS, the class plaintiffs, the States, Florida, and the AOA have entered into this Escrow Agreement to facilitate the consummation of the Settlement Agreement;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.    The class plaintiffs, the States, Florida and the AOA do hereby appoint, constitute and designate Milberg Weiss as their Escrow Agent for the purposes set forth herein, and Milberg Weiss accepts the agency created under this Escrow Agreement and agrees to perform the obligations imposed herein.

2.    As used herein, "Final Order and Judgment" means the Court giving final approval to the Settlement Agreement pursuant to paragraph 10 thereof;

3.    As used herein, "Florida Counsel" shall mean the Attorney General of Florida, acting through Patricia A. Conners, Chief, Antitrust Section, or such other representative as the Florida Attorney General may designate in writing.

4.    As used herein, "States Counsel" shall mean the Attorney General of Maryland acting through Assistant Attorney General John Tennis, or such other representative as the Maryland Attorney General may designate in writing.

5.    From the date of this Escrow Agreement until the Escrow Agent receives joint written instructions from Milberg Weiss, AOA counsel, Florida counsel, and the

States Counsel that the Final Order and Judgment has been entered, "Counsel," as used hereinafter, shall mean Milberg Weiss, AOA counsel, Florida Counsel and States Counsel. When "Counsel" means Milberg Weiss, AOA Counsel, Florida counsel, and States Counsel, instructions, confirmations and authorizations to or from the Escrow Agent must be received from Milberg Weiss, AOA Counsel, Florida counsel, and States Counsel.

6.     The AOA has sent a check for $750,000 (seven hundred fifty thousand dollars) payable to the Milberg Weiss Bershad Hynes & Lerach LLP Trust Account. Upon execution of the Settlement Agreement, the AOA will authorize Milberg Weiss to deposit in the Account the $750,000 which, together with interest which thereafter accrues in the Account, shall constitute the "Escrow Fund."

7.     The Escrow Agent shall invest the Escrow Fund in a money market fund which invests solely in United States Treasury securities which are direct obligations of the United States of America or obligations of the principal of and the interest on which are unconditionally guaranteed by the United States of America. The Escrow Agent may sell or liquidate any of the investments at any time if the proceeds thereof are required for any release of funds permitted or required hereunder, and the Escrow Agent shall not be liable or responsible for any loss, charge, load, premium loss and/or penalty resulting from any such sale or liquidation. If an investment must be liquidated, the proceeds of the liquidation will not be available for distribution until the Escrow Agent has received immediately available funds from the sale or liquidation of the investment. Any losses or damages from such liquidation shall be deducted from the Escrow Fund.

8.     All income earned by the Escrow Fund shall be reinvested by the Escrow Agent in accordance with the above-referenced written instructions of Counsel and shall become a part of the Escrow Fund.

9.     Before the Settlement Agreement becomes final, the Escrow Agent is hereby authorized to transfer and distribute funds from the Escrow Fund by check, wire,

electronic, or internal process, in accordance with paragraphs 5 and 7 hereof and upon such other prior written   authorization from Counsel as it may receive.   Such authorization may be by facsimile transmission or other written communication. Except as provided in paragraph 8 hereof, the Escrow Agent shall disburse no funds from the Escrow Fund before the Settlement Agreement is final pursuant to paragraph 10 of the Settlement Agreement without prior written authorization of Counsel.

10.    Subject to such   further orders and/or directions as may be made by the Court, after the Settlement Agreement is final, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of the Settlement Agreement or Orders of the Court.

12.    All funds deposited with or held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to an Order of the Court.

13.    In the event of disagreement between Counsel with respect to the distribution of funds from the Escrow Fund, the Escrow Agent shall hold the disputed funds until the disagreement is resolved.

14.    Any Federal, State, Municipal or local taxes due as a result of income earned by, or assets in, the Escrow Fund are to be paid from the Escrow Fund by the Escrow Agent. The Escrow Agent shall make all estimated tax payments and make or file any returns or reports relative thereto, upon such confirmations by Counsel as it may request.  In the event any tax liability is finally assessed against and paid by the AOA as a result of income earned by, or assets in, the Escrow Fund, the AOA shall be entitled to reimbursement of such payment from the Escrow Fund.  In that event, the AOA shall present proof of payment to the Escrow Agent and, within five (5) business days of receipt, the AOA shall be reimbursed for such payment from the Escrow Fund.

15.    The AOA, Florida Counsel, the States' Counsel, Class Counsel, and the Escrow Agent agree to treat the Escrow Fund as being at all times as one or more "qualified settlement funds" within the meaning of Treas. Reg. Section 1.468B-1.  In addition, the Escrow Agent and, as required, the AOA, Florida Counsel, Class Counsel, and States' Counsel, shall jointly and timely make such elections as necessary or advisable to carry out the provisions of this section, including the "relation-back election" (as defined in Treas. Reg. Section 1.468B-1) back to the earliest permitted date.  Such elections shall be made in compliance with the procedures and requirements contained in such regulations.  It shall be the responsibility of the Escrow Agent to timely and properly prepare, and deliver the necessary documentation for signature by all necessary parties, and thereunder to cause the appropriate filing to occur.

16.    For the purpose of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent.  The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Escrow Fund (including without limitation the returns described in Treas. Reg. Section 1.468B-2(k)).  Such returns (as well as the election described above) shall be consistent with this paragraph and in all events shall reflect that all taxes (including any interest or penalties) on the income earned by the Escrow Fund shall be paid out of the Escrow Fund.

17.    All (a) taxes (including any interest or penalties) arising with respect to the income earned by the Escrow Fund, including any taxes or tax detriments that may be imposed upon the AOA with respect to any income earned by the Escrow Fund for any period during which the Escrow Fund does not qualify as a "qualified settlement fund" for Federal or state income tax purposes ("Taxes") and (b) expense and costs incurred in connection with the operation and implementation of this paragraph (including, without limitation, expense of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing or failing to file the appropriate returns) ("Tax Expenses"),

- 5 -

shall be paid out of the Escrow Fund.  In all events, the AOA shall have no liability or responsibility for the Taxes or Tax Expenses.  The Escrow Agent shall indemnify and hold the AOA harmless for Taxes or Tax Expenses (including, without limitation, taxes payable by reason by reason of any such indemnification).  In the event that any income earned by the Escrow Fund is under applicable Federal or state income tax laws includible in the taxable income of the AOA, the amount of indemnification due hereunder shall be equal to the product of (i) the amount of such income inclusion (increased by any additional amounts includible in income as a result of this indemnification) and (ii) as to the AOA, the maximum marginal corporate income or franchise tax rate (before credits) applicable on ordinary taxable income that is imposed under the tax laws of the applicable taxing jurisdiction before net operating loss carryovers for the AOA for the taxable year in which indemnification hereunder becomes due and payable.  Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of this Escrow Agreement and shall be timely paid by the Escrow Agent out of the Escrow Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to class members or, if necessary, from refund to the AOA, any funds necessary to pay such amounts, including the establishment of adequate reserves for any such contingent Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. Section 1.468B-2(1)(2)).  The parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this paragraph.

18.    The Escrow Agent shall be entitled to rely upon the most recent instructions from Counsel as to the names of the persons authorized to instruct the Escrow Agent. Counsel shall provide a list of the signatures of such authorized persons to the Escrow Agent from time to time.

19.     The Escrow Agent shall be protected in acting upon written notice, request, waiver, consent, receipt or other paper document furnished to it by Counsel, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information contained therein, which they in good faith believe to be genuine and what it purports to be.

20.     Should the Escrow Agent receive or become aware of any demands or claims with respect to the Escrow Fund, other than those as contemplated by the Settlement Agreement, they shall have the right to apply to the District Court, on notice to the parties hereto, for appropriate instructions.   Upon application to and order of the District Court, on notice to the parties, the Escrow Agent shall be entitled to reimburse themselves from the Escrow Fund for all costs, damages, judgments and expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with or arising out of their action with respect to the Escrow Fund.

21.     This Escrow Agreement may not be assigned by the Escrow Agent without prior written approval of the parties hereto; provided, however, that upon thirty (30) days written notice by the Escrow Agent to the parties hereto, the Escrow Agent may resign as Escrow Agent hereunder.   Any assets held by such Escrow Agent under the terms of this agreement as of the effective date of the resignation shall be delivered to a successor escrow agent designated in writing by Counsel.   If no successor agent has been  appointed as of the effective date of the resignation, all obligations of such Escrow Agent hereunder shall nevertheless cease and terminate.   In the event the Escrow Agent resigns and a successor is not appointed as provided in this paragraph, the Escrow Agent's sole responsibility thereafter shall be to keep safely all Escrow Funds held by them and to deliver the same to a person designated by Counsel or in accordance with the direction of a final order or judgment of a court of competent jurisdiction.

22.     This Escrow Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the parties hereto.

23.    This Escrow Agreement will be governed by and construed in accordance with the laws of the State of Florida.

24.    For purposes of notice, correspondence and mailing of checks, or wiring of funds, the parties' addresses shall be:

    MILBERG WEISS BERSHAD
      HYNES & LERACH LLP
    DENNIS STEWART
    JOY ANN BULL
    600 West Broadway, Suite 1800
    San Diego, CA 92101
    Telephone: 619/231-1058
    FAX: 619/231-7423

    ROBERT A. BUTTERWORTH
    ATTORNEY GENERAL
    Patricia A. Conners
    Chief, Antitrust Section
    STATE OF FLORIDA
    PL-01 The Capitol
    Tallahassee, FL 32399-1050
    Telephone: 850/414-3600
    FAX: 850/488-9134

    EDWARD C. LAROSE
    TRENAM, KEMKER, SCHARF, BARKIN, FRYE,
      O'NEILL & MULLIS
    Professional Association
    101 E. Kennedy Blvd., Suite 2700
    Tampa, FL 33601
    Telephone: 813/223-7474
    FAX: 813/229-6553

    J. JOSEPH CURRAN, JR.
    ATTORNEY GENERAL
    A.A.G. JOHN TENNIS
    STATE OF MARYLAND
    200 Saint Paul Place
    Baltimore, MD 21202-2202
    Telephone: 410/576-6474
    FAX: 410/576-7830

25.    All signatories to this Escrow Agreement warrant that they have full and complete authority to enter into and sign this Escrow Agreement on behalf of the entity or person they represent.

26.     This Escrow Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the class plaintiffs, the States, Florida, the AOA, and the Escrow Agent have caused this Escrow Agreement to be signed as of the 22-1 day of May, 2001.

**Co-Lead Counsel for Class Plaintiffs:**

HAGENS BERMAN LLP
STEVE W. BERMAN
GEORGE W. SAMPSON

_____
GEORGE W. SAMPSON

1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  206/623-7292

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
LEONARD B. SIMON
DENNIS STEWART

_____
DENNIS STEWART

600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058

WECHSLER HARWOOD HALEBIAN
  & FEFFER LLP
STUART D. WECHSLER

_____
STUART D. WECHSLER

488 Madison Avenue, 8th Floor
New York, NY  10022
Telephone:  212/935-7400

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re DISPOSABLE CONTACT LENS ANTITRUST LITIGATION | ) MDL Docket No. 1030 |
| | ) |
| | ) SETTLEMENT AGREEMENT |
| | ) |
| This Document Relates To: | ) |
| | ) |
| ALL ACTIONS. | ) |
| | ) |

Ex. D

THIS SETTLEMENT AGREEMENT is entered into as of the $22$ nd day of May, 2001, between (1) each of the individual defendants: L. Edward Elliott, John A. Gazaway, Richard Hopping, Earle Hunter, Timothy Kime, Paul Klein, James C. Leadingham, Melvin Remba, Lee Rigel, Ronald Snyder, Jack Solomon, William David Sullins, Jr., and Stanley Yamane, separately and individually (collectively "Individual Defendants"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20, 94-1214-CIV-J-20, and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re: Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff-States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, with any state or commonwealth, including the District of Columbia, that joins this Settlement Agreement under paragraph 8(b) hereof, the "States") in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and as *parens patriae* on behalf of the States' economies and general welfare in Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A;97-928-CIV-J-20A; 98-93-CIV-J21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; and (4) the State of Florida ("Florida"), in its capacity as sovereign, as *parens patriae* on behalf of natural persons for whom Florida may act, and as *parens patriae* on behalf of Florida's economy and general welfare in Case No. 94-619-CIV-J-20 (the "Florida Action") pending in MDL-1030;

- 1 -

WHEREAS, the Florida action and the Class Action allege that certain of the Individual Defendants conspired with Johnson & Johnson Vision Products, Inc. ("Vistakon"), and/or CIBA Vision Corporation ("CIBA Vision"), and/or Bausch & Lomb Incorporated ("Bausch & Lomb") (collectively, Defendant Contact Lens Manufacturers) and/or the American Optometric Association ("AOA") not to sell replacement contact lenses (as defined herein) directly to alternative channels of distribution (as defined herein), and to restrain authorized distributors of the contact lens manufacturers from reselling such lenses directly to such alternative channels of distribution, with the alleged effect of artificially raising or maintaining the retail prices for Bausch & Lomb, Vistakon and/or CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution;

WHEREAS, the States Action (i) alleges that certain of the Individual Defendants conspired with Vistakon, Bausch & Lomb, CIBA Vision, the AOA, Contact Lens and Anterior Segment Society, Inc., American Society of Contact Lens Specialists, Society of Eye Care Specialists, Eye Care Management Group, Vision Enhancement Council International, Society of Contact Lens Specialists, National Association of Contact Lens Specialists, the California Optometric Association, Optometric Society of the City of New York, and/or the Wisconsin Optometric Association not to sell replacement contact lenses directly to alternative channels of distribution, to restrain authorized distributors of the contact lens manufacturers from reselling such lenses directly to such alternative channels of distribution, and to restrain consumer access to prescriptions or work orders needed to obtain contact lenses, with the alleged effect of artificially raising or maintaining the retail prices for Bausch & Lomb, Vistakon and CIBA Vision replacement contact lenses sold to consumers through those companies' authorized channels of distribution and alternative channels of distribution and (ii) does not seek damages or other relief based on the purchase

- 2 -

of contact lenses manufactured by persons or entities other than Bausch & Lomb, Vistakon or CIBA Vision;

WHEREAS, each of the Individual Defendants deny each and every allegation of unlawful conduct in the Class, States and Florida Actions;

WHEREAS, on or about September 5, 1996, the Court in MDL 1030, after briefing and argument, certified a consumer class in the Class Action consisting of: "All purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners during the period 1988 to the present, excluding consumers in Florida represented by the Florida Attorney General in *State of Florida v. Johnson & Johnson Vision Products, et al.*, Case No. 94-619-CIV-J-20" (the "Class"), and determined that the class plaintiffs were adequate representatives of the Class and had claims which were typical of those of its members;

WHEREAS, on July 28, 1997, the Court modified its class certification order to exclude consumers residing in Georgia or Tennessee;

WHEREAS, the Class, the States and Florida entered into a settlement agreement with CIBA Vision in May of 1997, which this Court finally approved on February 28, 2001 ("CIBA Vision Settlement");

WHEREAS, the Class, the States and Florida entered into a settlement agreement with Bausch & Lomb on February 16, 2001, which this Court preliminarily approved on March 16, 2001 ("Bausch & Lomb Settlement");

WHEREAS, in connection with the CIBA Vision Settlement and the Bausch & Lomb Settlement, the Court approved use of a "Settlement Class" which is defined the same as the Class is defined above, and which includes consumers in Georgia or Tennessee;

WHEREAS, in the States Action and the Florida Action, the States and Florida represent State residents (as defined herein) pursuant to 15 U.S.C. §15c;

- 3 -

WHEREAS, the class plaintiffs, the States and Florida and their respective counsel have concluded, after extensive discovery, and a thorough review of the facts and the relevant law, that it would be in the best interests of the Settlement Class and the residents of the States (as defined herein) and of Florida to enter into this Settlement Agreement in order to avoid the risk and uncertainty of continued litigation against the Individual Defendants, and to assure a benefit to the Settlement Class and residents of the States and of Florida;

WHEREAS, this Settlement Agreement is the result of arm's length negotiations, and the class plaintiffs, the States and Florida and their respective counsel consider this Settlement Agreement to be fair, reasonable, adequate and in the best interests of the Settlement Class and residents of the States and of Florida;

WHEREAS, the Individual Defendants have concluded that, despite their denials of wrongdoing and liability, it is in their best interests to enter into this Settlement Agreement to eliminate the expense, inconvenience, burden and inherent risk and uncertainty of continued litigation;

WHEREAS, this Settlement Agreement shall not be deemed or construed as an admission or evidence of any violation of law or any liability or wrongdoing by the Individual Defendants;

NOW, THEREFORE, it is agreed by the undersigned, on behalf of the Individual Defendants, the class plaintiffs, the States and Florida that, subject to the approval of the Court as provided herein, the Class, States and Florida Actions and all claims of the class plaintiffs, the States and of Florida, shall be settled, compromised and dismissed with prejudice as to the Individual Defendants and, except as hereinafter provided, without costs or attorneys' fees, on the following terms and conditions:

1.    Definitions.  For purposes of this Settlement Agreement only, the following terms have the following meanings:

- 4 -

(a)     The term "alternative channel of distribution" means any mail order company, pharmacy, buying club, department store, mass merchandise outlet or other distribution alternative which does not require that an eye care practitioner (as defined herein), be either available on or side-by-side to, its premises, and/or examine the purchaser's eyes in connection with the sale of contact lenses.

(b)     The term "Settlement Class" means all purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners during the period 1988 to the present excluding consumers in Florida represented by the Florida Attorney General in State of Florida v. Johnson & Johnson Vision Products, et al., Case No. 94-619-Civ-J-20.

(c)     The term "Settlement Class member" means a member of the Settlement Class.

(d)     The term "contact lens" means a medical device made of plastic that is placed on the eye.

(e)     The term "eye care practitioner" means an optometrist, ophthalmologist or optician, including, but not limited to, any such person employed by or associated with a retail optical store (as defined herein).

(f)     The term "Florida resident" means any natural person who was a resident of the State of Florida at the time he or she, or someone on his or her behalf, purchased CIBA Vision, Bausch & Lomb and/or Vistakon contact lenses.

(g)     The term "purchasers of Vistakon, Bausch & Lomb and CIBA replacement contact lenses from eye care practitioners" means any natural person who bought, or on whose behalf someone bought, CIBA Vision, Bausch & Lomb and/or Vistakon replacement contact lenses (as defined herein) from an eye care practitioner (as defined herein).

(h)     The term "replacement contact lenses" means contact lenses that are sold or dispensed to replace the initial contact lenses.

(i)     The term "retail optical store" means a store or a chain of stores that sells contact lenses to consumers and employs or has associated an eye care practitioner either available on, or side-by-side to, its premises to examine the purchaser's eyes in connection with the sale of contact lenses, including all stores or chains of stores to which CIBA Vision, Vistakon and/or Bausch & Lomb or their authorized distributors sold contact lenses.

(j)     The term "State resident" means any natural person who was a resident of any State at the time he or she, or someone on his or her behalf, purchased Bausch & Lomb, CIBA and/or Vistakon contact lenses.

2.      **Motion for Preliminary Approval**. Within twenty (20) business days of the execution of this Settlement Agreement, the class plaintiffs, the States and Florida shall submit a motion to the Court requesting preliminary approval of this Settlement Agreement and entry of an order in the form annexed hereto as Exhibit A.

3.      **Plan for Dissemination of Notice**. Simultaneously with the parties' motion for preliminary approval, the class plaintiffs, the States and Florida shall submit to the Court a plan for dissemination of notice to Settlement Class members, State residents and Florida residents.  The form of notice for this settlement shall be, as far as is practicable, a part of and included in the form of notice for the Bausch & Lomb Settlement.  The plan for dissemination of notice for the Bausch & Lomb Settlement provides for dissemination of notice at least as broadly as was provided for in the CIBA Vision Settlement.  In addition, notice of the Bausch & Lomb Settlement (including notice of the Individual Defendant Settlement) is to be mailed personally to each person who requested notice of the CIBA Vision Settlement, or who made a claim or otherwise registered for the CIBA Vision Benefits Package.

- 6 -

4.     **The Settlement Fund**.

(a)     Subject to final approval of this Settlement Agreement under paragraph 10 hereof and the Individual Defendants' rights of termination under paragraph 7 hereof, the Individual Defendants each have previously paid, or have agreed to pay, no later than five (5) days from the date of the execution of this Settlement Agreement, $8,000 in cash, in full, complete and final settlement of the Class Action, the States Action, the Florida Action, all Released Claims (as defined in paragraph 11(a) hereof) and any obligations the Individual Defendants might otherwise have to pay, including the cost of any notice to Class members, State residents or Florida residents, the payment of claims to Class members, State residents or Florida residents, and the costs of suit, including reasonable attorneys' fees, as approved by the Court pursuant to Fed. R. Civ. P. 23 and 15 U.S.C. §§15, 15c and 26, as follows: 1) before execution of this Settlement Agreement, certain of the Individual Defendants, Elliott, Gazaway, Hopping, Hunter, Kime, Leadingham, Remba, Rigel, Solomon, and Sullins, sent checks totaling $80,000 payable to the Milberg Weiss Bershad Hynes & Lerach LLP Trust Account.   Upon execution of this Settlement Agreement, Milberg Weiss is authorized to deposit that $80,000 into an escrow account to be maintained by San Diego National Bank (the "Account"), 2)within five (5) days after execution of this Settlement Agreement, the other Individual Defendants Klein, Snyder, and Yamane shall each send $8,000 to the Milberg Weiss trust account and shall authorize Milberg Weiss to deposit such amounts into the Account. The monies paid by the Individual Defendants under this Section, together with the interest which thereafter accrues in the Account shall constitute the Individual Defendant Settlement Fund (the "Settlement Fund").   The Settlement Fund will be invested in a money market fund that invests solely in United States Treasury securities that are direct obligations of the United States of America or obligations the principal of, and the interest on which, are unconditionally guaranteed by the United States of America.   The Settlement Fund shall be administered pursuant to the Escrow

Agreement annexed hereto as Exhibit B (the "Escrow Agreement"). Except for the payment of the fees and costs of administration incurred pursuant to the Escrow Agreement, the Settlement Fund will remain intact until final approval of this Settlement Agreement pursuant to paragraph 10 hereof. The Settlement Fund shall be administered for the benefit of Settlement Class members, State residents and Florida residents as ordered by the Court.

(b)     If at the end of any claim submission period monies remain in the Settlement Fund, net of costs of administration and costs of suit, including reasonable attorneys' fees, as approved by the Court, the remaining amount shall be distributed in a manner, which may include a *cy pres* distribution, and on terms and conditions, determined by the Court in the exercise of its reasonable discretion; provided, however, that the Individual Defendants shall be given written notice of any application requesting the Court's exercise of discretion pursuant to this subparagraph.

(c)     If, prior to the giving of Court-approved notice, (i) the Court declines to approve this Settlement Agreement preliminarily, (ii) the Court preliminarily approves the Settlement Agreement but withdraws such preliminary approval, or (iii) this Settlement Agreement is terminated under paragraph 7 hereof, then the Settlement Fund, including all income earned thereon, shall be returned to the Individual Defendants within ten (10) business days of such event, less only (a) the fees and costs of administration incurred under the Escrow Agreement; and (b) any accrued tax liability.

(d)     It is intended that any taxes due as a result of income earned by the Settlement Fund will be paid from the Settlement Fund. In the event that federal or state income tax liability is finally assessed against and paid by the Individual Defendants as a result of income earned by the Settlement Fund, the Individual Defendants shall be entitled to reimbursement of such payment from the Settlement Fund. The Individual Defendants will use their best efforts to resist any such payments.

5.     **Injunctive Relief**. The following injunctive terms apply:

- 8 -

    (a)    As to Defendants Paul Klein and Ronald Snyder:

        (i)    Defendants Klein and Snyder shall not advocate the withholding of prescriptions from patients or the interruption of the sale of disposable contact lenses through alternative channels who dispense in accordance with applicable law;

        (ii)    Defendants Klein and Snyder will not solicit contact lens manufacturers to refrain from selling disposable contract lenses to alternative channels that dispense disposable contact lenses in accordance with applicable law;

        (iii)    Defendants Klein and Snyder will release contact lens prescriptions to their patients upon the patients' requests, in conformity with Florida law;

        (iv)    Defendants Klein and Snyder will testify in person at any resumption of the trial in MDL No. 1030, if requested by Plaintiffs.  At least seven (7) days advance notice will be given to Klein or Snyder, who will appear and testify in Jacksonville at his own expense.

    (b)    As to Defendant Yamane:

        (i)    If Defendant Yamane reenters private optometry practice, he will not oppose the release of contact lens prescriptions to his patients upon the patients' requests, consistent with applicable law;

        (ii)    If Defendant Yamane reenters private practice, he will not oppose the nondiscriminatory distribution of contact lenses by manufacturers to alternative channels of distribution that dispense contact lenses upon presentation of a valid prescription and in accordance with applicable law;

        (iii)    As an employee of Defendant Johnson & Johnson Vision Products, Inc., Defendant Yamane will comply with the terms of any injunction entered against Johnson & Johnson Vision Products, Inc.  As a member of the AOA, he will comply with the terms of any injunction entered against the AOA;

(iv)     Defendant Yamane will comply with any business practice terms to which his employer, Johnson & Johnson Vision Products, Inc. agrees as a part of the settlement;

(v)     Defendant Yamane will provide trial testimony in person at any resumption of the trial in MDL No. 1030, if requested by Plaintiffs.  At least three (3) days advance notice will be given to counsel for Defendant Yamane.

(c)     As to Defendants L. Edward Elliot, John A. Gazaway, Richard Hopping, Earle Hunter, Timothy Kine, James C. Leadingham, Melvin Remba, Lee Rigel, Jack Solomon, and William David Sullins, Jr. (the "Individual AOA Defendants"), for four (4) years from the date of the Final Order:

(i)     Consistent with state law, each Individual AOA Defendant will not object to the release of contact lens prescriptions to patients, except in the affirmative exercise of his own medical judgment related to the specific identified documented health needs of the individual patient;

(ii)     Each Individual AOA Defendant will not advocate that an optometrist refuse to release a contact lens prescription to a patient except where, consistent with state law, in the exercise of the optometrist's own medical judgment, release is not appropriate because of specific identified documented health needs of a particular patient;

(iii)     Consistent with state law, each Individual AOA Defendant will release a contact lens prescription to a patient upon the patient's request, except in the affirmative exercise of  the defendant's own medical judgment related to the specific identified documented health needs of the individual patient;

(iv)     Each Individual AOA Defendant will not ask or encourage any contact lens manufacturer to refuse to sell contact lenses to any channel of trade;

(v)     Each Individual AOA Defendant will not advocate that any contact lens manufacturer refuse to sell contact lenses to any channel of trade;

(vi)   Each Individual AOA Defendant will not solicit manufacturers to refrain from selling disposable contact lenses to alternative channels that dispense upon the presentation of a valid prescription and in accordance with applicable law;

(vii)   Each Individual AOA Defendant will be bound by the terms of any injunction entered against the AOA;

(viii)   Each Individual AOA Defendant will testify in person at any resumption of the trial in MDL No. 1030, if requested by Plaintiffs.  At least three (3) days advance notice will be given to any testifying Individual AOA Defendant, who will appear and testify in Jacksonville at his own expense.

6.   **Exclusive Remedies**.

(a)   Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided in the Court-approved notice shall look solely to the Settlement Fund and injunctive relief for settlement and satisfaction of all Released Claims, as defined in paragraph 11(a) hereof, as against the Individual Defendants.

(b)   Except as provided in this Settlement Agreement, the Individual Defendants shall not be liable for any costs, fees or expenses of the class plaintiffs, the States, Florida or their counsel, experts, advisors, agents or representatives.

(c)   Since the Individual Defendants' agreed-upon payment of the Settlement Fund will fully discharge any obligation they may otherwise have with respect to the payment of the costs, expenses and attorneys' fees in the Class, States and Florida Actions, the Individual Defendants agree not to take any position or participate in the fee and expense approval process.

7.   **Termination**.  Notwithstanding any other provision hereof, any of the Individual Defendants may terminate this Settlement Agreement as to him if, prior to the entry of the Final Order and Judgment pursuant to paragraph 10(b) hereof, any Non-Signatory State commences an action against any of the Individual Defendants or advises

- 11 -

any of the Individual Defendants, or any State, pursuant to paragraph 8(a) hereof, that it intends to initiate an investigation under federal or state law arising out of or relating to any of the Individual Defendants' alleged policies, practices, courses of dealing, agreements with optometrists or any contact lens manufacturer, and/or pressure on any contact lens manufacturer not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturer's authorized distributors from doing so and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses. In the event any of the Individual Defendants exercises his right to terminate this Settlement Agreement under this paragraph, he shall notify the class plaintiffs, the States and Florida within ten (10) business days of the commencement of the Non-Signatory State's action or of being advised of the Non-Signatory State's intention to initiate an investigation.

8.  **Non-Signatory States**.

(a)    The States and Florida represent and warrant that they have disclosed the general terms and conditions of this Settlement Agreement to each state and commonwealth that is a non-signatory to this Settlement Agreement and the District of Columbia (collectively, the "Non-Signatory States"); that no later than fifteen (15) days after preliminary approval by the Court of this Settlement Agreement, the States and Florida will provide a written invitation to each Non-Signatory State to become a party to this Settlement Agreement; and that, in the event any Non-Signatory State informs a State or Florida that it intends to investigate, assert or pursue any claim against any of the Individual Defendants arising out of or relating to any of the Individual Defendants' alleged policies, practices, courses of dealing, agreements with optometrists or any contact lens manufacturer and/or pressure on any contact lens manufacturer not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturer's authorized distributors from doing so and/or to restrain consumer access to prescriptions or work orders needed to obtain

contact lenses, such State or Florida shall immediately notify each of the Individual Defendants of such Non-Signatory State's intention.

(b)     Any Non-Signatory State may subsequently become a party to this Settlement Agreement (to which the Individual Defendants agree to waive any objection) by signing a copy of the Joinder in Settlement Agreement annexed hereto as Exhibit C no later than three (3) days before the actual publication of the Court-approved dissemination of notice, and then delivering such signed copy to the Individual Defendants and each other party to this Settlement Agreement in accordance with paragraph 17 hereof.

9.     **Entry of Final Order and Judgment**.  If the Court finally approves this Settlement Agreement under paragraph 10 hereof, the class plaintiffs, the States, Florida and the Individual Defendants shall jointly request entry of a Final Order and Judgment in the form annexed hereto as Exhibit D.

10.     **Finality of Settlement**. This Settlement Agreement shall become final upon the occurrence of all of the following events:

(a)     It is approved in all respects by the Court as required by Fed. R. Civ. P. 23(e) and 15 U.S.C. §15c(c);

(b)     Entry, as provided for in paragraph 9 hereof, is made of the Final Order and Judgment (Exhibit D hereto); and

(c)     The time for appeal or to seek permission to appeal from the Court's approval of this Settlement Agreement as required by subparagraph (a) hereof and entry of a Final Order and Judgment as required by subparagraph (b) hereof has expired or, if appealed, approval of this Settlement Agreement and the Final Order and Judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.  The provisions of Fed. R. Civ. P. 60 shall not be taken into account in determining the times herein.

11.    **Releases, Covenants Not to Sue and Judgment Reduction**.

(a)    Upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised their right to opt out as provided by the Court-approved notice, their successors, heirs and assigns, the States and Florida, in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, shall release and forever discharge the Individual Defendants and any of their legal representatives, heirs, executors, administrators, successors and assigns (the "Released Parties") from all manner of claims, liabilities, demands, actions, suits and causes of action, for damages, restitution, disgorgement, injunctive and/or declaratory relief, whether class, individual, representative or otherwise in nature, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that accrued prior to the date of the Court's final approval of this Settlement Agreement as required by paragraph 10 hereof and that the class plaintiffs, Settlement Class members, State residents, Florida residents and the States and Florida ever had, now have or hereafter can, shall or may have, which have been asserted or could have been asserted in the Class Action, States Actions or Florida Action, including, but not limited to, claims under the Sherman Antitrust Act, 15 U.S.C. §1 *et seq.*, Alabama Restraint of Trade or Production Act, §8-10-1 *et seq.*, Code of Alabama (1975), Alaska Monopolies and Restraint of Trade Act, AS §45.50.562 *et seq.*, Arizona's Uniform State Antitrust Act, A.R.S. §44-1402 *et seq.*, Ark. Code Ann. §4-75-201 *et seq.*, California Business and Professions Code Sections 16700 *et seq.*, California Business and Professions Code Sections 17200 (including Business and Professions Code §17206.1), Sections 35-26 and 35-28 of the Connecticut General Statutes, Sections 35-32, 35-34, 35-35 and 35-38 of the Connecticut General Statutes, the Delaware Antitrust Act, 6

Del. C. Chapter 21, Florida Statutes §§501.201 *et seq*., 542.15 *et seq*., the Idaho Antitrust Law, Idaho Code §§48-101 *et seq*., Idaho Code §48-603(18) of the Idaho Consumer Protection Act, the Illinois Antitrust Act, 740 I.L.C.S. 10/1 *et seq*., Iowa Competition Law, Iowa Code §§553.1 *et seq. (2001)*, Kansas Restraint of Trade Act, K.S.A. §§50-101. *et seq*., Louisiana Rev. Stat. title 51, part IV, §1401, *et seq*., Maine mini-Sherman Act, 10 M.R.S.A. §§1101, *et seq*., 5 M.R.S.A., §§205-A *et seq*., Maryland Antitrust Act, Maryland Comm. Law Code Ann. 11-201, *et seq*., Mass. Gen. Laws Ann. ch. 93, §§1-14A, and Ch. 93A, §§2, 4, §2 of the Michigan Antitrust Reform Act, MCL 445.772; MSA 28.70(2), the Minnesota Antitrust Law of 1971, Minn. Stat. §§325D.49-325D.66, the Missouri Antitrust Law, §§416.011 *et seq*., the Missouri Merchandising Practices Act, §§407.010 *et seq*., Nevada Unfair Trade Practices Act, NRS 598A.010 *et seq*., New Jersey Antitrust Act, N.J.S.A. 56:9-3, New York General Business Law §§340-347, North Carolina Antitrust Act, N.C. Gen. Stat., 75-1 *et seq*. North Dakota's Uniform State Antitrust Act, N.D. Cent. Code §§51-08.1-01 *et seq*., Ohio Antitrust Law, the Ohio Valentine Act, Ohio Rev. Code §§1331.01 *et seq*., Oregon Antitrust Law, ORS 646.705 *et seq*., Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. Com. Code §§15.01, *et seq*., Utah Antitrust Act, Utah Code Ann.§§76-10-911, *et seq*., the Virginia Antitrust Act, Va. Code §59.1-9.1 *et seq*., the West Virginia Antitrust Act, W. Va. Code §47-18-1 *et seq*., the West Virginia Consumer Credit and Protection Act, W. Va. Code §46A-1-101 *et seq*., the Wisconsin Trust and Monopolies Law, §§133.03(1), 133.04, 133.16, 133.17 and 133.18, Stats., or any state antitrust and/or consumer protection law, arising out of or relating to the Individual Defendants' alleged policies, practices, courses of dealing, agreements with optometrists or any contact lens manufacturer, and/or pressure on any contact lens manufacturer not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturer's authorized distributors from doing so, and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses ("Released Claims");

- 15 -

(b)     The class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity: (i) shall not bring any proceeding to establish liability against any Released Party based, in whole or in part, upon any Released Claim; and (ii) upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, covenant and agree not to seek thereafter to establish liability against any Released Party based, in whole or in part, upon any Released Claim.

(c)     In the event Vistakon, as a non-settling defendant, obtains judgment, in whole or in part, against the Individual Defendants for contribution or indemnity based upon any claim a class plaintiff, a State, Florida or a Settlement Class member, State resident or Florida resident who has not timely exercised the right to opt out as provided in the Court-approved notice: (i) has asserted under state law against Vistakon in any action in MDL 1030; or (ii) has asserted or may assert under state law against Vistakon arising out of or relating to the Individual Defendants' alleged policies, practices, courses of dealing, agreements with optometrists or any contact lens manufacturer, and/or pressure on any contact lens manufacturer not to sell contact lenses directly to alternative channels of distribution and/or to restrain such manufacturer's authorized distributors from doing so, and/or to restrain consumer access to prescriptions or work orders needed to obtain contact lenses, (1) such class plaintiff or Settlement Class member, in the case of a judgment arising out of a class plaintiff or Settlement Class member's claim, (2) such State or State resident, in the case of a judgment arising our of a claim by a State or State resident who is not a Class member, or (3) Florida or such Florida resident, in the case of a judgment arising out of a

- 16 -

claim by Florida or a Florida resident, shall reduce any judgment or proportion thereof obtained against Vistakon by the proportionate amount of such judgment attributable to the Individual Defendants.  In the event the judgment or proportion thereof is not so reduced, such class plaintiff, State, Florida or such Settlement Class member, State resident or Florida resident shall not attempt to collect from Vistakon such amount attributable to the Individual Defendants.

(d)     Nothing in this Settlement Agreement is intended to constitute, or shall be construed as, a release of or a covenant not to sue any party other than the Released Parties, including, but not limited to, Vistakon for any claim or cause of action whatsoever, including, but not limited to, claims founded, in whole or in part, upon the conduct of the Released Parties.

12.     **Waiver and Released Rights Under California Civil Code Section 1542.**

(a)     Upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, the class plaintiffs and all Settlement Class members, States residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, the States and Florida (in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economies and general welfare) and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, expressly waive and release any and all provisions, rights and benefits conferred by §1542 of the California Civil Code, which provides:

> Section 1542. ***Certain Claims Not Affected by General Release.*** A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor;

or by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to §1542 of the California Civil Code.

- 17 -

(b)      The class plaintiffs and all Settlement Class members, State residents and Florida residents, their successors, heirs and assigns, and anyone acting on their behalf, including in a representative or derivative capacity, and the States and Florida and their assigns, may, after final approval of this Settlement Agreement pursuant to paragraph 9 hereof, discover facts other than or different from those which he, she or it knows or believes to be true with respect to Released Claims.  Nevertheless, upon this Settlement Agreement becoming final under paragraph 9 hereof, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, their successors, heirs and assigns, and the States and Florida in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom they may act, and as *parens patriae* on behalf of their economics and general welfare, and their assigns, and anyone acting on their behalf, including in a representative or derivative capacity, waive and fully, finally and forever settle and release, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other or different facts.

13.      **Termination by Reason of Court Action**.  In the event that this Settlement Agreement does not become final pursuant to paragraph 10 hereof, it shall become null and void and have no force and effect, except as expressly provided otherwise herein.

14.      **Rescheduling of Events in Scheduling Order**.  In the event this Settlement Agreement is terminated pursuant to paragraph 7 or paragraph 13 hereof, the class plaintiffs, the States, Florida  and the Individual Defendants shall use their best efforts to reschedule events in MDL 1030 that have been suspended as to the Individual Defendants, in a manner that will reasonably accommodate the litigation interests of the class plaintiffs, the States, Florida, and the Individual Defendants.  In such event, the Individual Defendants reserve the

right to move for a separate trial of the Class Action, the States Action and/or Florida Action against them.

15. **Inadmissibility of Settlement Agreement.** This Settlement Agreement, including all exhibits, whether or not it becomes final pursuant to paragraph 10 hereof, and any and all negotiations, documents and discussions associated with it, shall not constitute or be construed as an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the Individual Defendants or of the truth of any of the claims or allegations in the Class Action, the States Action, the Florida Action or any other action in MDL 1030.

16. **Return of the Individual Defendants' Discovery Materials.** The class plaintiffs, the States, Florida and their respective counsel agree that, except as otherwise required by law, all materials produced by, or information discovered from, or records of information discovered from, or produced by, the Individual Defendants, pursuant to the Federal Rules of Civil Procedure or any state law or rule authorizing civil investigation demands, including all copies thereof (collectively, "Individual Defendants Materials"), in the possession or control of the class plaintiffs, the States, Florida or their counsel, experts, consultants or agents shall, within sixty (60) days after the final termination of the Class Action, the States Action and the Florida Action, be destroyed or, at the election of the respective plaintiffs, returned to the Individual Defendants. Upon the Individual Defendants' request, counsel for the class plaintiffs, counsel for the States and counsel for Florida shall provide a written declaration certifying that all the Individual Defendants Materials have been destroyed or returned to the Individual Defendants, as the case may be.

17. **Notices.** All notices, demands, requests and other communications (collectively "Notices") given or served by any party in connection with this Settlement Agreement shall be in writing. Notices shall be given by hand delivery, with receipt, or by nationally recognized overnight courier, with receipt, to each of the following:

- 19 -

Notices to Class Plaintiffs:

Dennis Stewart, Esq.
Joy Ann Bull, Esq.
Milberg Weiss Bershad
 Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, California 92101

George W. Sampson, Esq.
Hagens & Berman
1301 Fifth Avenue, Suite 2929
Seattle, Washington 98101

Stuart D. Wechsler, Esq.
Wechsler Harwood Halebian
 & Feffer LLP
488 Madison Avenue, 8th Floor
New York, NY  10022

Notices to the States and Florida provided to the persons set forth below on the

signature pages of this Settlement Agreement at the addresses set forth on such pages.

Notices to the Individual Defendants:

Edward C. LaRose
Trenam, Kemker, Scharf, Barkin, Frye,
O'Neill & Mullis, P.A.
Post Office Box 1102
Tampa, Florida 33601-1102

Geoffrey B. Schwartz
Huey, Guilday & Tucker
P.O. Box 12500
Tallahassee, Florida 32308

John R. Howes
Trial Lawyers Building, Suite 4F
633 S.E. 3rd Avenue
Ft. Lauderdale, Florida 33301

18.     **Binding Nature of Agreement.**  This Settlement Agreement shall be binding

upon, and inure to the benefit of, the Individual Defendants' successors and assigns.  Upon

this Settlement Agreement becoming final under paragraph 10 hereof, it shall be binding

upon, and inure to the benefit of, all Settlement Class members, State residents and Florida

residents who have not timely exercised the right to opt out as provided in the Court-

approved notice, their heirs and assigns, and upon the States and Florida and their assigns.

19.     **Complete Agreement.**  This Settlement Agreement contains an entire,

complete, and integrated statement of each and every term and provision agreed to by and

among the parties; it is not subject to any condition not provided for herein; and it supersedes

all prior agreements between the parties with respect to its subject matter.  This Settlement

Agreement shall not be modified in any respect except by a writing executed by all of the parties.

20.    **Mutual Drafting of Agreement**.  None of the parties to this Settlement Agreement shall be considered its drafter for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

21.    **Exclusive Jurisdiction**.  Upon this Settlement Agreement becoming final pursuant to paragraph 10 hereof, the Individual Defendants, the class plaintiffs and all Settlement Class members, State residents and Florida residents who have not timely exercised the right to opt out as provided in the Court-approved notice, the States and Florida agree irrevocably: (i) to submit to the exclusive jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement, including its applicability; and (ii) not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of the United States District Court for the Middle District of Florida, Jacksonville Division, or that such Court is an improper venue or an inconvenient forum.

22.    **Counterparts**.  This Settlement Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

**Co-Lead Counsel for Class Plaintiffs:**

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
DENNIS STEWART
JOY ANN BULL

_____
DENNIS STEWART

600 West Broadway, Suite 1800

HAGENS BERMAN LLP
GEORGE SAMPSON

_____
GEORGE SAMPSON

1301 Fifth Avenue, Suite 2900

- 21 -

## ESCROW AGREEMENT

THIS AGREEMENT is made and entered into as of May, 2001, by and between (1) Individual Defendants: L. Edward Elliott, John A. Gazaway, Richard Hopping, Earle Hunter, Timothy Kime, Paul Klein, James C. Leadingham, Melvin Remba, Lee Rigel, Ronald Snyder, Jack Solomon, William David Sullins, Jr., and Stanley Yamane ("Individual Defendants"); (2) the plaintiffs, both individually and in their capacities as class representatives (the "class plaintiffs"), and their counsel, in Civil Action Nos. 94-657-CIV-J-20C, 94-635-CIV-J-20, 94-1214-CIV-J-20, and 94-780-CIV-J-20 (collectively, the "Class Action"), pending in *In re Disposable Contact Lens Antitrust Litigation*, 94-MDL-1030-J-20A, in the United States District Court for the Middle District of Florida, Jacksonville Division ("MDL 1030"); (3) the plaintiff States of Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oregon, Texas, Utah, West Virginia and Wisconsin, and the commonwealths of Massachusetts, Pennsylvania and Virginia (collectively, the "States"), in their capacities as sovereigns, as *parens patriae* on behalf of natural persons for whom the States may act, and as *parens patriae* on behalf of the States' economies and general welfare on Civil Action No. 97-299-CIV-J-20A; 97-698-CIV-J-21C; 97-861-CIV-J-20A; 97-928-CIV-J-20A; 98-93-CIV-J-21A; 98-511-CIV-J-21B; 98-515-CIV-J-21C; 98-536-CIV-J-20A; and 98-638-CIV-J-21A (the "States Action"), pending in MDL 1030; (4) the State of Florida ("Florida"), in its capacity as sovereign, as *parens patriae* on behalf of natural persons for whom Florida may act, and as *parens patriae* on behalf of Florida's economy and general welfare in civil Action No. 94-619-Civ-J-20, pending in MDL-1030; (5) Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") (one of co-lead counsel for the class plaintiffs and the Class and as Escrow Agent (as defined in paragraph 1 herein)); (6) Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, Professional Association ("Individual AOA Defendants

- 1 -

counsel"); (7) John R. Howes ("Klein and Snyder counsel"); and Huey, Guilday & Tucker ("Yamane counsel").

WHEREAS, as of May 22, 2001, the Individual Defendants, the class plaintiffs, the States, and Florida entered into a Settlement Agreement (the "Settlement Agreement");

WHEREAS, the class plaintiffs, the States, Florida and the Individual Defendants will seek a Final Order and Judgment (as hereinafter defined) from the Court approving the Settlement Agreement and the dismissal of the Class Action, Florida Action and the States Action against the Individual Defendants;

WHEREAS, pursuant to that Settlement Agreement, the Individual Defendants agreed to deposit the cash consideration for the settlement, *i.e.*, $104,000, into an escrow account to be maintained at San Diego National Bank ("The Account") upon signature of the Settlement Agreement;

WHEREAS, the class plaintiffs, the States, Florida, and the Individual Defendants have entered into this Escrow Agreement to facilitate the consummation of the Settlement Agreement;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.. The class plaintiffs, the States, Florida and the Individual Defendants do hereby appoint, constitute and designate Milberg Weiss as their Escrow Agent for the purposes set forth herein, and Milberg Weiss accepts the agency created under this Escrow Agreement and agrees to perform the obligations imposed herein.

2. As used herein, "Final Order and Judgment" means the Court giving final approval to the Settlement Agreement pursuant to paragraph 10 thereof;

3.     As used herein, "Florida Counsel" shall mean the Attorney General of Florida, acting through Patricia A. Conners, Chief, Antitrust Section, or such other representative as the Florida Attorney General may designate in writing.

4.     As used herein, "States Counsel" shall mean the Attorney General of Maryland acting through Assistant Attorney General John Tennis, or such other representative as the Maryland Attorney General may designate in writing.

5.     From the date of this Escrow Agreement until the Escrow Agent receives joint written instructions from Milberg Weiss, Individual AOA Defendants counsel, Klein and Snyder counsel, Yamane counsel, Florida counsel, and the States Counsel that the Final Order and Judgment has been entered, "Counsel," as used hereinafter, shall mean Milberg Weiss, Individual AOA Defendants counsel, Klein and Snyder counsel, Yamane counsel, Florida Counsel and States Counsel.  When "Counsel" means Milberg Weiss, Individual AOA Defendants Counsel, Klein and Snyder counsel, Yamane counsel, Florida counsel, and States Counsel, instructions, confirmations and authorizations to or from the Escrow Agent must be received from Milberg Weiss, Individual Defendants AOA Counsel, Klein and Snyder counsel, Yamane counsel, Florida counsel, and States Counsel.

6.     The Individual Defendants have sent or will send checks for $104,000 (one hundred four thousand dollars) payable to the Milberg Weiss Bershad Hynes & Lerach LLP Trust Account.  Upon execution of the Settlement Agreement, the Individual Defendants will authorize Milberg Weiss to deposit in the Account the $104,000 which, together with interest which thereafter accrues in the Account, shall constitute the "Escrow Fund."

7.     The Escrow Agent shall invest the Escrow Fund in a money market fund which invests solely in United States Treasury securities which are direct obligations of the United States of America or obligations of the principal of and the interest on which are unconditionally guaranteed by the United States of America.  The Escrow Agent may

sell or liquidate any of the investments at any time if the proceeds thereof are required for any release of funds permitted or required hereunder, and the Escrow Agent shall not be liable or responsible for any loss, charge, load, premium loss and/or penalty resulting from any such sale or liquidation. If an investment must be liquidated, the proceeds of the liquidation will not be available for distribution until the Escrow Agent has received immediately available funds from the sale or liquidation of the investment. Any losses or damages from such liquidation shall be deducted from the Escrow Fund.

8.     All income earned by the Escrow Fund shall be reinvested by the Escrow Agent in accordance with the above-referenced written instructions of Counsel and shall become a part of the Escrow Fund.

9.     Before the Settlement Agreement becomes final, the Escrow Agent is hereby authorized to transfer and distribute funds from the Escrow Fund by check, wire, electronic, or internal process, in accordance with paragraphs 5 and 7 hereof and upon such other prior written   authorization from Counsel as it may receive.   Such authorization may be by facsimile transmission or other written communication. Except as provided in paragraph 8 hereof, the Escrow Agent shall disburse no funds from the Escrow Fund before the Settlement Agreement is final pursuant to paragraph 10 of the Settlement Agreement without prior written authorization of Counsel.

10.     Subject to such  further orders and/or directions as may be made by the Court, after the Settlement Agreement is final, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of the Settlement Agreement or Orders of the Court.

11.     All funds deposited with or held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to an Order of the Court.

12.   In the event of disagreement between Counsel with respect to the distribution of funds from the Escrow Fund, the Escrow Agent shall hold the disputed funds until the disagreement is resolved.

13.   Any Federal, State, Municipal or local taxes due as a result of income earned by, or assets in, the Escrow Fund are to be paid from the Escrow Fund by the Escrow Agent. The Escrow Agent shall make all estimated tax payments and make or file any returns or reports relative thereto, upon such confirmations by Counsel as it may request.   In the event any tax liability is finally assessed against and paid by the Individual Defendants as a result of income earned by, or assets in, the Escrow Fund, the Individual Defendants shall be entitled to reimbursement of such payment from the Escrow Fund.  In that event, the Individual Defendants shall present proof of payment to the Escrow Agent and, within five (5) business days of receipt, the Individual Defendants shall be reimbursed for such payment from the Escrow Fund.

14.   The Individual Defendants, Class Counsel, Florida Counsel, the States' Counsel, and the Escrow Agent agree to treat the Escrow Fund as being at all times as one or more "qualified settlement funds" within the meaning of Treas. Reg. Section 1.468B-1. In addition, the Escrow Agent and, as required, the Individual Defendants, Class Counsel, Florida Counsel, and States' Counsel, shall jointly and timely make such elections as necessary or advisable to carry out the provisions of this section, including the "relation-back election" (as defined in Treas. Reg. Section 1.468B-1) back to the earliest permitted date.  Such elections shall be made in compliance with the procedures and requirements contained in such regulations.  It shall be the responsibility of the Escrow Agent to timely and properly prepare, and deliver the necessary documentation for signature by all necessary parties, and thereunder to cause the appropriate filing to occur.

15.   For the purpose of Section 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent.  The Escrow Agent shall timely and properly file all informational and

other tax returns necessary or advisable with respect to the Escrow Fund (including without limitation the returns described in Treas. Reg. Section 1.468B-2(k)). Such returns (as well as the election described above) shall be consistent with this paragraph and in all events shall reflect that all taxes (including any interest or penalties) on the income earned by the Escrow Fund shall be paid out of the Escrow Fund.

16.    All (a) taxes (including any interest or penalties) arising with respect to the income earned by the Escrow Fund, including any taxes or tax detriments that may be imposed upon the Individual Defendants with respect to any income earned by the Escrow Fund for any period during which the Escrow Fund does not qualify as a "qualified settlement fund" for Federal or state income tax purposes ("Taxes") and (b) expense and costs incurred in connection with the operation and implementation of this paragraph (including, without limitation, expense of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing or failing to file the appropriate returns) ("Tax Expenses"), shall be paid out of the Escrow Fund. In all events, the Individual Defendants shall have no liability or responsibility for the Taxes or Tax Expenses. The Escrow Agent shall indemnify and hold the Individual Defendants harmless for Taxes or Tax Expenses (including, without limitation, taxes payable by reason by reason of any such indemnification). In the event that any income earned by the Escrow Fund is under applicable Federal or state income tax laws includible in the taxable income of the Individual Defendants, the amount of indemnification due hereunder shall be equal to the product of (i) the amount of such income inclusion (increased by any additional amounts includible in income as a result of this indemnification) and (ii) as to the Individual Defendants, the maximum marginal corporate income or franchise tax rate (before credits) applicable on ordinary taxable income that is imposed under the tax laws of the applicable taxing jurisdiction before net operating loss carryovers for the Individual Defendants for the taxable year in which indemnification hereunder becomes due and payable. Further, Taxes and Tax Expenses

- 6 -

shall be treated as, and considered to be, a cost of administration of this Escrow Agreement and shall be timely paid by the Escrow Agent out of the Escrow Fund without prior order from the Court and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to class members or, if necessary, from refund to the Individual Defendants, any funds necessary to pay such amounts, including the establishment of adequate reserves for any such contingent Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treas. Reg. Section 1.468B-2(1)(2)).   The parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this paragraph.

17.     The Escrow Agent shall be entitled to rely upon the most recent instructions from Counsel as to the names of the persons authorized to instruct the Escrow Agent. Counsel shall provide a list of the signatures of such authorized persons to the Escrow Agent from time to time.

18.     The Escrow Agent shall be protected in acting upon written notice, request, waiver, consent, receipt or other paper document furnished to it by Counsel, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information contained therein, which they in good faith believe to be genuine and what it purports to be.

19.     Should the Escrow Agent receive or become aware of any demands or claims with respect to the Escrow Fund, other than those as contemplated by the Settlement Agreement, they shall have the right to apply to the District Court, on notice to the parties hereto, for appropriate instructions.   Upon application to and order of the District Court, on notice to the parties, the Escrow Agent shall be entitled to reimburse themselves from the Escrow Fund for all costs, damages, judgments and expenses, including reasonable attorneys' fees, suffered or incurred by the Escrow Agent in connection with or arising out of their action with respect to the Escrow Fund.

20.     This Escrow Agreement may not be assigned by the Escrow Agent without prior written approval of the parties hereto; provided, however, that upon thirty (30) days written notice by the Escrow Agent to the parties hereto, the Escrow Agent may resign as Escrow Agent hereunder.  Any assets held by such Escrow Agent under the terms of this agreement as of the effective date of the resignation shall be delivered to a successor escrow agent designated in writing by Counsel.  If no successor agent has been  appointed as of the effective date of the resignation, all obligations of such Escrow Agent hereunder shall nevertheless cease and terminate.  In the event the Escrow Agent resigns and a successor is not appointed as provided in this paragraph, the Escrow Agent's sole responsibility thereafter shall be to keep safely all Escrow Funds held by them and to deliver the same to a person designated by Counsel or in accordance with the direction of a final order or judgment of a court of competent jurisdiction.

21.     This Escrow Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the parties hereto.

22.     This Escrow Agreement will be governed by and construed in accordance with the laws of the State of Florida.

23.     For purposes of notice, correspondence and mailing of checks, or wiring of funds, the parties' addresses shall be:

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
DENNIS STEWART
JOY ANN BULL
600 West Broadway, Suite 1800
San Diego, CA  92101
Telephone:  619/231-1058
FAX:  619/231-7423

ROBERT A. BUTTERWORTH
ATTORNEY GENERAL
Patricia A. Conners
Chief, Antitrust Section
STATE OF FLORIDA
PL-01 The Capitol
Tallahassee, FL  32399-1050
Telephone:  850/414-3600
FAX:  850/488-9134

- 8 -

EDWARD C. LAROSE
TRENAM, KEMKER, SCHARF, BARKIN, FRYE,
 O'NEILL & MULLIS
Professional Association
101 E. Kennedy Blvd., Suite 2700
Tampa, FL 33601
Telephone: 813/223-7474
FAX: 813/229-6553

JOHN R. HOWES
Trial Lawyers Building, Suite 4R
633 S.E. 3rd Avenue
Ft. Lauderdale, Florida 33301
Telephone: 954/763-6003
FAX: 954/462-2255

GEOFFREY B. SCHWARTZ
HUEY, GUILDAY & TUCKER
P.O. Box 12500
Tallahassee, Florida 32308
Telephone: 850/224-7091
FAX: 850/222-2593

J. JOSEPH CURRAN, JR.
ATTORNEY GENERAL
A.A.G. JOHN TENNIS
STATE OF MARYLAND
200 Saint Paul Place
Baltimore, MD 21202-2202
Telephone: 410/576-6474
FAX: 410/576-7830

24.     All signatories to this Escrow Agreement warrant that they have full and complete authority to enter into and sign this Escrow Agreement on behalf of the entity or person they represent.

25.     This Escrow Agreement may be executed in multiple counterparts, each of which shall be deemed original, and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the class plaintiffs, the States, Florida, the Individual Defendants, and the Escrow Agent have caused this Escrow Agreement to be signed as of the 22nd day of _____May_____, 2001.

F I L E   C O P Y

Date Printed: 11/02/2001


Notice sent to:

    ____ Charles P. Pillans III, Esq.
          Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.
          The Bedell Bldg.
          101 East Adams St.
          Jacksonville, FL  32202

    ____ Patrick P. Coll, Esq.
          Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.
          The Bedell Bldg.
          101 East Adams St.
          Jacksonville, FL  32202

    ____ Daniel M. Abuhoff, Esq.
          Debevoise & Plimpton
          919 Third Ave.
          New York, NY  10022

    ____ Jeffrey S. Jacobson, Esq.
          Debevoise & Plimpton
          919 Third Ave.
          New York, NY  10022

    ____ Charles P. Reichmann, Esq.
          Debevoise & Plimpton
          919 Third Ave.
          New York, NY  10022

    ____ Robert W. Yalen, Esq.
          Debevoise & Plimpton
          919 Third Ave.
          New York, NY  10022

    ____ R. Scott Palmer, Esq.
          Berman, DeValerio, Pease, Tabacco,
          Burt & Pucillo
          Northbridge Centre, Suite 1701
          515 N. Flagler Dr.
          West Palm Beach, FL  33401

    ____ C. Oliver Burt III, Esq.
          Berman, DeValerio, Pease, Tabacco,
          Burt & Pucillo
          Northbridge Centre, Suite 1701
          515 N. Flagler Dr.
          West Palm Beach, FL  33401

    ____ Parker D. Thomson, Esq.
          Thomson, Muraro, Razook & Hart, P.A.
          1700 Sun Bank Int'l Center
          One SE 3rd Ave.
          Miami, FL  33131-1710

_____   Steven W. Davis, Esq.
        Thomson, Muraro, Razook & Hart, P.A.
        1700 Sun Bank Int'l Center
        One SE 3rd Ave.
        Miami, FL  33131-1710

_____   Patricia A. Conners, Esq.
        Attorney General's Office
        Antitrust Section
        PL-01, The Capitol
        Tallahassee, FL  32399

_____   Richard A. Ripley, Esq.
        Howrey, Simon, Arnold & White, LLP
        1299 Pennsylvania Ave., N.W.
        Washington, DC  20004-2402

_____   Margaret M. Zwisler, Esq.
        Howrey, Simon, Arnold & White, LLP
        1299 Pennsylvania Ave., N.W.
        Washington, DC  20004-2402

_____   Darren B. Bernhard, Esq.
        Howrey, Simon, Arnold & White, LLP
        1299 Pennsylvania Ave., N.W.
        Washington, DC  20004-2402

_____   James Whitelaw Middleton, Esq.
        Rogers, Towers, Bailey, Jones & Gay
        1301 Riverplace Blvd., Suite 1500
        Jacksonville, FL  32207

_____   Kathryn A. Meisel, Esq.
        Johnson & Johnson
        One Johnson & Johnson Plaza
        New Brunswick, NJ  08933-7002

_____   Harry R. Detwiler Jr., Esq.
        Alford & Detwiler
        542 E. Park Ave.
        Tallahassee, FL  32301

_____   Thomas F. Cullen Jr., Esq.
        Jones, Day, Reavis & Pogue
        51 Louisiana Ave. NW
        Washington, DC  20001-2113

_____   William V. O'Reilly, Esq.
        Jones, Day, Reavis & Pogue
        51 Louisiana Ave. NW
        Washington, DC  20001-2113

_____   Edward C. LaRose, Esq.
        Trenam, Kemker, Scharf, Barkin,
        Frye, O'Neill & Mullis, P.A.
        101 E. Kennedy Blvd., Suite 2700
        P.O. Box 1102
        Tampa, FL  33601-1102

_____   Edward A. Groobert, Esq.



Dykema Gossett, P.L.L.C.
1300 I St., NW
Suite 300, W. Franklin Sq.
Washington, DC  20005-3306

_____  D. Biard MacGuineas, Esq.
Dykema Gossett, P.L.L.C.
1300 I St., NW
Suite 300, W. Franklin Sq.
Washington, DC  20005-3306

_____  Geoffrey Bogart Schwartz, Esq.
Huey, Guilday, Tucker, Schwartz & Williams, P.A.
1983 Centre Point Blvd, Suite 200
P.O. Box 12500
Tallahassee, FL  32317-2500

_____  S. Perry Penland Sr., Esq.
Law Office of S. Perry Penland, Sr.
219 N. Newnan St.
2nd Floor
Jacksonville, FL  32202

_____  Stuart D. Wechsler, Esq.
Wechsler, Harwood, Halebian & Feffer LLP
488 Madison Ave.
8th Floor
New York, NY  10022

_____  Lesley Gay Blackner, Esq.
Blackner, Stone & Assoc.
123 Australian Ave.
Palm Beach, FL  33480

_____  Douglas D. Chunn, Esq.
Douglas D. Chunn, P.A.
225 Water St., Suite 1250
Jacksonville, FL  32202

_____  Fred T. Isquith, Esq.
Wolf, Haldenstein, Adler, Freeman & Herz
270 Madison Ave.
New York, NY  10016

_____  Steve W. Berman, Esq.
Hagens & Berman
1301 Fifth Ave.
Suite 2929
Seattle, WA  98101

_____  George W. Sampson, Esq.
Hagens & Berman
1301 Fifth Ave.
Suite 2929
Seattle, WA  98101

_____  Dennis Stewart, Esq.
Milberg, Weiss, Bershad, Hynes & Lerach
600 W. Broadway, Suite 1800
San Diego, CA  92101

___  Leonard B. Simon, Esq.
     Milberg, Weiss, Bershad, Hynes & Lerach
     600 W. Broadway, Suite 1800
     San Diego, CA  92101

___  Jonathan W. Cuneo, Esq.
     The Cuneo Law Group
     317 Massachusetts Ave., N.E.
     Suite 300
     Washington, DC  20002

___  Michael J. Boni, Esq.
     Kohn, Swift & Graf, P.C.
     1101 Market St.
     Suite 2400
     Philadelphia, PA  19107-3389

___  Robert L. Hubbard, Esq.
     Attorney General's Office
     120 Broadway, Suite 2601
     New York, NY  10271-0332

___  John Robert Howes, Esq.
     Law Office of John Robert Howes
     P.O. Box 697
     Ft. Lauderdale, FL  33302

___  Anne Marie Cushmac, Esq.
     Attorney General's Office
     900 E. Main St.
     Richmond, VA  23219

___  Stephen Carter, Esq.
     Office of Attorney General
     Indiana Government Center S.
     402 W. Washington St.
     Indianapolis, IN  46204

___  M. Kristin Spath, Esq.
     Office of the Attorney General
     Consumer Protection & Antitrust Bureau
     33 Capitol St.
     33 Capitol St.
     Concord, NH  03301

___  Dale A. Comer, Esq.
     Office of Attorney General
     2115 State Capitol
     Lincoln, NE  68509

___  Thomas P. Dove, Esq.
     The Furth Firm
     201 Sansome St., Suite 1000
     San Francisco, CA  94111

___  Michael J. Korn, Esq.
     Korn & Zehmer, P.A.
     6620 Southpoint Dr. S., Suite 200
     P.O. Box 550700

Jacksonville, FL  32255-0700

____  Garth T. Vincent, Esq.
      Munger, Tolles & Olson LLP
      355 South Grand Ave., 35th floor
      Los Angeles, CA  90071-1570

____  Harold S. Lippes, Esq.
      Harold S. Lippes, P.A.
      One Enterprise Center
      225 Water Street, Suite 2100
      Jacksonville, FL  32202

____  Albert A. Foer, Esq.
      American Antitrust Institute
      2919 Ellicott St., NW
      Washington, DC  20008-1022

____  John J. Pentz, Esq.
      The Objectors Group
      717R Boston Post Rd.
      Sudbury, MA  01776

____  Paul S. Rothstein, Esq.
      Law Office of Paul S. Rothstein
      626 NE First St.
      Gainesville, FL  32601

____  Edward W. Cochran, Esq.
      Law Office of Edward W. Cochran
      2872 Broxton Rd.
      Shaker Heights, OH  44120

____  Frank H. Tomlinson, Esq.
      Pritchard, McCall & Jones, LLC
      800 Financial Center
      Birmingham, AL  35203

____  Kearney Dee Hutsler, Esq.
      Kearney Dee Hutsler P.C.
      P.O. Box 59345
      Birmingham, AL  35259

____  Charles M. Thompson, Esq.
      Charles M. Thompson & Assoc. P.C.
      2142 Highland Ave.
      Birmingham, AL  35205

____  R. Stephen Griffis, Esq.
      R. Stephen Griffis P.C.
      P.O. Box 361565
      Birmingham, AL  35236

____  Gregory A. Lawrence, Esq.
      Thomas & Lawrence, P.A.
      300 W. Adams St.
      Suite 480
      Jacksonville, FL  32202

____  N. Albert Bacharach Jr., Esq.



Law Office of N. Albert Bacharach, Jr.
115 N.E. 6th Ave.
Gainesville, FL  32601

_____   Leslie A. Wickes, Esq.
Volpe, Bajalia, Wickes & Rogerson
1301 Riverplace Blvd., Suite 1700
Jacksonville, FL  32207

_____   Frank R. Siderius, Esq.
Siderius Lonergan & Martin, LLP
500 Union St.
847 Logan Bldg.
Seattle, WA  98101-2394

_____   Michael S. Popok, Esq.
Kel-Tec CNC Industries, Inc.
701 Brickell Ave.
Suite 1900
Miami, FL  33131

_____   Alice B. Mitinger, Esq.
Thorp, Reed & Armstrong, LLP
One Oxford Center
301 Grant St., 14th Floor
Pittsburgh, PA  15219-1425

_____   Paul Halpern, Esq.
Consolidated Vision Group
General Counsel
7255 Crescent Blvd.
Pennsauken, NJ  08110

_____   Barry Friedman, Esq.
New York University School of Law
40 Washington Square S.
Room 317
New York, NY  10012